# EXHIBIT 1

Carl D. Crowell, OSB No. 982049
email: crowell@kite.com
CROWELL LAW
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for plaintiff

RECEIVED
APR 03 2014
Marion County Circuit Court

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| VOLTAGE PICTURES, LLC | Case No.: 14C13823 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| DOES 1 - 50 | ORS 647.105 – State Trademark |
| Defendants. | This matter is NOT subject to Mandatory Court Arbitration |
| | Equitable Relief Only |

Plaintiff Voltage Pictures, LLC, complains and alleges as follows:

JURISDICTION AND VENUE

1. This is a suit for trademark infringement under ORS 647.105.

2. Jurisdiction and venue before this Court is proper as based pre-filing investigations it is believed that several defendants reside in Marion County and all defendants reside in the State of Oregon.

///

///

COMPLAINT - Page 1 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

PARTIES

THE PLAINTIFF

3.  Plaintiff Voltage Pictures, LLC ("Voltage" / "Plaintiff") is a limited liability company with principal offices in Los Angeles, California that produces, markets and distributes motion pictures including the subject work in this matter, a motion picture titled *Dallas Buyers Club*.

The Rights of the Plaintiff

4.  Plaintiff is a producer of the motion picture titled *Dallas Buyers Club*, released in 2013. *Dallas Buyers Club* is an acclaimed motion picture nominated for six Academy Awards (Oscars), winning Best Actor, Best Supporting Actor and Best Makeup.  Plaintiff's motion picture also won numerous Screen Actors Guild Awards, Golden Globes and other awards.

5.  In the marketing of plaintiff's motion picture, plaintiff has branded the motion picture with its distinctive and registered trademark, VOLTAGE PICTURES, which identifies the motion picture as being associated with plaintiff.

6.  Plaintiff has sole and exclusive rights to use the mark VOLTAGE PICTURES in association with its goods and services both within the State of Oregon and nationwide.

7.  The VOLTAGE PICTURES mark is unique, distinctive, and clearly visible in the presentation and the viewing of plaintiff's motion picture.

8.  The VOLTAGE PICTURES mark is valuable, well known and famous as it is associated with numerous award winning motion pictures in addition to *Dallas Buyers Club*.

9.  The mark VOLTAGE PICTURES has been registered with the State of Oregon pursuant to ORS 647.015, Registry Number 42677.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

10. Pursuant to ORS 647.095, a person who without the consent of Voltage Pictures, uses the VOLTAGE PICTURES mark in connection with the distribution of a reproduction, counterfeit or copy of a motion picture is liable for the equitable remedies provided in ORS 647.105.

11.    Pursuant to ORS 647.105, "The owner of a mark registered under this chapter may proceed in a civil action to seek an injunction against the … use, display or sale of a counterfeit or imitation of the mark."

12.    Plaintiff comes to this court seeking the equitable remedies provided by ORS Chapter 647, namely an injunction against those who have and would, without authorization, copy, reproduce and distribute motion pictures that bear its registered trademark.

<div align="center">THE DEFENDANTS</div>

13.    Defendants are participants in a peer-to-peer file sharing network.

14.    The defendants have been identified as Does in the instant case and are each indicated in the attached Exhibit 1 by a specific internet protocol ("IP") address used at a specific time to copy, reproduce and distribute a copy, counterfeit or reproduction of plaintiff's motion picture bearing plaintiff's registered mark without authorization.

15.    The defendants and each of them have improperly and without authorization from plaintiff copied, downloaded, shared and uploaded plaintiff's motion picture using a peer-to-peer network.

16.    The defendants have infringed plaintiff's State Trademark Rights.

17.    The defendants and their conduct are more specifically described below.

///

///

COMPLAINT - Page 3 of 15

Voltage v. Does 1 – 50 (A)

JOINDER

18. Plaintiff acknowledges that joinder in this action under ORCP 28 (A) is permissive in that plaintiff's claims arise out of the same occurrences or transactions, or series of occurrences or transactions and that there are questions of law and fact common to each of the defendants.

19. All defendants have collectively acted through the BitTorrent protocol to download and distribute plaintiff's motion picture bearing plaintiff's registered trademark.

20. All of the defendants, in a near contemporaneous time frame, were distributing the exact same file through Bit-Torrent, potentially with each other and jointly to third parties.

21. All defendants have acted through the BitTorrent protocol to jointly contribute to the functionality of the BitTorrent network by copying, reproducing and distributing plaintiff's motion picture bearing plaintiff's registered trademark.

22. As such, plaintiff's rights to relief, as stated below, ultimately arise out of the same series of transactions and occurrences.

23. This action also raises substantial questions of law and fact common to all defendants.

24. Permissive joinder in the instant case permits a more efficient management of the claims of plaintiff against the several defendants and reduces the costs to plaintiff and defendants and the costs and burdens on the Court.

25. Notice is provided that on being specifically identified and on request from an identified infringing defendant, with leave of the Court, plaintiff agrees to sever any defendant that claims prejudice in being joined in this matter and to proceed against each such defendant individually.

///

///

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

BACKGROUND

26. In the production of a motion picture there are countless expenses and labors, many of which are not evident in the final project, including writers, staff persons, construction workers and others.

27. Indeed, the final product produced, which may be less than two hours long is often sourced from countless hours of preparation, filming, post-production and promotion to bring the final product to viewers.

28. The end product that many consumers see is a few hours in a theater or a DVD product that once production is complete has a nominal cost on a per-viewing experience. However, this is misleading to the true costs of the motion picture as the costs to view a completed motion picture or produce a single DVD are nominal compared to what is often years of work by many of people leading up to the end product.

29. Added to this is that most people seen related to the end product, movie stars, directors and other persons of note, are generally perceived as highly compensated. This leads to the common misunderstanding that people involved in motion pictures are already wealthy.

30. When the perception is that those affiliated with a motion picture are already wealthy and the end product, such as a DVD, costs little to make, a reality disconnect often builds in the minds of much of the public, namely that those associated with a motion picture do not need any more money.

31. When this reality disconnect meets with the ready availability of pirated copies of motion pictures and the ease with which they can be pirated and downloaded at an almost anonymous level, many people feel justified in their pirating or theft of motion pictures.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

32. The result is that despite the industry's efforts to capitalize on internet technology and reduce costs to end viewers through legitimate and legal means of online viewing options such as through Netflix™, Hulu™, and Amazon Prime™, there are still those that use technology to steal motion pictures and undermine the efforts of creators through piracy and unauthorized distribution of motion pictures.

33. As noted by Senator Levin in Congressional hearings on peer-to-peer internet piracy, "taking someone's intellectual property is a serious offense, punishable by large fines. In the real world, violations of copyright law over the Internet are so widespread and easy to accomplish that many participants seem to consider it equivalent to jaywalking – illegal but no big deal.  But it is a big deal. Under U.S. law, *stealing intellectual property is just that – stealing. It hurts artists, the music industry, the movie industry, and others involved in creative work. And it is unfortunate that the software being used – called 'file sharing' as if it were simply enabling friends to share recipes, is helping create a generation of Americans who don't see the harm.*" (emphasis added)

34. In recognition of the growing problems and challenges with counterfeiting and piracy, The Oregon House of Representatives passed House Memorial 2 in 2013, which made the following findings:

Whereas the United States and other nations share **the challenge of combating intellectual piracy and the counterfeiting of intellectual property such as … films…** and technologies that affect the quality of life; and
Whereas **intellectual piracy and counterfeiting have a significant impact on Oregon's economy**, and the economies of other states and of nations around the world, which results in job and earnings losses, reduced tax revenues and increased threats to public health and safety; and
…
**Whereas protecting and enforcing intellectual property rights is crucial to the future of our innovation-based economy**; and
Whereas industries that use intellectual property extensively generate nearly $7.7 trillion in gross output and account for more than 60 percent of total exports from our nation; and

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

Whereas industries that use intellectual property extensively ... employ more than 19 million Americans, whose salaries average about 60 percent higher than salaries in industries that do not make extensive use of intellectual property; and

Whereas intellectual property infringement can undermine the nation's economic security; and

Whereas violations of intellectual property rights, ambiguities in the law and a lack of enforcement create uncertainty in the marketplace and in the legal system and undermine consumer trust; and

Whereas **intellectual property, including trademarks, [are] essential** ...; and

...

Whereas **failing to adequately protect and enforce intellectual property rights will increase counterfeiting and illicit trade;**

...

(emphasis added)

35. As such it is clear that giving effect to ORS Chapter 647, and the enforcement of intellectual property rights, and in particular the fight against counterfeiting and piracy are critical issue of importance to both the United States of America and the State of Oregon.

## PEER-TO-PEER INTERNET PIRACY

36. Peer-to-peer networks, at least in their most common form, are computer systems that enable internet users to: 1) make files (including motion pictures) stored on each user's computer available for copying by other users or peers; 2) search for files stored on other users' computers; and 3) transfer ("share") exact copies of files between computers via the Internet.

37. The particular peer-to-peer protocol at issue in this suit is the BitTorrent protocol.

38. To use BitTorrent, a user intentionally downloads a program that they then install on their computer called a "client." The BitTorrent client is the user's interface during the downloading/uploading process. The client may be free, supported by advertising, offer upgrades or add on services for a fee, or a combination of several options.

39. Users then intentionally visit a "torrent site" or network site to find media or content available for download, often using a standard web browser.

COMPLAINT - Page 7 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

40. A torrent site is often an advertising revenue or subscription supported index of media or content being made available by other users on the network and maintains a listing of movies and television programs among other protected content.

41. A user then uses the torrent site to connect with other users and exchange or "share" content though the BitTorrent protocol often with many users at the same time.

42. Internet piracy, and in particular BitTorrent piracy, though known as peer-to-peer file sharing, is often a for-profit business as many software clients, torrent sites and networks generate millions of dollars in revenue through sales and advertising.

43. To increase the value of the advertising and sometimes subscription access sold by torrent sites, many torrent sites work to expand the pool of available titles and speed of downloads through increasing the number of member peers and thus the desirability of their clients and networks.  To accomplish this they reward participants who contribute by giving them faster download speeds, greater access, or other benefits.

44. A significant element of the BitTorrent model is that those who participate and download movies not only share and upload movies with others, but participants are often rewarded through various means based on the volume and availability of content participants in turn provide the network.  In sum, there is a feedback incentive for participants as they obtain not only the benefit of their pirated copy of a movie, but they obtain other benefits by increasing the availability of pirated content to others.

45. As such there are a growing number of users that participate in peer-to-peer networks and receive personal gain or compensation in that the networks they use reward those who provide large numbers of files for upload to others.

COMPLAINT - Page 8 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel:  503-581-1240

46. On information and belief, many defendants in Exhibit 1 have been compensated through benefits received for their participation in expanding the availability of pirated content to others through BitTorrent networks, including works that bear plaintiff's mark.

47. The use of BitTorrent does more than cause harm through the theft of intellectual property. The BitTorrent distribution of pirated files is a model of business that profits from theft through sales and advertising and a system of rewards and compensation to the participants, each of whom contribute to and further the enterprise.

48. Each of the defendants is a participant in the BitTorrent distribution of pirated files furthering a model of business that profits from theft of intellectual property including plaintiff's motion picture.

<center>IP Addresses</center>

49. An Internet Service Provider, ("ISP"), grants access to the Internet and the ability to send and receive information, whether in the form of an email, photo or motion picture. To connect to the Internet a user must contract with an ISP and create an account for service either directly, or through an intermediary such as a subscriber.

50. The ISP then generally assigns each subscriber a unique IP address. An IP address is like the address used on an envelope. It is the identifier each defendant used to tell the world not only where they were sending data from, but the location to where any requested data should be sent.

51. The defendants have been identified as Does in the instant case and are indicated in the attached Exhibit 1 by a specific IP address, used at a specific time to exchange plaintiff's motion picture though the BitTorrent peer-to-peer network.

COMPLAINT - Page 9 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

52. Under the BitTorrent protocol each file has a unique "hash" (a file identifier generated by an algorithm) tied to a specific file. In the instant case, the hash identified on Exhibit 1 has been confirmed as being for an unauthorized copy of plaintiff's motion picture bearing plaintiff's registered mark.

53. Plaintiff has, to a reasonable degree of scientific certainty, learned the ISP used by each defendant, the torrent file copied and distributed by each defendant, the BitTorrent client application utilized by each defendant, and the likely location of each defendant, at least down to the state level, if not the county level at the time of infringement as determined by geolocation technology. Relevant information related to each defendant's IP address, and the time of infringement is provided in Exhibit 1, filed herewith.

54. Plaintiff's investigator has further established a direct peer-to-peer link with each defendant, confirming not only the apparent IP address used by each defendant, but also confirming the actual IP address overcoming any concerns with forging or "spoofing" an IP address.

55. Plaintiff's investigator has further monitored each defendant's IP address to the extent practical, confirming each IP address is not an incidental or transitory participant in BitTorrent, but observed as associated with persistent and prolonged BitTorrent activity. As such each IP address is likely to go to a specific authorized user and persistent infringer as opposed to an occasional guest or visitor or party without authorized and secure access to the specific IP address.

56. Despite the best available investigative techniques, it is impossible for plaintiff to identify defendants by name at this time. Thus plaintiff must sue defendants as Does 1 - 50.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

57. Plaintiff believes the defendants' ISP, Comcast, has information identifying the subscribers who are either defendants or who are parties with information needed to identify the defendants as defendants acted through the accounts of subscribers who were assigned the IP addresses of Exhibit 1. Plaintiff intends to issue subpoenas to the Comcast to identify subscribers and any subsequent intermediary in order to learn the identity of the Does.

<div align="center">Conduct of Defendants</div>

58. Plaintiff has recorded each defendant identified herein as copying and publishing plaintiff's motion picture via BitTorrent as plaintiff's investigator has been able to download a portion of plaintiff's motion picture from each defendant identified herein, and collectively, from the identified defendants and others, plaintiff has been able to download a complete copy of plaintiff's motion picture obtaining an integral portion from each defendant.

59. On information and belief, defendants' conduct was unauthorized and in violation of the license and terms of access to the Internet through their ISP, Comcast.

60. Upon information and belief, each defendant was a willing and knowing participant in the infringing of plaintiff's trademark rights.

61. Each defendant's conduct is effectively part of a collective enterprise constituting substantially similar or identical facts.

62. Upon information and belief, many defendants also obtained compensation or personal benefit through making plaintiff's motion picture available to others.

63. Each IP address in Exhibit 1 has further been observed as associated with other infringing conduct and as such it is believed that each defendant's conduct is not an isolated incident, but is part of a persistent and continuing pattern of infringing activity and until enjoined will continue

COMPLAINT - Page 11 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

1    to infringe on plaintiff's rights in both plaintiff's motion picture and possibly other motion

2    pictures.

3                                    Exemplar Defendant

4        64. While it would be an undue and unnecessary burden to outline each defendant's conduct,

5    an exemplar is provided to facilitate understanding of plaintiff's claims.

6
7        65. Exemplar user Doe No. 1 of 50, known at this time only by the IP address of

8    98.246.58.231, and believed to reside in Salem, as either a subscriber or acting through an

9    account established by a subscriber, initiated his or her infringing conduct by first intentionally

10   logging into the one of many BitTorrent client repositories known for their large index of

11   copyrighted and trademarked movies, television shows and software. Doe No. 1 then

12   intentionally obtained a torrent file identified by a "hash" or SHA1:

13   F18A60DB02EC3B55C18924F47955DE766DACC537 in this specific instance which is for

14
15   plaintiff's motion picture from the index and intentionally loaded that torrent file into a computer

16   program or client designed to read such files.

17       66. With the torrent file intentionally loaded by Doe No. 1, his or her BitTorrent client used

18   the BitTorrent protocol to initiate connections with potentially hundreds of other users

19   possessing and uploading or sharing copies of the digital media described in that same hash,

20   namely, plaintiff's motion picture.  As the motion picture was copied to Doe No. 1's computer

21   piece by piece, these downloaded pieces of plaintiff's motion picture were then published and

22   made available for upload to others from Doe No. 1's computer.

23
24       67. Each of Does 1 - 50 performed the same acts as those described for Doe No. 1, above.

25   Each of these defendants also became an uploader, meaning that each downloaded file or file

26   segment was then available to other users seeking to obtain the file without degradation in sound

COMPLAINT - Page 12 of 15

Voltage v. Does 1 – 50 (A)

or picture quality. Thus, each defendant was an uploader or publisher and also a downloader or copier of plaintiff's motion picture.

68. With Doe No. 1, as with all other Does, there is other observed activity associated with the defendant's IP address, as such it is unlikely the defendants' activity is isolated or a one time occurrence, but is likely part of a pattern of regular and continuing conduct causing harm to plaintiff and others.

69. Attached hereto as Exhibit 2 is a partial listing of some of the other activity observed associated with Doe No. 1's IP address.

70. As can be seen from the data observed with Doe No. 1's IP address, the BitTorrent piracy at issue is unlikely to be that of an occasional visitor or guest as the activity is persistent over time.

71. As can be seen from the data observed with Doe No. 1's IP address, the BitTorrent piracy at issue is unlikely to be from a young child or "innocent" as content does not reflect the type of content that might be associated from a young child.

72. Additional data observed associated with Doe No. 1's IP address indicates the defendant is likely a mature adult with specific viewing habits.

73. 100 files are presented as observed associated with Doe No. 1's IP address, but this is just a small portion of observed activity associated with Doe No. 1 and the various defendants as each and every Doe defendant IP address in Exhibit 1 is observed as associated with dozens of different BitTorrent files in addition to plaintiff's motion picture, many observed associated with several hundred BitTorrent files (500+). As such the conduct associated with the defendants represents notable economic harm not only to plaintiff but also to the people of the State of Oregon.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

74. The defendants and each of them are prolific proponents of the BitTorrent distribution system advancing the BitTorrent economy of piracy causing injury to plaintiff.

75. Some of the titles observed associated with Doe No. 1's IP address indicate association with the BitTorrent site TORRENTING.COM as seen in items 26, and 47.

76. TORRENTING.COM is torrent index site that profits from piracy of content, including plaintiff's motion picture through requesting "donations" as can been seen in Exhibit 3.

77. TORRENTING.COM actively promotes the download and distribution of plaintiff's motion picture as can be seen from a printout of the web page shown on Exhibit 4.

78. As such it is likely Doe No. 1 was involved with the promotion of TORRENTING.COM, at least to an incidental degree.

79. Co-opting and distributing pirated content for the promotion and benefit of third parties is regularly observed in the conduct associated with the several Doe defendants.

80. While it may or may not be that any one defendant in this case is personally and directly generating revenue or benefit from their conduct, defendants' conduct as a whole furthers such efforts on behalf of others as they persistently download and then re-published works, including plaintiff's motion picture for the benefit third parties.

### CLAIM FOR RELIEF

### ORS 647.105 – State Trademark

81. Defendants, and each of them, without the authorization or consent of plaintiff, used, copied and / or distributed a reproduction, counterfeit and copy of plaintiff's motion picture bearing plaintiff's registered trademark VOLTAGE PICTURES.

82. Defendants, and each of them have acted with knowledge and in bad faith in their infringement of plaintiff's rights.

COMPLAINT - Page 14 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

83. Plaintiff is entitled to an order of from this Court enjoining defendants from infringing plaintiff's rights and directing defendants to delete all unauthorized copies of plaintiff's motion pictures.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against each defendant as follows:

A.    For entry of permanent injunction enjoining each defendant from infringing plaintiff's rights in plaintiff's mark, including without limitation by using the Internet to reproduce, copy or distribute any motion picture which bears plaintiff's mark except pursuant to a lawful license or with the express authority of plaintiff. And further directing each defendant to destroy all unauthorized copies of plaintiff's motion pictures.

B.    For plaintiff's reasonable costs and attorney fees pursuant to ORS 647.105(2).

C.    For such other and further relief as the Court deems proper.

DATED: April 3, 2014.

Respectfully submitted,

CROWELL LAW

Carl D. Crowell, OSB No. 982049
P.O. Box 923
Salem, OR 97308
Tel: 503-581-1240
Email: crowell@kite.com
Of attorneys for the plaintiff

COMPLAINT - Page 15 of 15

Voltage v. Does 1 – 50 (A)

Voltage v. Does 1 – 50 (A): Dallas Buyers Club  :  SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537

| No | IP | HitDate UTC | File Name | File Hash | City |
|----|-----|-------------|-----------|-----------|------|
| 1 | 98.246.58.231 | 3/1/14 03:20:44 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Salem |
| 2 | 71.236.199.153 | 3/2/14 06:27:59 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Salem |
| 3 | 50.137.175.241 | 3/2/14 05:07:28 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Eugene |
| 4 | 67.171.218.49 | 3/2/14 03:50:49 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Eugene |
| 5 | 71.193.161.214 | 3/2/14 02:29:31 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 6 | 67.171.241.250 | 3/2/14 02:00:30 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Eugene |
| 7 | 50.139.45.191 | 3/2/14 01:49:09 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 8 | 24.20.194.39 | 3/2/14 01:17:21 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Gresham |
| 9 | 24.20.51.61 | 3/2/14 01:07:39 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Sherwood |
| 10 | 76.115.65.13 | 3/2/14 12:31:46 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 11 | 24.21.3.76 | 3/1/14 10:14:41 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Salem |
| 12 | 71.237.211.196 | 3/1/14 08:16:54 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 13 | 24.21.201.25 | 3/1/14 12:02:55 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 14 | 24.20.217.135 | 3/1/14 10:46:16 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 15 | 67.160.186.216 | 3/1/14 06:15:27 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 16 | 50.186.14.245 | 3/1/14 05:04:37 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Eugene |
| 17 | 67.189.91.91 | 3/1/14 04:45:53 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 18 | 71.59.128.169 | 3/1/14 03:39:48 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Beaverton |
| 19 | 76.105.236.29 | 3/1/14 03:22:40 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 20 | 67.189.44.43 | 3/2/14 06:48:18 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Eugene |
| 21 | 98.246.224.156 | 3/1/14 03:15:53 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Corvallis |
| 22 | 50.139.65.104 | 3/1/14 02:12:59 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 23 | 50.137.32.40 | 2/28/14 03:47:37 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Beaverton |
| 24 | 71.59.227.66 | 2/28/14 03:26:35 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Eugene |
| 25 | 50.139.25.43 | 2/28/14 03:08:09 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 26 | 24.20.12.15 | 2/28/14 08:27:09 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Eugene |
| 27 | 98.232.131.82 | 2/28/14 07:17:35 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Gresham |
| 28 | 71.59.250.196 | 2/28/14 04:46:46 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 29 | 67.160.191.37 | 2/28/14 03:26:09 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |

EXHIBIT 1
Page 1 of 2

Voltage v. Does 1 – 50 (A): Dallas Buyers Club  :  SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537

| 30 | 76.115.100.56 | 2/28/14 03:00:55 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Lake Oswego |
| 31 | 76.105.209.134 | 2/28/14 02:39:43 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 32 | 76.105.248.188 | 2/28/14 01:48:30 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 33 | 76.115.129.44 | 2/28/14 12:47:02 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 34 | 24.20.47.88 | 2/27/14 11:59:25 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 35 | 24.20.19.0 | 2/27/14 08:43:58 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Corvallis |
| 36 | 50.139.61.183 | 2/27/14 06:37:14 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 37 | 98.246.243.17 | 2/27/14 05:50:16 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 38 | 67.171.190.6 | 2/27/14 06:52:00 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 39 | 50.137.43.19 | 3/3/14 05:31:53 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Corvallis |
| 40 | 67.189.65.237 | 3/3/14 04:04:43 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Salem |
| 41 | 76.105.163.251 | 3/3/14 10:20:28 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Clackamas |
| 42 | 98.246.3.145 | 3/3/14 08:56:31 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Tualatin |
| 43 | 71.236.196.40 | 3/2/14 07:05:10 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Salem |
| 44 | 76.115.231.103 | 3/2/14 05:58:42 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Salem |
| 45 | 50.188.131.243 | 2/26/14 07:06:52 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Corvallis |
| 46 | 50.137.150.50 | 3/2/14 07:45:56 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 47 | 50.139.72.151 | 2/27/14 06:15:40 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 48 | 50.139.99.56 | 2/27/14 05:03:58 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |
| 49 | 24.20.194.105 | 2/27/14 12:12:50 AM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Gresham |
| 50 | 50.139.46.209 | 2/26/14 07:32:42 PM | Dallas Buyers Club (2013) | SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537 | Portland |

EXHIBIT 1
Page 2 of 2

Voltage v. Does 1 – 50 (A) : Dallas Buyers Club  :  SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537
Exemplar Doe:  IP Address 98.246.58.231

| | IP | Torrentname | Category | FileHash | Date ▾ |
|---|---|---|---|---|---|
| 1. | 98.246.58.231 | Volume.License.Windows.8..activator.rar | Software | 43ce7a74d5c787508a5f743acdc5102cd1ba5f17 | 2013/09/07 |
| 2. | 98.246.58.231 | | | 0c12a7c0b934e9e3075ef02b6ac044cf00c2e571 | 2013/09/18-2013/09/19 |
| 3. | 98.246.58.231 | | | f37c73a5a12ebf3732952e09f70419d1663f7081 | 2013/09/19 |
| 4. | 98.246.58.231 | Elysium 2013 R6 x264 AAC-JYK | Video | b167eae6045e36d6f0e0e586274a82f6756c78f3 | 2013/09/21 |
| 5. | 98.246.58.231 | The.Elder.Scrolls.V.Skyrim.Legendary.Edition-WaLMaRT | Software | 775c20956dd8a9f692879c24e89d9a0c0e913f6d | 2013/09/22 |
| 6. | 98.246.58.231 | Sony Vegas Pro 11 0 Build 370 Patch 32 Bit Rh | Software | ef6a66b783bff59310951cb76b71588c75545351 | 2013/10/04-2014/01/30 |
| 7. | 98.246.58.231 | Penn.And.Teller.Fool.Us | TV Series | 5d6dcd57e67b1bd49740df8d002060b2e2f3788c | 2013/10/09 |
| 8. | 98.246.58.231 | Season 5 | TV Series | 91f0dcc5aeef32095441f5f0ff3d79c9717f3036 | 2013/10/10 |
| 9. | 98.246.58.231 | Season 4 | TV Series | e2e8e316164a7614e7cc4f95b125328586ed95f7 | 2013/10/10 |
| 10. | 98.246.58.231 | Augustana - Discography | Audio | 6b6251546c15476ecf6efabd1c7dfe33e68043c1 | 2013/10/10-2013/10/11 |
| 11. | 98.246.58.231 | Sinfully Summer - Aimee Duffy.epub | eBook | 59d1b837251068eb0d7efbca3d7cbce6feb160df | 2013/10/13 |
| 12. | 98.246.58.231 | Tiesto_-_Club_Life_197-CABLE-01-07-2011-TALiON www.0daymusic.org | Audio | eeb9d85c7a79b114064a68dea2a490d565c37cc5 | 2013/10/14 |
| 13. | 98.246.58.231 | Terraria v1.1.2 Final | Software | eeb9db07f8774d594240836f0f4f85fc5fa60f1b | 2013/10/14 |
| 14. | 98.246.58.231 | Julie&Julia.2009_HDRip__[scarabey.org].avi | Video | 18071bb7987269285b8bb91976039031ca848b5a | 2013/10/15 |
| 15. | 98.246.58.231 | The Reason I Jump - The Inner Voice of A Thirteen Year Old Boy With Autism - Naoki Higashida.epub | eBook | 3d554514627627d7e140dc5c674700f7f7bfb97a | 2013/10/17 |
| 16. | 98.246.58.231 | Riddick [2013] Dvd Full HD.avi | Audio | 59d35d5808b7d736545046f27bb73e2b6b6325a1 | 2013/10/18 |
| 17. | 98.246.58.231 | The.Mentalist.S06E05.HDTV.x264-LOL.mp4 | TV Series | 5b4768e7f9786ce5c6d7c0dcd1751e8a01f0ad61 | 2013/10/28 |
| 18. | 98.246.58.231 | Solaris (2002) 720p BRrip scOrp {~dude7001~} | Video | f7a3aba76e7a14f40963d11ed5865b73fab6c5b9 | 2013/10/28 |
| 19. | 98.246.58.231 | Steven Price - Gravity (2013) | Audio | 6322962b88506b93f388d2c209e7c0fe2603a65f | 2013/11/01 |
| 20. | 98.246.58.231 | The.Mentalist.S06E06.HDTV.x264-LOL.mp4 | TV Series | 7c9c2fc35d7a14b494740eb30cc53c8c7f8fd4ba | 2013/11/04-2013/11/05 |
| 21. | 98.246.58.231 | QI.S11E09.HDTV.x264-C4TV.[VTV].mp4 | TV Series | deeda4622f4e2fb8a67ffe749452cd2ba630a346 | 2013/11/04-2013/11/05 |
| 22. | 98.246.58.231 | [Underwater] KILL la KILL - 02 (720p) [C0DDB47F].mkv | Video | 3a64b87cfef9a1440d16bb9edb1a69812fe0d2f9 | 2013/11/06 |
| 23. | 98.246.58.231 | [Underwater] KILL la KILL - 05 (720p) [FBA0A5AB].mkv | Video | 7f3d15c7fbb483bc903d9e76f046624063a9813b | 2013/11/06 |
| 24. | 98.246.58.231 | Un.castello.in.Italia.Movie.Italia.2013.BluRay 1080p x264-PRIM4L | Video | 62009bc914fedaa71b4488688e1b8a4714dbd466 | 2013/11/09 |
| 25. | 98.246.58.231 | The.Mentalist.S06E07.HDTV.x264-LOL.mp4 | TV Series | 8377cec616b80e9a57f498e6decec9f66d74d6e7 | 2013/11/19-2013/11/23 |

EXHIBIT 2
Page 1 of 5

Voltage v. Does 1 – 50 (A) : Dallas Buyers Club  :  SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537
Exemplar Doe:  IP Address 98.246.58.231

| | | | | | |
|---|---|---|---|---|---|
| 26. | 98.246.58.231 | [ www.Torrenting.com ] - Live.At.The.Apollo.S09E01.720p.HDTV.x264-FTP | TV Series | 64132e86b8e6740188d640180b1f4a1716123a8f | 2013/11/24-2013/12/01 |
| 27. | 98.246.58.231 | [Underwater] KILL la KILL - 08 (720p) [F1CEE4AF].mkv | Video | c808fa11c24f88fd4d90ea972ebf282b88ab0b40 | 2013/11/24-2013/12/02 |
| 28. | 98.246.58.231 | 10 Chess Books | eBook | 28fa72a09dcc4768523d502d31828e5975055d8b | 2013/12/02 |
| 29. | 98.246.58.231 | 35 Chess Books | eBook | 4cca229bdfb9992affc5490cfeb6846cdd78965f | 2013/12/02 |
| 30. | 98.246.58.231 | [Underwater] KILL la KILL - 09 (720p) [F07FE376].mkv | Video | 52db9a7b4d02e1baed3b85a359f4b289380790da | 2013/12/02 |
| 31. | 98.246.58.231 | La.Piscine.1969.PROPER.720p.BluRay.x264-CiNEFiLE.mkv | Video | 6a1d8467f2b1f04936b771a6d05f4727056aea84 | 2013/12/02 |
| 32. | 98.246.58.231 | [Underwater] KILL la KILL - 06 (720p) [7E816CC0].mkv | TV Series | 1ffecaabfe668724a055dd2151c35120f2aaa1f7 | 2013/12/02-2013/12/03 |
| 33. | 98.246.58.231 | The.Mentalist.S06E08.HDTV.x264-LOL.mp4 | TV Series | 58039983e0abc022865725601e25612421b6eff4 | 2013/12/02-2013/12/03 |
| 34. | 98.246.58.231 | The.Mentalist.S06E09.HDTV.x264-LOL.mp4 | TV Series | 7069dee40347007e6c6ba08d4eca57873e12383a | 2013/12/02-2013/12/03 |
| 35. | 98.246.58.231 | [Underwater] KILL la KILL - 07 (720p) [5B5C3690].mkv | Video | 7bfd8f962d5a5833354932dee594c0afa463e20c | 2013/12/02-2013/12/03 |
| 36. | 98.246.58.231 | 10 Chess Books on Combinatios & Tactics | eBook | 8c28e4a626fbdad0f10f0f28d8c6bb3e67a6e732 | 2013/12/02-2013/12/03 |
| 37. | 98.246.58.231 | Complete Book of Chess Strategy (gnv64).pdf | eBook | dbf415124e8eac8b857abc77229a3372ec5276f6 | 2013/12/02-2013/12/03 |
| 38. | 98.246.58.231 | | | d0500dfc249b9b76ab442b0c8b8318353ac0424f | 2013/12/04-2013/12/12 |
| 39. | 98.246.58.231 | | | 04791307229c784ede926cb6185215415e580c7e | 2013/12/04-2013/12/13 |
| 40. | 98.246.58.231 | | | 2bb6694dab57d8595982d01d6612619ea3c0ead6 | 2013/12/04-2013/12/13 |
| 41. | 98.246.58.231 | | | 43d435adfa3a966ecab108c5f6de586be03dd509 | 2013/12/04-2013/12/13 |
| 42. | 98.246.58.231 | | | e1b4b9ff6530384e11652de29dcff65b0962833d | 2013/12/04-2013/12/13 |
| 43. | 98.246.58.231 | Heroes VI.iso | Software | 3a32ac6c8647eeaf93561bb7697bc387d3542101 | 2013/12/10 |
| 44. | 98.246.58.231 | World of Warcraft - (2006) Cycle of Hatred - Keith R. A. DeCandido.pdf | eBook | 5970e8e7e863f6713dfb67c227077028aa5f58b2 | 2013/12/13 |
| 45. | 98.246.58.231 | CODBO2+12Tr-LNG_v1.3.rar | Software | 5970f57bfe8ea33a7119df759c6dd8af21d006e9 | 2013/12/13 |
| 46. | 98.246.58.231 | [Underwater] KILL la KILL - 10 (720p) [8D12E723].mkv | Video | a249740e55b9e1c88eaeacc738b7903ff0f6c332 | 2013/12/13 |

EXHIBIT 2
Page 2 of 5

Voltage v. Does 1 – 50 (A) : Dallas Buyers Club  :  SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537
Exemplar Doe:  IP Address 98.246.58.231

| 47. | 98.246.58.231 | [ www.Torrenting.com ] - Impractical.Jokers.S02E23.HDTV.x264-KILLERS | TV Series | 23c2a0b6b3703b7c649f94c784a3bba7f127c794 | 2013/12/15-2013/12/20 |
|---|---|---|---|---|---|
| 48. | 98.246.58.231 | Impractical.Jokers.S02E27.720p.HDTV.x264-KILLERS [PublicHD] | TV Series | 2520dd30f8bed1ce1debf31c830842c4c3647242 | 2013/12/15-2013/12/20 |
| 49. | 98.246.58.231 | Impractical.Jokers.S02E28.HDTV.x264-PLAYNOW.mp4 | TV Series | 715aac851e3da3a87db183ca9e7aa041ae788ec2 | 2013/12/15-2013/12/20 |
| 50. | 98.246.58.231 | House and Leisure Magazine November 2013 | eBook | 715aa7de183149c16d7984aad193a873da133b7b | 2013/12/20 |
| 51. | 98.246.58.231 | All In All Alaguraja (2013) - Lotus - Untouched - DVD5 - Uyirvani | Video | fdbec51a65df086d9fc6d4bd0f11add3e5905ca9 | 2013/12/22 |
| 52. | 98.246.58.231 | Fly Crypter 2.3.zip | Software | 08047340a3f0de2ec88fe2e84afc420d15fdb528 | 2014/01/10 |
| 53. | 98.246.58.231 | Acapella's Most Studio | Audio | 1d1b26d574a8702ebd72cc9fe5c240193a72d945 | 2014/01/10 |
| 54. | 98.246.58.231 | Sherlock Holmes - Jeremy Brett - Season 4 | TV Series | 23cfccec9e685e4ae8501da781c178d0fefe28f0 | 2014/01/10-2014/01/11 |
| 55. | 98.246.58.231 | Sherlock Holmes - Jeremy Brett - Season 7 | TV Series | f6682ec47ec0739c992103220b6a8f0d23a916f2 | 2014/01/10-2014/01/11 |
| 56. | 98.246.58.231 | Skyfall.2012.DVDRip.XviD-SPARKS | Video | f149e64db16602edec371743d662d90f2eeb97d8 | 2014/01/14-2014/03/05 |
| 57. | 98.246.58.231 | Camtasia Studio FULL 8.1.2 + Serials-ThumperDC | Software | 59d92162ba09097ba9c68fe848c7cc6e24a338ff | 2014/01/28-2014/03/27 |
| 58. | 98.246.58.231 | Daemon Tools Ultra V1 1 0 | Software | 6a1d88c5851eac95512dc3c020da284db065a795 | 2014/01/29-2014/02/15 |
| 59. | 98.246.58.231 | | | 59d8b74e2df601bde9f3fa15d73f19498412dafc | 2014/02/02 |
| 60. | 98.246.58.231 | Paranormal.Activity.The.Marked.Ones.DVDRIP[Jaybob] | Video | 5813a147cefe04acb66fc92d2f5878e8713117f4 | 2014/02/07 |
| 61. | 98.246.58.231 | Linda Castillo - Duistere vlucht + Sprong in het duister, NL Ebook | eBook | 58b86750a778abd42659597db93071f8442aef4e | 2014/02/07 |
| 62. | 98.246.58.231 | Corel Draw Graphics Suite X4 14 0 0 Full M8 | Software | 58d9d3b9e9a752549fc87132ea08df032c3cc8a1 | 2014/02/07 |
| 63. | 98.246.58.231 | | | 598626728be2099492e18119d6edd4b25ac01735 | 2014/02/07 |
| 64. | 98.246.58.231 | Gramatik - The Age of Reason | Audio | 109c54db8f62125c843b8ec0affb0df1844fe0ba | 2014/02/27 |
| 65. | 98.246.58.231 | American Hustle (2013) [1080p] | Video | 10ab9cad41f545893af00993cbfa168fabd46395 | 2014/03/01 |
| 66. | 98.246.58.231 | Philomena 2013 DVDSCR XViD-NiNJA | Video | 42221f6aa6776c723e1d3f3b2154d5522146a869 | 2014/03/01 |
| 67. | 98.246.58.231 | Blue Jasmine (2013) [1080p] | Video | 44ec61297d65c408b6638d2b6702af63b50a1e7e | 2014/03/01 |
| 68. | 98.246.58.231 | 20.Feet.from.Stardom.2013.HDRip.X264.AC3-PLAYNOW.mkv | Video | 4c324e362a5582877905fc803c2b5306f35f28f7 | 2014/03/01 |
| 69. | 98.246.58.231 | Captain Phillips (2013) [1080p] | Video | 6041818de2d64fea82405bba08b52d3f10b0f89c | 2014/03/01 |
| 70. | 98.246.58.231 | Gravity (2013) [1080p] | Video | 95731ce3c5ea065766f6eb92c9a426a58ada56fe | 2014/03/01 |
| 71. | 98.246.58.231 | 12 Years a Slave (2013) [1080p] | Video | aad050ee1bb22e196939547b134535824dabf0ce | 2014/03/01 |
| 72. | 98.246.58.231 | Nebraska (2013) | Video | d1f87a13f66909dcb58ec23ee2db8bf1e9bf4186 | 2014/03/01 |
| 73. | 98.246.58.231 | Dallas Buyers Club (2013) | Video | f18a60db02ec3b55c18924f47955de766dacc537 | 2014/03/01 |

EXHIBIT 2
Page 3 of 5

Voltage v. Does 1 – 50 (A) : Dallas Buyers Club  :  SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537
Exemplar Doe:  IP Address 98.246.58.231

| 74. | 98.246.58.231 | Inside.Llewyn.Davis.2013.DVDScr.XVID.AC3.HQ.Hive-CM8 | Video | f61c05416fe4fbbb5021ff2d9237f56ff4edafea | 2014/03/01 |
|---|---|---|---|---|---|
| 75. | 98.246.58.231 | The.Girl.Who.Played.With.Fire.2009.PROPER.720p.BluRay.x264-NODLABS [PublicHD].mkv | Video | 18d3b1b824856cd192caca07225dbcfee1405459 | 2014/03/02 |
| 76. | 98.246.58.231 | The.Girl.With.The.Dragon.Tattoo.2009.PROPER.720p.BluRay.x264-NODLABS [PublicHD].mkv | Video | bc0c2b86e03fd977c36993eb534f98d3685bdb86 | 2014/03/02 |
| 77. | 98.246.58.231 | The.Girl.Who.Kicked.The.Hornet's.Nest.2009.PROPER.720p.BluRay.x264-NODLABS [PublicHD].mkv | Video | bdeba0c52663e7ebcf2b26fe37810a815eaafb21 | 2014/03/02 |
| 78. | 98.246.58.231 | | | 6c6aa64cdc64ce53474b442657dbbaf4a6c9d148 | 2014/03/03 |
| 79. | 98.246.58.231 | | | 3a0b38c178834a1da86022400ceda8772f2bfde3 | 2014/03/08-2014/03/10 |
| 80. | 98.246.58.231 | | | 9c02ba3e90b7be9fcec58d33788df1d3f61fa52f | 2014/03/08-2014/03/10 |
| 81. | 98.246.58.231 | True Detective S01E05 HDTV x264-KILLERS[ettv] | TV Series | 05076833cdfd0e3afde675148082e3becf677cb9 | 2014/03/10 |
| 82. | 98.246.58.231 | True Detective S01E06 HDTV x264-2HD[ettv] | TV Series | 7211426c34f38ef6dc93b62545f8f23f159071f9 | 2014/03/10 |
| 83. | 98.246.58.231 | True Detective S01E08 HDTV x264-2HD[ettv] | TV Series | a94d84388856dc6186a2081e6619de17ff57e6f7 | 2014/03/10 |
| 84. | 98.246.58.231 | True.Detective.S01E02.HDTV.x264-2HD.mp4 | TV Series | d4a80c4dce3b08e38f26d21a71a02fe6f121dec5 | 2014/03/10 |
| 85. | 98.246.58.231 | Despicable Me 2 2013 BluRay 720p DTS x264-MgB | Video | ecbdbaa90ff43644afeccfc9a55ff6e72a4acc18 | 2014/03/10 |
| 86. | 98.246.58.231 | Ender's Game 2013 BluRay 720p DTS x264-MgB [ETRG] | Video | f1625ebc655f9079716b4b8616fccd7dc8d8e7e2 | 2014/03/10 |
| 87. | 98.246.58.231 | | | 555b6ba7e079ab026ba307637f5879413f78ede8 | 2014/03/13-2014/03/16 |
| 88. | 98.246.58.231 | Veronica.Mars.2014.WEBRIP.x264.AC3-MiLLENiUM | Video | 52aa00ced20f0e80bda75a6070b1d5a4b60da48a | 2014/03/15 |
| 89. | 98.246.58.231 | | | 40e982e99383b435b2db6db8e425eef01787e4f1 | 2014/03/16-2014/03/17 |
| 90. | 98.246.58.231 | | | 9645cd5c25fd1e785c85381d9a9db0cce5efa0d5 | 2014/03/16-2014/03/17 |
| 91. | 98.246.58.231 | Psych.S08E06.HDTV.x264-KILLERS.mp4 | TV Series | 224931239a4f45872ba654608c4edc775478a5dc | 2014/03/17 |
| 92. | 98.246.58.231 | | | 5ee43016fe138919bacf78f6edcd46decb0021f9 | 2014/03/20-2014/03/21 |
| 93. | 98.246.58.231 | | | cca33ff8cd911f1522b87b54fb1b9469b2f395f3 | 2014/03/20-2014/03/21 |
| 94. | 98.246.58.231 | | | e71d7fd8655ff5d60367dcbcf233ded69af28655 | 2014/03/20-2014/03/21 |
| 95. | 98.246.58.231 | | | 302f205e6d34c05cb83892a4b2764b39d30d3c4d | 2014/03/21 |
| 96. | 98.246.58.231 | | | 30eb092f13d94eb0a263c638e1c9a3ab26edd798 | 2014/03/21 |
| 97. | 98.246.58.231 | | | f2c8064472558a7e75ea2996bfe81448760017b6 | 2014/03/21 |

EXHIBIT 2
Page 4 of 5

Voltage v. Does 1 – 50 (A) : Dallas Buyers Club  :  SHA1: F18A60DB02EC3B55C18924F47955DE766DACC537
Exemplar Doe:  IP Address 98.246.58.231

| 98. | 98.246.58.231 | Ride.Along.2014.DVDRip.XviD-XraY | Video | afa339c1dbb5b4a855c302a8f8b46e3af586a3b0 | 2014/03/22 |
| 99. | 98.246.58.231 | | | 995fb1c725d4ba9071769aebbc40cfeaddac85a5 | 2014/03/27 |
| 100. | 98.246.58.231 | Frozen.2013.720p.BluRay.DTS.x264-PublicHD | Video | 654eaa94a55cd46bc578a7c3a14813e16cfacc85 | 2014/03/28 |

EXHIBIT 2
Page 5 of 5

**Ratio:** Uploaded: **3.000 GB**    Downloaded: **0.000 kB**    Bonus Points: 0.0



There are currently **1,674** active users browsing TorrenTing.COM



## Only 1 Day left for Double up!
## Donate to the bunny... to do what we do

**Home    Torrents    Users Torrent    Upload!    RSS    Chat    Forums    Rules    Profile    Help    Radio    Donate    Staff**



| Movie Name | **Dallas Buyers Club 2013 720p BRRip x264 AAC-ViSiON** |
|---|---|
| Description |  |



## Dallas Buyers Club 2013 720p BRRip x264 AAC-ViSiON



**Dallas Buyers Club (2013)**
**117 min  -  Biography | Drama | History  -  22 November 2013 (USA)**
**IMDB rating: 8.1**

**In 1985 Dallas, electrician and hustler Ron Woodroof works around the system to help AIDS patients get the medication they need after he is himself diagnosed with the disease.**

**Director: Jean-Marc Vall?e**
**Writers: Craig Borten (screenplay), Melisa Wallack (screenplay)**



**Jared Leto ... Rayon**
**Matthew McConaughey ... Ron Woodroof**
**Jennifer Garner ... Dr. Eve Saks**
**Steve Zahn ... Tucker**
**Denis O'Hare ... Dr. Sevard**
**Kevin Rankin ... T.j**
**Steffie Grote ... The Girl With The Snake Tattoo (as Stephanie Grote)**
**Dallas Roberts ... David Wayne**
**Griffin Dunne ... Dr. Vass**
**Jeanine Hill ... Rodeo girl**

EXHIBIT 3
Page 2



File: Dallas.Buyers.Club.2013.720p.BRRip.x264.AAC-ViSiON.mp4
Size: 2522073214 bytes (2.35 GiB), duration: 01:56:57, avg.bitrate: 2875 kb/s
Audio: aac, 48000 Hz, 5:1 (und)
Video: h264, yuv420p, 1280x536, 23.98 fps(r) (und)



EXHIBIT 3
Page 3







Dallas Buyers Club - Official Trailer (HD) Matt...

0:00 / 2:49



```
VIDEO: 2500 Kbps
ENCODER: DjDayV
AUDIO: AAC 5.1 {448Kbps}
SIZE: 2.34 GB
FRAMERATE: 23.976
NTSC FILES: 1x MP4
SOURCE: 1080p BluRay SPARKS
RESOLUTION: 1280x536
LANGUAGE: English
SUBTITLES: English
```

**IMDb: http://www.imdb.com/title/tt0790636/**



**Mind-blowing**
**8/10**

**Mathew Mc. obviously deserves a bit of a salute. His efforts to slim way down brings to mind, obviously, Christian Bale. Not bad company to be in!**

**But the REAL STAR is Jared Leto. I know his other work and kept reminding myself that he/she was really a transvestite. And so sad to see the drug use (shh). And he/she was truly pretty. Of course, in real life, he's s a gorgeous guy. So,I hope the Academy will take note!**

**Also interesting to hear of the Interferon drugs talked about. Now THAT'S something I know about. I have M.S. and inject myself once a week with it. It slows the progression of the disease Too bad the movie doesn't mention the other druga now available. Perhaps they weren't around then.**

**I'm not a doctor, just more familiar with some of the drugs - would be great if I weren't!**





**We need your help to keep Torrenting.com alive**

DONATE

| | |
|---|---|
| **Type** | XviD Movies |
| **Uploaded** | 67d 10:10:51 ago |
| **Size** | 2.67 GB (2,883,921,648 bytes) |
| **Added** | 2014-01-24 12:28:07 |

| **Num files** [See full list] | 4 files |
|---|---|
| **Peers** | 77 seeder(s) 2 leecher(s) = 13 peer(s) connected |

**Quick Comment**



Submit

**Add a full comment**

**<< Prev     Next >>**
**1 - 15**

#541404 by **ihleonevr** (Power User) at 2014-01-24 17:59:07 GMT

thanks for sharing

#541994 by **justsofly** (User) at 2014-01-25 10:19:39 GMT

thanks for upload great copy

#542308 by **almackem** (Power User) at 2014-01-25 17:51:53 GMT

thanks

#542655 by **blade27240** (User) at 2014-01-26 01:40:33 GMT

thanks

EXHIBIT 3
Page 6



Ratio: Uploaded: **3.000 GB**  Downloaded: **0.000 kB**  Bonus Points: **0.0**

# Torrenting
### Believe in the bunny!

There are currently **1,682** active users browsing TorrenTing.COM



## Only 1 Day left for Double up!
## Donate to the bunny... to do what we do

**Home   Torrents   Users Torrent   Upload!   RSS   Chat   Forums   Rules   Profile   Help   Radio   Donate   Staff**

# We really need your help.

This site is relies solely for the benefit of it's users and all donations go towards running costsie server bills, no profit is made from this site whatsoever. Any extra we recieve will be puttowards server upgrades and/or saved for months we don't receive enough funds.

| Donate 5$ | Donate 10$ | Donate 15$ | Donate 20$ |
|---|---|---|---|
| Donate 5 Dollars and receive: | Donate 10 Dollars and receive: | Donate 15 Dollars and receive: | Donate 20 Dollars and receive: |
| **2 x 10 GB** of Upload Credits | **2 x 20 GB** of Upload Credits | **2 x 30 GB** of Upload Credits | **2 x 40 GB** of Upload Credits |
| • 2 Weeks VIP Status | • 1 Month VIP Status | • 1 Month VIP Status | • 1 Month VIP Status |
| • Star of Torrenting ❤ | • Star of Torrenting ❤ | • Star of Torrenting ❤ | • Star of Torrenting ❤ |
| • Immunity to inactivity pruning. | • Immunity to inactivity pruning. | • Immunity to inactivity pruning. | • Immunity to inactivity pruning. |
| • Access to Power User exclusive features. | • Access to Power User exclusive features. | • Access to Power User exclusive features. | • Access to Power User exclusive features. |
| • 60 Torrent slots. | • 80 Torrent slots. | • 120 Torrent slots. | • 300 Torrent slots. |

   

Donate Bitcoins   Donate Bitcoins   Donate Bitcoins   Donate Bitcoins

| Donate 30$ | Donate 40$ | Donate 50$ | Donate 100$ |
|---|---|---|---|
| Donate 30 Dollars and receive: | Donate 40 Dollars and receive: | Donate 50 Dollars and receive: | Donate 100 Dollars and receive: |
| **2 x 80 GB** of Upload Credits | **2 x 120 GB** of Upload Credits | **2 x 200 GB** of Upload Credits | **2 x 500 GB** of Upload Credits |
| • 2 Month VIP Status | • 2 Month VIP Status | • 3 Month VIP Status | • 5 Month VIP Status |
| • Star of Torrenting ❤ | • Star of Torrenting ❤ | • Star of Torrenting ❤ | • Star of Torrenting ❤ |
| • Immunity to inactivity pruning. | • Immunity to inactivity pruning. | • Immunity to inactivity pruning. | • Immunity to inactivity pruning. |
| • Access to Power User exclusive features. | • Access to Power User exclusive features. | • Access to Power User exclusive features. | • Access to Power User exclusive features. |
| • **Unlimited++** Torrent slots. | • **Unlimited++** Torrent slots. | • **Unlimited** Torrent slots. | • **Unlimited++** Torrent slots. |

   

Donate Bitcoins   Donate Bitcoins   Donate Bitcoins   Donate Bitcoins

Voltage Pictures v. Does                                          EXHIBIT 4



## THIRD JUDICIAL DISTRICT
## MARION COUNTY CIRCUIT COURT

### Read carefully. If you do not comply with the following, your case will be dismissed.

_Voltage_      v.      _Does_

Case Number: __14C13823__      Date: __4.3.14__

### THIS CASE HAS BEEN ASSIGNED TO:

| | |
|---|---|
| ☐ Judge Donald D. Abar (503) 588-5135 | ☐ Judge David E. Leith (503) 588-5160 |
| ☐ Judge Claudia M. Burton (503) 584-7713 | ☐ Judicial Position #3 (503) 588-5028 |
| ☐ Judge Vance D. Day (503) 588-5026 | ☐ Judge Lindsay R. Partridge (503) 588-5030 |
| ☒ Judge Courtland Geyer (503) 373-4445 | ☐ Judge Dale W. Penn (503) 588-5492 |
| ☐ Judge Dennis J. Graves (503) 585-4939 | ☐ Judge Tracy A. Prall (503) 566-2974 |
| ☐ Judge Thomas M. Hart (503) 584-7749 | ☐ Judge Jamese L. Rhoades (503) 588-7950 |
| ☐ Judge Mary M. James (503) 373-4303 | ☐ Judge Susan M. Tripp (503) 373-4361 |

### If a party served with a summons intends to contest this matter, that party must file a response, or other appearance, as instructed in the summons.

A status conference will be set after the party served has filed an appearance. All attorneys must appear at the status conference with their calendars. If parties do not have legal representation, they are to appear at the status conference.

If the Plaintiff has not filed a Return or Acceptance of Service by the 63rd day after the filing of the complaint, the case may be dismissed for want of prosecution 28 days later. If proof of service is filed by the 91st day from the filing of the complaint, and no default is later filed, the case will be dismissed 119 days from the date of the filing of the complaint.

Follow these instructions carefully and refer to the Uniform Trial Court Rules for further information or clarification.

All correspondence or other communication shall be directed to the assigned Judge at the following address: Marion County Circuit Court, PO Box 12869, Salem, Oregon 97309-0869.

☐ _Assignment following standard procedure._
☐ _Random assignment following the standard procedure._
☐ _Random assignment at the request of:_ _____

1   Carl D. Crowell, OSB No. 982049
    email:  crowell@kite.com
2   CROWELL LAW
    P.O. Box 923
3   Salem, OR 97308
    (503) 581-1240
4   Of attorneys for plaintiff

5

6

7                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

8                        FOR THE COUNTY OF MARION

9

10  VOLTAGE PICTURES, LLC              Case No.:  14C13823

11          Plaintiff,

12  v.                                 PLAINTIFF'S *EX PARTE* MOTION
                                       FOR DISCOVERY ORDER;
13  DOES 1 - 50                        MEMORANDUM; PROPOSED
                                       DISCOVERY ORDER
14          Defendants.
                                       ORS 647.105 – State Trademark
15

16

17          PLAINTIFF'S *EX PARTE* MOTION FOR DISCOVERY ORDER

18          On April 3, 2014, plaintiff filed the instant action against a number of Doe defendants (Does

19  1 – 50) known to plaintiff only through the Internet Protocol ("IP") used by each defendant to

20  infringe on plaintiff's rights, as identified in Exhibit 1 to the complaint.[1] Prior to issuing subpoenas

21  pursuant to ORCP 55 for such further information needed to ascertain the identity of the various

22  defendants, plaintiff requests a Discovery Order from this court to govern *ex parte* discovery.

23

24  _____

25  [1] Also filed on April 3, 2014 is the related proceeding of Voltage v. Does 1 – 50, Marion Co.
26  Circuit Court 14C13824.

MOTION – DISCOVERY ORDER
Page 1 of 7

Voltage v. Does 1 – 50 (A)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiff submits with its motion a proposed form of Discovery Order that provides specific notice and reference to the obligations of parties in compliance with 47 U.S.C. §551(c)(2)(C) and provides for limits on plaintiff's use of any information obtained.

Plaintiff believes the submitted proposed Discovery Order, narrowing and focusing plaintiff's subpoena power and providing notice to parties of rights and duties is in the interest of efficiency and justice.

WHEREFORE for the reasons stated in the below Memorandum, plaintiff moves this court for entry of the proposed Discovery Order presented herewith.


DATED: April 4, 2014.


Respectfully submitted,

CROWELL LAW


Carl D. Crowell, OSB No. 982049
P.O. Box 923
Salem, OR 97308
Tel:  503-581-1240
Email: crowell@kite.com
Of attorneys for the plaintiff

///

///


MOTION – DISCOVERY ORDER
Page 2 of 7

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel:  503-581-1240

1

MEMORANDUM

2

## I.    INTRODUCTION

3

4    As more specifically outlined in the Complaint, plaintiff Voltage Pictures, LLC, is in the

5    business of producing, marketing and distributing motion pictures, including the subject

6    motion picture in this case *Dallas Buyers Club*.  Defendants are BitTorrent users, or "peers,"

7    whose computers are interconnected with others and used for illegally copying and distributing

8    plaintiffs' motion picture to others.  Plaintiff is suing the several Doe defendants seeking

9    equitable injunctive relief to prohibit them from their continuing infringement of plaintiff's

10   rights.

11   As the defendants used the Internet to commit infringement, plaintiff only knows the

12   defendants by their Internet Protocol ("IP") address, and the time of the infringement as stated

13   in Exhibit 1 to the Complaint.  Defendants' IP addresses were assigned by their Internet

14   Service Provider ("ISP"), Comcast.  Comcast uses the IP address to specifically identify each

15   subscriber using the Internet though Comcast to transmit and receive data similar to the address

16   on a house, namely it is the location to which it sends data requested and from which it

17   receives data.  Publicly available data allows plaintiff to identify the specific ISP defendants

18   used, and other information such as the city or area associated with the IP address.   Publicly

19   available data generally does not permit plaintiff to ascertain the identity of the defendants.

20   But as Comcast controls defendants' access to the Internet, so too does Comcast have the

21   records which tie the IP addresses identified as infringing plaintiff's rights to the specific

22   parties who contracted with Comcast for service. Without this information, plaintiff cannot

23   ascertain the identity of the defendants nor pursue this lawsuit to protect its rights.

24

25

26

MOTION – DISCOVERY ORDER
Page 3 of 7

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel:  503-581-1240

ORCP 55 permits plaintiff to issue subpoenas to Comcast *sua sponte*.  In the management of related cases, plaintiff observes many parties may be unfamiliar with their respective rights and duties and the general sensitivity many parties may have to such discovery.  For instance, not all Internet Service Providers ("ISPs") may be fully aware of their obligations and responsibilities under the Cable Communications Act of 1984, 47 U.S.C. § 521, et seq. and The Stored Communications Act, 18 U.S.C. § 2701, et seq..  As well, some individual parties may be unsure as to their privacy rights, though courts have generally found there is no privacy right in the information sought by plaintiff.  *United States v. Forrester*, 495 F.3d 1041, 1049 (9th Cir. 2007), citing *Smith v. Maryland*, 442 U.S. 735, (1979).

With the sensitivities of this matter in mind, plaintiff would like to avoid complications and any unnecessary or excessive burden on the courts or any party who may attempt to comply with a subpoena in good faith.  To that end, plaintiff requests the court adopt an order to govern the subpoenas issued in this case and the discovery received.

## II.    SUBPOENAS

ORCP 55 permits a party to issue subpoenas to third parties for the production of documents and things, including the identity of the subscriber information related to IP addresses, such as those identified in Exhibit 1 to the Complaint. Pursuant to ORCP 55 D(1) all "parties" to a case are to be served with a copy of any subpoena on a third party seven days prior to service on the third party.  However, in this case there are no known parties, thus the necessity of the *ex parte* subpoenas.

Rather than proceed pursuant to a strict reading of ORCP 55, plaintiff prefers to proceed under judicial order to ensure that rights and interests of all parties are protected and submits the presented proposed Discovery Order.

MOTION – DISCOVERY ORDER
Page 4 of 7

Voltage v. Does 1 – 50 (A)

1

### A. Doe Defendants

2

3
This is an action under state trademark law, ORS 647.105. In matters of trademark,

4
Oregon courts generally look to federal law for guidance. *See CollegeNet, Inc. v. Embark*

5
*Com., Inc.*, 230 F.Supp.2d 1167, 1177 (D.Or. 2001)(*citing Classic Instruments, Inc., v. VDO-*

6
*Argo Instruments*, 73 Or.App. 732, 745, 700 P.2d 677 (1985), *review denied*, 300 Or. 111, 707

7
P.2d 583 (1985)).

8
Federal courts routinely allow discovery to identify "Doe" defendants operating through

9
the Internet. *Voltage v. Does 1 – 371, et al.*, 3:13-cv-00295-AA (D. Or. Jun. 7, 2013) (Order

10
releasing subpoenaed information of severed Doe #1.); *Matot v. Does 1-5*, 6:13-cv-00153-TC

11
(D. Or. Feb. 12, 2013) (leave granted to subpoena any email service or internet service

12
providers for such further information as may be needed to specifically identify the Doe

13
defendants); *Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir. 1980) ("where the identity of

14
alleged defendants [are not] known prior to the filing of a complaint . . . the plaintiff should be

15
given an opportunity through discovery to identify the unknown defendants"); *Cottrell v.*

16
*Unknown Correctional Officers, 1-10*, 230 F .3rd 1366 (9th Cir. 2000); *Wakefield v.*

17
*Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (error to dismiss unnamed defendants given

18
possibility that identity could be ascertained through discovery); *Murphy v. Goord*, 445

19
F.Supp.2d 261, 266 (W.D. New York 2006) (in situations where the identity of alleged

20
defendants may not be known prior to the filing of a complaint, the plaintiff should have an

21
opportunity to pursue discovery to identify the unknown defendants); *Equidyne Corp. v. Does*

22
*1-21*, 279 F.Supp.2d 481, 483 (D. Del. 2003) (allowing discovery from ISPs to obtain identities

23
of users anonymously posting messages on message boards).

24

25

26
///

MOTION – DISCOVERY ORDER
Page 5 of 7

Voltage v. Does 1 – 50 (A)

### A.  Good Cause for Discovery

Good cause clearly exists in this case to proceed because the ISP used to commit the acts of infringement is the only source that can supply the information necessary to identify the defendant.  A further basis for good cause is that in a claim for infringement there is a presumption of irreparable harm to the rights owner.  *See UMG Recordings, Inc. v. Doe*, 2008 WL 4104214 (N.D. Cal. 2008) (Finding good cause for expedited discovery exists in Internet infringement cases, where a plaintiff makes a prima facie showing of infringement, there is no other way to identify the Doe defendant, and there is a risk an ISP will destroy its records after delay.)

Absent a subpoena of Comcast records, the identity of the infringers will remain hidden, and defendants will be able to continue to freely infringe plaintiff's rights and commit other acts of theft with impunity.

### B.  Privacy Interests

While some parties may be unsure as to their privacy rights, courts have generally found there is no privacy right in the information sought by plaintiff.   In the 9th Circuit, an IP address and even the "to/from" fields for email do not carry an expectation of privacy as these are the same as the address on a public package. *United States v. Forrester*, 495 F.3d 1041, 1049 (9th Cir. 2007), citing *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577 (1979). Indeed, all parties subscribing to the related IP addresses of Exhibit 1 have already caused his or her IP address to be broadcast repeatedly in communications and requests for data and has through their ISP designated where the deliveries of requested data are to be made. "[T]here is no expectation of privacy in Internet subscriber information because it has already been exposed to a third party, the Internet Service Provider." *Courtright v. Madigan*, 2009 WL 3713654 at *2

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel:  503-581-1240

1    (S.D. Ill., 2009); see also *Guest v. Leis*, 255 F.3d 325 (6th Cir. 2001); *United States v. Simons*,

2    206 F.3d 392 (4th Cir. 2000).

3        Regardless, plaintiff proposes terms in the proposed Discovery Order to permit

4    subpoenaed parties to remain anonymous for cause, at least through initial proceedings.

5    Plaintiff further proposes terms to limit the use of any discovery obtained by *ex parte*

6    subpoenas to the enforcement of plaintiff's rights and the rights in the motion picture *Dallas*

7    *Buyers Club*.

8

9    **CONCLUSION**

10       For the foregoing reasons, plaintiff respectfully requests the Court grant the proposed

11   Discovery Order governing initial *ex parte* discovery in this matter.

12

13       DATED: April 4, 2014.

14

15                                        Respectfully submitted,

16                                        CROWELL LAW

17

18

19                                        _____

                                          Carl D. Crowell, OSB No. 982049
20                                        P.O. Box 923
                                          Salem, OR 97308
21                                        Tel:  503-581-1240
                                          Email: crowell@kite.com
22                                        Of attorneys for the plaintiff

23

24

25

26

MOTION – DISCOVERY ORDER
Page 7 of 7

Voltage v. Does 1 – 50 (A)

1  Carl D. Crowell, OSB No. 982049
   email:  crowell@kite.com
2  CROWELL LAW
   P.O. Box 923
3  Salem, OR 97308
   (503) 581-1240
4  Of attorneys for plaintiff
5

6

7              IN THE CIRCUIT COURT OF THE STATE OF OREGON

8                    FOR THE COUNTY OF MARION

9

10 VOLTAGE PICTURES, LLC              Case No.:  14C13823

                 Plaintiff,
11                                    (Proposed)
   v.                                 DISCOVERY ORDER
12
   DOES 1 - 50                        ORS 647.105 – State Trademark
13
                 Defendants.
14

15                          **DISCOVERY ORDER**

16         This matter came before the Court on plaintiff's *ex parte* Motion related to plaintiff's

17 issuance of ORCP 55 subpoenas to third parties in an effort to ascertain the identity of the

18 several Doe defendants currently known only by their IP address as identified in Exhibit 1 to the

19 Complaint.

20         The Court being duly advised does hereby **FIND AND ORDER:**

21

22         1.      Plaintiff has established "good cause" for it to serve third party subpoenas on the

23 Internet Service Providers ("ISPs") for the Internet Protocol ("IP") addresses listed in Exhibit 1

24 of the complaint in order to identify and specifically name the several Doe defendants.

25

26

DISCOVERY ORDER (Proposed)
Page 1 of 3

Voltage v. Does 1 – 50 (A)

2.      Plaintiff may serve the ISP Comcast with an *ex parte* ORCP 55 subpoena commanding the ISP to provide plaintiff with all subscriber identifying information, which shall include the true names, addresses, telephone numbers, contact information and e-mail addresses of all parties to whom the ISPs assigned the IP addresses set forth on Exhibit 1 of the complaint, together with other relevant information related to each subscriber.

3.      Plaintiff may also serve *ex parte* ORCP 55 subpoenas in the same manner as above on any party that is identified in response to a subpoena as a provider of internet services, namely should any IP address identified be sub-licensed to another ISP or user or the like, plaintiff may serve subpoenas until a specific Doe defendant party is identified.

4.      Subscriber identifying information to be provided to plaintiff shall not include photographs, emails, or content which may be subject to The Stored Communications Act, 18 U.S.C. § 2701, et seq., but shall be limited to information that may assist plaintiff in identifying the Doe defendants.

### NOTICE TO CABLE OPERATORS

(Cable Communications Act of 1984)

5.      If any ISP subpoenaed qualifies as a "cable operator," as defined by 47 U.S.C. § 522(5), **such ISP is notified that 47 U.S.C. § 551(c)(2)(C) contains a requirement that any cable operator provide the subscriber the opportunity to prohibit or limit such disclosure**. Such requirement may be met by:

a.      By mailing the subscriber a copy of the subpoena and a copy of this Order; and

b.      Giving the subscriber twenty one (21) days to file a motion to quash the issued subpoena; *or*

c.      Any other manner established by the ISP to comply with 47 U.S.C. §551(c)(2)(C).

DISCOVERY ORDER (Proposed)
Page 2 of 3

Voltage v. Does 1 – 50 (A)

6.      Absent a filed motion to quash, received by the ISP within twenty one (21) days of mailing or otherwise notifying the subscriber, subscriber identifying information shall be promptly submitted to plaintiff.

7.      ISP's may invoice plaintiff for reasonable costs for responses to subpoenas issued pursuant to this order and plaintiff is directed to pay all such reasonable costs.

8.      Any defendant or party identified in response to a subpoena issued pursuant to this order shall have 21 days to petition the Court to remain anonymous and plaintiff shall not name or publicly disclose the identity of any such party within such time period.

9.      Information disclosed in response to a subpoena issued pursuant to this order may only be used for protecting and enforcing rights in the motion picture *Dallas Buyers Club* and the rights of plaintiff.


**ORDERED** this ___ day of _____, 2014.


By:   _____
      Circuit Court Judge


Prepared by:
Carl D. Crowell, OSB No. 982049
email:  crowell@kite.com
Crowell Law
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of counsel for plaintiff


DISCOVERY ORDER (Proposed)
Page 3 of 3

Voltage v. Does 1 – 50 (A)

1    Carl D. Crowell, OSB No. 982049
     email:  crowell@kite.com
2    CROWELL LAW
     P.O. Box 923
3    Salem, OR 97308
     (503) 581-1240
4    Of attorneys for plaintiff

5

6

7                IN THE CIRCUIT COURT OF THE STATE OF OREGON

8                        FOR THE COUNTY OF MARION

9

10   VOLTAGE PICTURES, LLC              |  Case No.:  14C13823
                    Plaintiff,          |
11                                      |
     v.                                 |  DISCOVERY ORDER
12                                      |
     DOES 1 - 50                        |  ORS 647.105 – State Trademark
13                                      |
                    Defendants.         |
14   ─────────────────────────────────────────────────────────

15                            **DISCOVERY ORDER**

16          This matter came before the Court on plaintiff's *ex parte* Motion related to plaintiff's

17   issuance of ORCP 55 subpoenas to third parties in an effort to ascertain the identity of the

18   several Doe defendants currently known only by their IP address as identified in Exhibit 1 to the

19   Complaint.

20
            The Court being duly advised does hereby **FIND AND ORDER:**
21
            1.      Plaintiff has established "good cause" for it to serve third party subpoenas on the
22
     Internet Service Providers ("ISPs") for the Internet Protocol ("IP") addresses listed in Exhibit 1
23
     of the complaint in order to identify and specifically name the several Doe defendants.
24

25

26

     DISCOVERY ORDER
     Page 1 of 3
     Voltage v. Does 1 – 50 (A)

2.      Plaintiff may serve the ISP Comcast with an *ex parte* ORCP 55 subpoena commanding the ISP to provide plaintiff with all subscriber identifying information, which shall include the true names, addresses, telephone numbers, contact information and e-mail addresses of all parties to whom the ISPs assigned the IP addresses set forth on Exhibit 1 of the complaint, together with other relevant information related to each subscriber.

3.      Plaintiff may also serve *ex parte* ORCP 55 subpoenas in the same manner as above on any party that is identified in response to a subpoena as a provider of internet services, namely should any IP address identified be sub-licensed to another ISP or user or the like, plaintiff may serve subpoenas until a specific Doe defendant party is identified.

4.      Subscriber identifying information to be provided to plaintiff shall not include photographs, emails, or content which may be subject to The Stored Communications Act, 18 U.S.C. § 2701, et seq., but shall be limited to information that may assist plaintiff in identifying the Doe defendants.

## NOTICE TO CABLE OPERATORS

(Cable Communications Act of 1984)

5.      If any ISP subpoenaed qualifies as a "cable operator," as defined by 47 U.S.C. § 522(5), **such ISP is notified that 47 U.S.C. § 551(c)(2)(C) contains a requirement that any cable operator provide the subscriber the opportunity to prohibit or limit such disclosure**. Such requirement may be met by:

a.      By mailing the subscriber a copy of the subpoena and a copy of this Order; and

b.      Giving the subscriber twenty one (21) days to file a motion to quash the issued subpoena; *or*

c.      Any other manner established by the ISP to comply with 47 U.S.C. §551(c)(2)(C).

DISCOVERY ORDER
Page 2 of 3

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

6.      Absent a filed motion to quash, received by the ISP within twenty one (21) days of mailing or otherwise notifying the subscriber, subscriber identifying information shall be promptly submitted to plaintiff.

7.      ISP's may invoice plaintiff for reasonable costs for responses to subpoenas issued pursuant to this order and plaintiff is directed to pay all such reasonable costs.

8.      Any defendant or party identified in response to a subpoena issued pursuant to this order shall have 21 days to petition the Court to remain anonymous and plaintiff shall not name or publicly disclose the identity of any such party within such time period.

9.      Information disclosed in response to a subpoena issued pursuant to this order may only be used for protecting and enforcing rights in the motion picture *Dallas Buyers Club* and the rights of plaintiff.


**ORDERED** this ___ day of _____, 2014.


By:   _____
          Circuit Court Judge


Prepared by:
Carl D. Crowell, OSB No. 982049
email:  crowell@kite.com
Crowell Law
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of counsel for plaintiff


DISCOVERY ORDER
Page 3 of 3

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel:  503-581-1240

6. Absent a filed motion to quash, received by the ISP within twenty one (21) days of mailing or otherwise notifying the subscriber, subscriber identifying information shall be promptly submitted to plaintiff.

7. ISP's may invoice plaintiff for reasonable costs for responses to subpoenas issued pursuant to this order and plaintiff is directed to pay all such reasonable costs.

8. Any defendant or party identified in response to a subpoena issued pursuant to this order shall have 21 days to petition the Court to remain anonymous and plaintiff shall not name or publicly disclose the identity of any such party within such time period.

9. Information disclosed in response to a subpoena issued pursuant to this order may only be used for protecting and enforcing rights in the motion picture *Dallas Buyers Club* and the rights of plaintiff.

**ORDERED** this 4TH day of APRIL, 2014.

By: ______________________
Circuit Court Judge

Prepared by:
Carl D. Crowell, OSB No. 982049
email: crowell@kite.com
Crowell Law
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of counsel for plaintiff

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

Carl D. Crowell, OSB No. 982049
email: crowell@kite.com
CROWELL LAW
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for plaintiff

RECEIVED
APR 03 2014
Marion County Circuit Court

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| VOLTAGE PICTURES, LLC | Case No.: 14C13823 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| DOES 1 - 50 | ORS 647.105 – State Trademark |
| Defendants. | This matter is NOT subject to Mandatory Court Arbitration |
| | Equitable Relief Only |

Plaintiff Voltage Pictures, LLC, complains and alleges as follows:

JURISDICTION AND VENUE

1.  This is a suit for trademark infringement under ORS 647.105.

2.  Jurisdiction and venue before this Court is proper as based pre-filing investigations it is believed that several defendants reside in Marion County and all defendants reside in the State of Oregon.

///

///

COMPLAINT - Page 1 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

PARTIES

THE PLAINTIFF

3.  Plaintiff Voltage Pictures, LLC ("Voltage" / "Plaintiff") is a limited liability company with principal offices in Los Angeles, California that produces, markets and distributes motion pictures including the subject work in this matter, a motion picture titled *Dallas Buyers Club.*

The Rights of the Plaintiff

4.  Plaintiff is a producer of the motion picture titled *Dallas Buyers Club,* released in 2013. *Dallas Buyers Club* is an acclaimed motion picture nominated for six Academy Awards (Oscars), winning Best Actor, Best Supporting Actor and Best Makeup.  Plaintiff's motion picture also won numerous Screen Actors Guild Awards, Golden Globes and other awards.

5.  In the marketing of plaintiff's motion picture, plaintiff has branded the motion picture with its distinctive and registered trademark, VOLTAGE PICTURES, which identifies the motion picture as being associated with plaintiff.

6.  Plaintiff has sole and exclusive rights to use the mark VOLTAGE PICTURES in association with its goods and services both within the State of Oregon and nationwide.

7.  The VOLTAGE PICTURES mark is unique, distinctive, and clearly visible in the presentation and the viewing of plaintiff's motion picture.

8.  The VOLTAGE PICTURES mark is valuable, well known and famous as it is associated with numerous award winning motion pictures in addition to *Dallas Buyers Club.*

9.  The mark VOLTAGE PICTURES has been registered with the State of Oregon pursuant to ORS 647.015, Registry Number 42677.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

10. Pursuant to ORS 647.095, a person who without the consent of Voltage Pictures, uses the VOLTAGE PICTURES mark in connection with the distribution of a reproduction, counterfeit or copy of a motion picture is liable for the equitable remedies provided in ORS 647.105.

11.    Pursuant to ORS 647.105, "The owner of a mark registered under this chapter may proceed in a civil action to seek an injunction against the ... use, display or sale of a counterfeit or imitation of the mark."

12.    Plaintiff comes to this court seeking the equitable remedies provided by ORS Chapter 647, namely an injunction against those who have and would, without authorization, copy, reproduce and distribute motion pictures that bear its registered trademark.

### THE DEFENDANTS

13.    Defendants are participants in a peer-to-peer file sharing network.

14.    The defendants have been identified as Does in the instant case and are each indicated in the attached Exhibit 1 by a specific internet protocol ("IP") address used at a specific time to copy, reproduce and distribute a copy, counterfeit or reproduction of plaintiff's motion picture bearing plaintiff's registered mark without authorization.

15.    The defendants and each of them have improperly and without authorization from plaintiff copied, downloaded, shared and uploaded plaintiff's motion picture using a peer-to-peer network.

16.    The defendants have infringed plaintiff's State Trademark Rights.

17.    The defendants and their conduct are more specifically described below.

///

///

COMPLAINT - Page 3 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

JOINDER

18. Plaintiff acknowledges that joinder in this action under ORCP 28 (A) is permissive in that

plaintiff's claims arise out of the same occurrences or transactions, or series of occurrences or

transactions and that there are questions of law and fact common to each of the defendants.

19. All defendants have collectively acted through the BitTorrent protocol to download and

distribute plaintiff's motion picture bearing plaintiff's registered trademark.

20. All of the defendants, in a near contemporaneous time frame, were distributing the exact

same file through Bit-Torrent, potentially with each other and jointly to third parties.

21. All defendants have acted through the BitTorrent protocol to jointly contribute to the

functionality of the BitTorrent network by copying, reproducing and distributing plaintiff's

motion picture bearing plaintiff's registered trademark.

22. As such, plaintiff's rights to relief, as stated below, ultimately arise out of the same series

of transactions and occurrences.

23. This action also raises substantial questions of law and fact common to all defendants.

24. Permissive joinder in the instant case permits a more efficient management of the claims

of plaintiff against the several defendants and reduces the costs to plaintiff and defendants and

the costs and burdens on the Court.

25. Notice is provided that on being specifically identified and on request from an identified

infringing defendant, with leave of the Court, plaintiff agrees to sever any defendant that claims

prejudice in being joined in this matter and to proceed against each such defendant individually.

///

///

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

BACKGROUND

26. In the production of a motion picture there are countless expenses and labors, many of which are not evident in the final project, including writers, staff persons, construction workers and others.

27. Indeed, the final product produced, which may be less than two hours long is often sourced from countless hours of preparation, filming, post-production and promotion to bring the final product to viewers.

28. The end product that many consumers see is a few hours in a theater or a DVD product that once production is complete has a nominal cost on a per-viewing experience. However, this is misleading to the true costs of the motion picture as the costs to view a completed motion picture or produce a single DVD are nominal compared to what is often years of work by many of people leading up to the end product.

29. Added to this is that most people seen related to the end product, movie stars, directors and other persons of note, are generally perceived as highly compensated. This leads to the common misunderstanding that people involved in motion pictures are already wealthy.

30. When the perception is that those affiliated with a motion picture are already wealthy and the end product, such as a DVD, costs little to make, a reality disconnect often builds in the minds of much of the public, namely that those associated with a motion picture do not need any more money.

31. When this reality disconnect meets with the ready availability of pirated copies of motion pictures and the ease with which they can be pirated and downloaded at an almost anonymous level, many people feel justified in their pirating or theft of motion pictures.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

32. The result is that despite the industry's efforts to capitalize on internet technology and reduce costs to end viewers through legitimate and legal means of online viewing options such as through Netflix™, Hulu™, and Amazon Prime™, there are still those that use technology to steal motion pictures and undermine the efforts of creators through piracy and unauthorized distribution of motion pictures.

33. As noted by Senator Levin in Congressional hearings on peer-to-peer internet piracy, "taking someone's intellectual property is a serious offense, punishable by large fines. In the real world, violations of copyright law over the Internet are so widespread and easy to accomplish that many participants seem to consider it equivalent to jaywalking – illegal but no big deal.  But it is a big deal. Under U.S. law, *stealing intellectual property is just that – stealing. It hurts artists, the music industry, the movie industry, and others involved in creative work. And it is unfortunate that the software being used – called 'file sharing' as if it were simply enabling friends to share recipes, is helping create a generation of Americans who don't see the harm.*" (emphasis added)

34. In recognition of the growing problems and challenges with counterfeiting and piracy, The Oregon House of Representatives passed House Memorial 2 in 2013, which made the following findings:

Whereas the United States and other nations share **the challenge of combating intellectual piracy and the counterfeiting of intellectual property such as … films…** and technologies that affect the quality of life; and

Whereas **intellectual piracy and counterfeiting have a significant impact on Oregon's economy**, and the economies of other states and of nations around the world, which results in job and earnings losses, reduced tax revenues and increased threats to public health and safety; and

...

**Whereas protecting and enforcing intellectual property rights is crucial to the future of our innovation-based economy**; and

Whereas industries that use intellectual property extensively generate nearly $7.7 trillion in gross output and account for more than 60 percent of total exports from our nation; and

COMPLAINT - Page 6 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

Whereas industries that use intellectual property extensively ... employ more than 19 million Americans, whose salaries average about 60 percent higher than salaries in industries that do not make extensive use of intellectual property; and

Whereas intellectual property infringement can undermine the nation's economic security; and

Whereas violations of intellectual property rights, ambiguities in the law and a lack of enforcement create uncertainty in the marketplace and in the legal system and undermine consumer trust; and

Whereas **intellectual property, including trademarks, [are] essential** ...; and

...

Whereas **failing to adequately protect and enforce intellectual property rights will increase counterfeiting and illicit trade;**

...

(emphasis added)

35. As such it is clear that giving effect to ORS Chapter 647, and the enforcement of intellectual property rights, and in particular the fight against counterfeiting and piracy are critical issue of importance to both the United States of America and the State of Oregon.

## PEER-TO-PEER INTERNET PIRACY

36. Peer-to-peer networks, at least in their most common form, are computer systems that enable internet users to: 1) make files (including motion pictures) stored on each user's computer available for copying by other users or peers; 2) search for files stored on other users' computers; and 3) transfer ("share") exact copies of files between computers via the Internet.

37. The particular peer-to-peer protocol at issue in this suit is the BitTorrent protocol.

38. To use BitTorrent, a user intentionally downloads a program that they then install on their computer called a "client." The BitTorrent client is the user's interface during the downloading/uploading process. The client may be free, supported by advertising, offer upgrades or add on services for a fee, or a combination of several options.

39. Users then intentionally visit a "torrent site" or network site to find media or content available for download, often using a standard web browser.

COMPLAINT - Page 7 of 15

Voltage v. Does 1 – 50 (A)

40. A torrent site is often an advertising revenue or subscription supported index of media or content being made available by other users on the network and maintains a listing of movies and television programs among other protected content.

41. A user then uses the torrent site to connect with other users and exchange or "share" content though the BitTorrent protocol often with many users at the same time.

42. Internet piracy, and in particular BitTorrent piracy, though known as peer-to-peer file sharing, is often a for-profit business as many software clients, torrent sites and networks generate millions of dollars in revenue through sales and advertising.

43. To increase the value of the advertising and sometimes subscription access sold by torrent sites, many torrent sites work to expand the pool of available titles and speed of downloads through increasing the number of member peers and thus the desirability of their clients and networks. To accomplish this they reward participants who contribute by giving them faster download speeds, greater access, or other benefits.

44. A significant element of the BitTorrent model is that those who participate and download movies not only share and upload movies with others, but participants are often rewarded through various means based on the volume and availability of content participants in turn provide the network. In sum, there is a feedback incentive for participants as they obtain not only the benefit of their pirated copy of a movie, but they obtain other benefits by increasing the availability of pirated content to others.

45. As such there are a growing number of users that participate in peer-to-peer networks and receive personal gain or compensation in that the networks they use reward those who provide large numbers of files for upload to others.

COMPLAINT - Page 8 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

46. On information and belief, many defendants in Exhibit 1 have been compensated through benefits received for their participation in expanding the availability of pirated content to others through BitTorrent networks, including works that bear plaintiff's mark.

47. The use of BitTorrent does more than cause harm through the theft of intellectual property. The BitTorrent distribution of pirated files is a model of business that profits from theft through sales and advertising and a system of rewards and compensation to the participants, each of whom contribute to and further the enterprise.

48. Each of the defendants is a participant in the BitTorrent distribution of pirated files furthering a model of business that profits from theft of intellectual property including plaintiff's motion picture.

<div align="center">IP Addresses</div>

49. An Internet Service Provider, ("ISP"), grants access to the Internet and the ability to send and receive information, whether in the form of an email, photo or motion picture. To connect to the Internet a user must contract with an ISP and create an account for service either directly, or through an intermediary such as a subscriber.

50. The ISP then generally assigns each subscriber a unique IP address. An IP address is like the address used on an envelope. It is the identifier each defendant used to tell the world not only where they were sending data from, but the location to where any requested data should be sent.

51. The defendants have been identified as Does in the instant case and are indicated in the attached Exhibit 1 by a specific IP address, used at a specific time to exchange plaintiff's motion picture though the BitTorrent peer-to-peer network.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

52. Under the BitTorrent protocol each file has a unique "hash" (a file identifier generated by an algorithm) tied to a specific file. In the instant case, the hash identified on Exhibit 1 has been confirmed as being for an unauthorized copy of plaintiff's motion picture bearing plaintiff's registered mark.

53. Plaintiff has, to a reasonable degree of scientific certainty, learned the ISP used by each defendant, the torrent file copied and distributed by each defendant, the BitTorrent client application utilized by each defendant, and the likely location of each defendant, at least down to the state level, if not the county level at the time of infringement as determined by geolocation technology. Relevant information related to each defendant's IP address, and the time of infringement is provided in Exhibit 1, filed herewith.

54. Plaintiff's investigator has further established a direct peer-to-peer link with each defendant, confirming not only the apparent IP address used by each defendant, but also confirming the actual IP address overcoming any concerns with forging or "spoofing" an IP address.

55. Plaintiff's investigator has further monitored each defendant's IP address to the extent practical, confirming each IP address is not an incidental or transitory participant in BitTorrent, but observed as associated with persistent and prolonged BitTorrent activity. As such each IP address is likely to go to a specific authorized user and persistent infringer as opposed to an occasional guest or visitor or party without authorized and secure access to the specific IP address.

56. Despite the best available investigative techniques, it is impossible for plaintiff to identify defendants by name at this time. Thus plaintiff must sue defendants as Does 1 - 50.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

57. Plaintiff believes the defendants' ISP, Comcast, has information identifying the subscribers who are either defendants or who are parties with information needed to identify the defendants as defendants acted through the accounts of subscribers who were assigned the IP addresses of Exhibit 1. Plaintiff intends to issue subpoenas to the Comcast to identify subscribers and any subsequent intermediary in order to learn the identity of the Does.

### Conduct of Defendants

58. Plaintiff has recorded each defendant identified herein as copying and publishing plaintiff's motion picture via BitTorrent as plaintiff's investigator has been able to download a portion of plaintiff's motion picture from each defendant identified herein, and collectively, from the identified defendants and others, plaintiff has been able to download a complete copy of plaintiff's motion picture obtaining an integral portion from each defendant.

59. On information and belief, defendants' conduct was unauthorized and in violation of the license and terms of access to the Internet through their ISP, Comcast.

60. Upon information and belief, each defendant was a willing and knowing participant in the infringing of plaintiff's trademark rights.

61. Each defendant's conduct is effectively part of a collective enterprise constituting substantially similar or identical facts.

62. Upon information and belief, many defendants also obtained compensation or personal benefit through making plaintiff's motion picture available to others.

63. Each IP address in Exhibit 1 has further been observed as associated with other infringing conduct and as such it is believed that each defendant's conduct is not an isolated incident, but is part of a persistent and continuing pattern of infringing activity and until enjoined will continue

COMPLAINT - Page 11 of 15

Voltage v. Does 1 – 50 (A)

1  to infringe on plaintiff's rights in both plaintiff's motion picture and possibly other motion

2  pictures.

3  <div align="center">Exemplar Defendant</div>

4  64. While it would be an undue and unnecessary burden to outline each defendant's conduct,

5  an exemplar is provided to facilitate understanding of plaintiff's claims.

6  65. Exemplar user Doe No. 1 of 50, known at this time only by the IP address of

7  98.246.58.231, and believed to reside in Salem, as either a subscriber or acting through an

8  account established by a subscriber, initiated his or her infringing conduct by first intentionally

9  logging into the one of many BitTorrent client repositories known for their large index of

10  copyrighted and trademarked movies, television shows and software. Doe No. 1 then

11  intentionally obtained a torrent file identified by a "hash" or SHA1:

12  F18A60DB02EC3B55C18924F47955DE766DACC537 in this specific instance which is for

13  plaintiff's motion picture from the index and intentionally loaded that torrent file into a computer

14  program or client designed to read such files.

15  66. With the torrent file intentionally loaded by Doe No. 1, his or her BitTorrent client used

16  the BitTorrent protocol to initiate connections with potentially hundreds of other users

17  possessing and uploading or sharing copies of the digital media described in that same hash,

18  namely, plaintiff's motion picture.  As the motion picture was copied to Doe No. 1's computer

19  piece by piece, these downloaded pieces of plaintiff's motion picture were then published and

20  made available for upload to others from Doe No. 1's computer.

21  67. Each of Does 1 - 50 performed the same acts as those described for Doe No. 1, above.

22  Each of these defendants also became an uploader, meaning that each downloaded file or file

23  segment was then available to other users seeking to obtain the file without degradation in sound

COMPLAINT - Page 12 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

or picture quality. Thus, each defendant was an uploader or publisher and also a downloader or copier of plaintiff's motion picture.

68. With Doe No. 1, as with all other Does, there is other observed activity associated with the defendant's IP address, as such it is unlikely the defendants' activity is isolated or a one time occurrence, but is likely part of a pattern of regular and continuing conduct causing harm to plaintiff and others.

69. Attached hereto as Exhibit 2 is a partial listing of some of the other activity observed associated with Doe No. 1's IP address.

70. As can be seen from the data observed with Doe No. 1's IP address, the BitTorrent piracy at issue is unlikely to be that of an occasional visitor or guest as the activity is persistent over time.

71. As can be seen from the data observed with Doe No. 1's IP address, the BitTorrent piracy at issue is unlikely to be from a young child or "innocent" as content does not reflect the type of content that might be associated from a young child.

72. Additional data observed associated with Doe No. 1's IP address indicates the defendant is likely a mature adult with specific viewing habits.

73. 100 files are presented as observed associated with Doe No. 1's IP address, but this is just a small portion of observed activity associated with Doe No. 1 and the various defendants as each and every Doe defendant IP address in Exhibit 1 is observed as associated with dozens of different BitTorrent files in addition to plaintiff's motion picture, many observed associated with several hundred BitTorrent files (500+). As such the conduct associated with the defendants represents notable economic harm not only to plaintiff but also to the people of the State of Oregon.

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

74. The defendants and each of them are prolific proponents of the BitTorrent distribution system advancing the BitTorrent economy of piracy causing injury to plaintiff.

75. Some of the titles observed associated with Doe No. 1's IP address indicate association with the BitTorrent site TORRENTING.COM as seen in items 26, and 47.

76. TORRENTING.COM is torrent index site that profits from piracy of content, including plaintiff's motion picture through requesting "donations" as can been seen in Exhibit 3.

77. TORRENTING.COM actively promotes the download and distribution of plaintiff's motion picture as can be seen from a printout of the web page shown on Exhibit 4.

78. As such it is likely Doe No. 1 was involved with the promotion of TORRENTING.COM, at least to an incidental degree.

79. Co-opting and distributing pirated content for the promotion and benefit of third parties is regularly observed in the conduct associated with the several Doe defendants.

80. While it may or may not be that any one defendant in this case is personally and directly generating revenue or benefit from their conduct, defendants' conduct as a whole furthers such efforts on behalf of others as they persistently download and then re-published works, including plaintiff's motion picture for the benefit third parties.

## CLAIM FOR RELIEF

### ORS 647.105 – State Trademark

81. Defendants, and each of them, without the authorization or consent of plaintiff, used, copied and / or distributed a reproduction, counterfeit and copy of plaintiff's motion picture bearing plaintiff's registered trademark VOLTAGE PICTURES.

82. Defendants, and each of them have acted with knowledge and in bad faith in their infringement of plaintiff's rights.

COMPLAINT - Page 14 of 15

Voltage v. Does 1 – 50 (A)

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel: 503-581-1240

1    83. Plaintiff is entitled to an order of from this Court enjoining defendants from infringing

2    plaintiff's rights and directing defendants to delete all unauthorized copies of plaintiff's motion

3    pictures.

4

5

6                                        PRAYER FOR RELIEF

7    WHEREFORE, plaintiff prays for judgment against each defendant as follows:

8    A.        For entry of permanent injunction enjoining each defendant from infringing

9    plaintiff's rights in plaintiff's mark, including without limitation by using the Internet to

10   reproduce, copy or distribute any motion picture which bears plaintiff's mark except

11   pursuant to a lawful license or with the express authority of plaintiff. And further directing

12   each defendant to destroy all unauthorized copies of plaintiff's motion pictures.

13   B.        For plaintiff's reasonable costs and attorney fees pursuant to ORS 647.105(2).

14
     C.        For such other and further relief as the Court deems proper.
15

16

17        DATED: April 3, 2014.

18                                                 Respectfully submitted,

19                                                 CROWELL LAW

20

21

22

23                                                 Carl D. Crowell, OSB No. 982049
                                                   P.O. Box 923
24                                                 Salem, OR 97308
                                                   Tel: 503-581-1240
25                                                 Email: crowell@kite.com
                                                   Of attorneys for the plaintiff
26


COMPLAINT - Page 15 of 15

1  Carl D. Crowell, OSB No. 982049
   email:  crowell@kite.com
2  CROWELL LAW
   P.O. Box 923
3  Salem, OR 97308
   (503) 581-1240
4  Of attorneys for plaintiff

5

6

7

8                   IN THE CIRCUIT COURT OF THE STATE OF OREGON

9                          FOR THE COUNTY OF MARION

10

11  VOLTAGE PICTURES, LLC                    Case No.:  14C13823

12             Plaintiff,                    Judge Geyer

13  v.                                              (PROPOSED)

14  DOES 1 – 50,                             ORDER TO SEVER DOE NO. 29

15             Defendants.

16                                           ORS 647.105 – State Trademark

17

18      This matter came before the Court on plaintiff's Motion to Sever Doe No. 29.

19      The Court being duly advised does hereby **FIND AND ORDER:**

20      1.  Defendant Doe No. 29, identified by IP address 67.160.191.37 observed infringing

21          plaintiff's motion picture at 2/28/14 03:26:09 AM, is hereby severed from this action

22          pursuant to ORCP 30.

23      2.  Plaintiff shall have 14 days from receipt of this order to re-file its complaint against the

24          individual Doe No. 29 and such case shall be a continuance of this case under a new

25          docket number.

26

ORDER TO SEVER DOE NO. 29 (Proposed)
Page 1 of 2

Voltage v. Does 1 – 50 : 14C13823

                                    Crowell Law
                                    P.O. Box 923
                                    Salem, OR 97308-0923
                                    Tel:  503-581-1240

3. Discovery in the severed case shall relate back to this case in all manners, including obligations and duties of parties and any pending subpoenas and all discovery orders shall remain in effect.

4. Defendant Doe 29, identified by IP address 67.160.191.37 observed infringing plaintiff's motion picture at 2/28/14 03:26:09 AM, shall be deemed served in the severed case by service on counsel of a summons and complaint pursuant to ORCP 9.

**ORDERED** this ___ day of _____, 2014.

By: _____
Circuit Court Judge

Prepared by:
Carl D. Crowell, OSB No. 982049
email:  crowell@kite.com
Crowell Law
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of counsel for plaintiff

ORDER TO SEVER DOE NO. 29 (Proposed)
Page 2 of 2

Voltage v. Does 1 – 50 : 14C13823

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel:  503-581-1240

Carl D. Crowell, OSB No. 982049
email:  crowell@kite.com
CROWELL LAW
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for plaintiff

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| VOLTAGE PICTURES, LLC | Case No.:  14C13823 |
| Plaintiff, | |
| | Judge Geyer |
| v. | |
| | CERTIFICATE OF SERVICE: |
| DOES 1 - 50, | |
| | PLAINTIFF'S MOTION TO SEVER |
| Defendants. | DOE NO. 29; MEMORANDUM; |
| | PROPOSED ORDER |
| | |
| | ORS 647.105 – State Trademark |

I hereby certify that I served the following documents:

1. Plaintiff's Motion to Sever with Memorandum; and
2. Proposed Order to Sever;

on the attorney for Defendant Doe 29:

> Garrett Maass, Esq.
> 5245 NE 31st Ave
> Portland OR  97211
>
> Email: garrettmaass@csi.com
>           garrettmaass@gmail.com

by mailing a full, true, and correct copy thereof in a sealed postage-prepaid envelope, addressed to the attorney for plaintiff as shown above together with documents in PDF form to the listed emails on the date set forth below.

COS: MOTION TO SEVER DOE. 29
Page 1 of 2

Voltage v. Does 1 – 50 : 14C13823

1

2    DATED: April 29, 2014.

3                                                    Respectfully submitted,

4                                                    CROWELL LAW

5

6

7                                                    _____

8                                                    Carl D. Crowell, OSB No. 982049
                                                     P.O. Box 923
9                                                    Salem, OR 97308
                                                     Tel:  503-581-1240
10                                                   Email: crowell@kite.com
                                                     Of attorneys for the plaintiff
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COS: MOTION TO SEVER DOE. 29
Page 2 of 2

Voltage v. Does 1 – 50 : 14C13823

Carl D. Crowell, OSB No. 982049
email:  crowell@kite.com
CROWELL LAW
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for plaintiff

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| VOLTAGE PICTURES, LLC | Case No.:  14C13823 |
| Plaintiff, | Judge Geyer |
| v. | PLAINTIFF'S MOTION TO ABATE PLAINTIFF'S PENDING MOTION TO SEVER DOE NO. 29; MEMORANDUM |
| DOES 1 – 50, | |
| Defendants. | |
| | ORS 647.105 – State Trademark |

PLAINTIFF'S MOTION TO ABATE

PLAINTIFF'S PENDING MOTION TO SEVER DOE NO. 29

*Preliminary Statement*

Plaintiff does not request oral argument.

Counsel for party served:    Garrett Maass, Esq.
5245 NE 31st Ave
Portland OR  97211
Tel:  503-313-1980
Email:  garrettmaass@csi.com
garrettmaass@gmail.com

1

2
# MOTION

3
Plaintiff moves to abate its pending motion to sever the party now known as Doe 29,

4
observed infringing plaintiff's motion picture using IP address 67.160.191.37 on 2/28/14 at

5

6
03:26:09 AM UTC or in the alternative moves to withdraw the motion with leave to re-file.  This

7
motion is supported by the record of this case and the below memorandum.   Plaintiff requests

8
such abatement continue until such time as the actual Doe 29 (or relevant party) requests such

9
directly or though counsel in a request submitted to the court, such as by letter.

10

11
# POINTS AND AUTHORITIES / MEMORANDUM

12
Plaintiff was initially contacted in this matter by attorney Garrett Maass who objected to his

13
client being joined with the other defendants.  Attorney Garratt Maass affirmatively identified his

14
client as: "My client's IP is 67.160.191.37."  Internet Protocol ("IP") address 67.160.191.37

15
corresponds with Doe 29 in the pending complaint.  In a subsequent telephone conferral, attorney

16
Garrett Maass maintained this position and the objection claiming improper joinder.

17

18
To resolve this point of dispute, and pursuant to a telephone conferral with defendant's

19
attorney, plaintiff agreed to sever Doe 29, with IP address 67.160.191.37.

20
After filing plaintiff's now pending motion to sever, plaintiff received an email from Garrett

21
Maass stating, "Feel free to move to sever the IP address I gave you. It does not belong to anyone I

22
represent-I got it courtesy of Comcast."  As such, it would appear Doe 29 is *NOT* represented by

23
Garrett Maass and the relevant Doe 29 may not object to being joined in this case.

24
In an attempt to resolve this apparent disparity, an explanation was requested with a response

25
that included  "Lawyers are not obligated to be honest with other lawyers except concerning

26

MOTION – SEVER DOE NO. 29
Page 2 of 3

Voltage v. Does 1 – 50 : 14C13823

Crowell Law
P.O. Box 923
Salem, OR 97308-0923
Tel:  503-581-1240

1    matters of representation to the Court." This was together with further demands and settlement

2    terms followed by the conflicting affirmative statement from defense counsel: "…you were foolish

3    to assume that my representations to you on [the identity of my client] (or really any topic not

4    directly before a tribunal) must be accurate."

5

6        As such, while it may be reasonable to assume attorney Garratt Maass has a client that

7    objected to being joined, and plaintiff agreed to sever that party as evidenced by the pending

8    motion, at this time plaintiff is without a good faith belief that Doe 29 was ever represented by

9    Garret Maass. As such, plaintiff believes the pending motion should be abated until such time as

10   the identity of Mr. Maass' client is ascertained.

11       WHEREFORE for the reasons stated herein, plaintiff moves this court to abate plaintiff's

12   pending motion to sever Doe 29.

13

14

15       DATED: May 5, 2014.

16                                                Respectfully submitted,

17                                                CROWELL LAW

18

19

20       _____
                                                 Carl D. Crowell, OSB No. 982049
21                                               P.O. Box 923
                                                 Salem, OR 97308
22                                               Tel: 503-581-1240
                                                 Email: crowell@kite.com
23                                               Of attorneys for the plaintiff

24

25

26

MOTION – SEVER DOE NO. 29
Page 3 of 3

Voltage v. Does 1 – 50 : 14C13823

1   Carl D. Crowell, OSB No. 982049
    email:  crowell@kite.com
2   CROWELL LAW
    P.O. Box 923
3   Salem, OR 97308
    (503) 581-1240
4   Of attorneys for plaintiff

5
                    IN THE CIRCUIT COURT OF THE STATE OF OREGON
6
                           FOR THE COUNTY OF MARION
7
    VOLTAGE PICTURES, LLC                    |   Case No.:  14C13823
8
                    Plaintiff,               |   Judge Geyer
9
    v.                                       |   CERTIFICATE OF SERVICE:
10
    DOES 1 - 50,                             |   PLAINTIFF'S MOTION TO ABATE
11                                           |   PLAINTIFF'S MOTION TO SEVER
                    Defendants.              |   DOE NO. 29
12
13
14                                           |   ORS 647.105 – State Trademark
15

16          I hereby certify that I served the following documents:

17              1.  Plaintiff's Motion to Abate Plaintiff's Motion to Sever with Memorandum

18          on:

19                           Garrett Maass, Esq.
20                           5245 NE 31st Ave
                             Portland OR  97211
21
                             Email: garrettmaass@csi.com
22                                   garrettmaass@gmail.com
23
    by mailing a full, true, and correct copy thereof in a sealed postage-prepaid envelope, addressed
24  to the attorney for plaintiff as shown above together with documents in PDF form to the listed
    emails on the date set forth below.
25

26

    COS: MOTION TO ABATE - DOE. 29                    Crowell Law
    Page 1 of 2                                        P.O. Box 923
                                                       Salem, OR 97308-0923
    Voltage v. Does 1 – 50 : 14C13823                  Tel:  503-581-1240

1

2    DATED: May 5, 2014.

3                                              Respectfully submitted,

4                                              CROWELL LAW

5

6

7

8                                              Carl D. Crowell, OSB No. 982049
                                               P.O. Box 923
9                                              Salem, OR 97308
                                               Tel:  503-581-1240
10                                             Email:  crowell@kite.com
                                               Of attorneys for the plaintiff
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COS: MOTION TO ABATE - DOE. 29
Page 2 of 2

Voltage v. Does 1 – 50 : 14C13823



RECEIVED
MAY 08 2014
Marion County Circuit Court

1   David H. Madden, OSB #080396
    Mersenne Law LLP
2   9600 S.W. Oak Street
    Suite 500
3   Tigard, Oregon 97223
    dhm@mersenne.com
4   (503)679-1671

5

6

7

8              IN THE CIRCUIT COURT OF THE STATE OF OREGON

9                              MARION COUNTY

10

11   **VOLTAGE PICTURES,** LLC            )   Case No.  14C13823-
                                          )             14C13824-
12          Plaintiff,                    )
                                          )
13     *v.*                               )   **Motion to Dismiss;**
                                          )   **Motion Quash or Modify**
14   **DOEs 1–50,**                       )   **Subpoena**
                                          )
15          Defendants                    )      (Oral Argument Requested)

16

17                         **UTCR Compliance**

18   Pursuant to UTCR 5.050(1), DOES A–D (four
     unidentified defendants represented by undersigned
19   counsel, two of whom are involved in 14C13823 and
     two of whom are involved in 14C13824) request oral
20   argument. Court reporting services are not requested.
     Defendants estimate that oral argument (applicable to
21   both cases) will take 30 minutes.

22

23   DOEs A–D appear by and through their undersigned counsel to request that

24   the Court dismiss the present action without prejudice for lack of jurisdiction,

25   or in the alternative, that the Court quash or modify the subpoenas served by

     14C13823, 13824   | Defendants' Motions to Dismiss and to Quash or Modify Subpoenas
     Page 1/15

(Left margin, vertical text)
Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com.............(503)679-1671

1   David H. Madden, OSB #080396
    Mersenne Law LLP
2   9600 S.W. Oak Street
    Suite 500
3   Tigard, Oregon  97223
    dhm@mersenne.com
4   (503)679-1671

5

6

7

8            **I**N THE **C**IRCUIT **C**OURT OF THE **S**TATE OF **O**REGON

9                         **M**ARION **C**OUNTY

10

11  **VOLTAGE PICTURES,** LLC          )
                                       )   Case No.  14C13823-
12          Plaintiff,                 )              14C13824-
                                       )
13       *v.*                          )   **Motion to Dismiss;**
                                       )   **Motion Quash or Modify**
14  **DOE**s 1–50,                     )   **Subpoena**
                                       )
15          Defendants                 )          (Oral Argument Requested)

16

17                    **UTCR Compliance**

18      Pursuant   to   UTCR   5.050(1),   DOES   A–D   (four
    unidentified   defendants   represented   by   undersigned
19  counsel, two of whom are involved in 14C13823 and
    two of whom are involved in 14C13824) request oral
20  argument.  Court reporting services are not requested.
    Defendants estimate that oral argument (applicable to
21  both cases) will take 30 minutes.

22

23  **DOE**s A–D appear by and through their undersigned counsel to request that

24  the Court dismiss the present action without prejudice for lack of jurisdiction,

25  or in the alternative, that the Court quash or modify the subpoenas served by

---

14C13823, 13824      Defendants' Motions to Dismiss and to Quash or Modify Subpoenas
Page 1/15

1   Plaintiff's counsel on non-party Internet Service Providers ("ISPs") pursuant to

2   the Court's April 4, 2014 grant of early discovery.  These motions are

3   submitted to the Court under ORCP Rules 21A(1), 21F and 55B and are

4   supported by the attached Memorandum of Points and Authorities.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Mersenne Law LLP**
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com.................................(503)679-1671

14C13823, 13824                    Defendants' Motions to Dismiss and to Quash or Modify Subpoenas
Page 2/15

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com ...........................(503)679-1671

## MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND

## AND TO QUASH OR MODIFY SUBPOENA

### Summary of Relief Requested

The Court should QUASH the subpoenas Plaintiff has issued pursuant to the Court's April 4ᵗʰ Order granting early discovery because the Court is WITHOUT JURISDICTION over the underlying subject matter. Because an order entered without jurisdiction is void, the discovery subpoenas have been issued without valid authority and are themselves invalid. Furthermore, the Court should DISMISS the current action without prejudice for lack of subject-matter jurisdiction.

Should the Court determine that its exercise of jurisdiction is appropriate, then Defendants ask the Court to MODIFY the subpoenas by limiting the uses Plaintiff may make of the information disclosed thereby. The details of the requested modification and the reasons therefor are explained below.

### Lack of Jurisdiction

As an initial matter, Defendants observe that actions seeking relief under the Copyright Act, 17 U.S.C. § 101 *et seq.*, are explicitly, solely and exclusively within the jurisdiction of the federal courts. 28 U.S.C. § 1338(a) provides:

> The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. **No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to** patents, plant variety protection, or **copyrights**.

Plaintiff VOLTAGE PICTURES LLC ("VOLTAGE") has styled the present action as one seeking only equitable relief under a purported claim of state

1  trademark infringement (Complaint at ¶¶ 1, 10).  However, the only allegation

2  of misuse or infringement of the trademark is in the "copy[ing],

3  reproduc[ing] and distribut[ing of a] motion picture that bear[s]" the mark

4  (Complaint at ¶  12).  The bulk of the complaint alleges wrongs that sound in

5  copyright, and indeed, most of the text is cribbed directly from VOLTAGE's

6  prior copyright-infringement suits (discussed below).

7      A state law claim is preempted by the Copyright Act, and therefore not

8  within a state court's jurisdiction, when **(1)** the subject matter of the state-law

9  claim falls within the subject matter of the copyright act, and **(2)** when the

10 rights asserted under state law are equivalent to the rights contained in 17

11 U.S.C. § 106, which articulates the exclusive rights of copyright holders.  *Laws*

12 *v. Sony Music Entertainment, Inc.*, 448 F.3d 1134, 1137-38 (9th Cir. 2006).

13 **(1)**  According to the Complaint, the subject matter of the state law claim is

14 the illegal copying, reproducing and distributing of a motion picture, *Dallas*

15 *Buyers Club*, which allegedly happens to bear Plaintiff's trademark.  Plaintiff

16 does not allege that the DOE defendants affixed Plaintiff's mark to the movie

17 themselves, only that they copied and distributed a movie bearing the mark.

18 If they had not copied and distributed the movie, then no trademark

19 infringement would have been committed.

20     **The alleged trademark infringement is inseparable from the**

21 **copying and distributing, and would not exist but for those alleged acts.**

22 **(2)**  17 U.S.C. § 106 secures to the copyright owner the exclusive rights to do

23 and to authorize:

24         (1) to **reproduce** the copyrighted work in copies or
        phonorecords;

25         […]

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com.........................(503)679-1671

(3) to **distribute** copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

Plaintiff's state law trademark claim concerns alleged conduct that is *exactly* coextensive with a copyright holder's rights under 17 U.S.C. § 106. There is not even a suggestion of a right of Plaintiff that is distinguishable from one of the § 106 rights. Thus, there is no question that Plaintiff's trademark claims are preempted by the Copyright Act, and by operation of 28 U.S.C. § 1338(a) (quoted above) this Court is without jurisdiction in this matter.

"An order or judgment entered by a court that lacks subject matter jurisdiction is void and not merely voidable." *Polygon Northwest v. NSP Development*, 96 P.3d 837 (Or. App., 2004). Because the Court lacks jurisdiction over the subject matter of the present suit, it MUST QUASH the subpoenas because the order purporting to grant authority to issue them is void.

If the Court fails to quash the subpoenas (and to notify the respondents of this decision), then it will countenance and acquiesce in the issuance of subpoenas bearing its imprimatur and supported by its invalid, void order. A party's issuance of rogue, unauthorized subpoenas would be a matter of serious concern to the Court, and the presently-challenged subpoenas should be treated exactly the same.

///

///

///

///

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com .........................(503)679-1671

**Introduction to the Merits**

Plaintiff VOLTAGE PICTURES LLC alleges that it is a producer, marketer and distributor[1] of motion pictures, including of 2013 Academy Award winner *Dallas Buyers Club*[2].  Indeed, VOLTAGE appears to be a busy and trusted distributor of Oscar-winners like *Dallas Buyers Club* (2013) and *Hurt Locker* (2008), as well as star vehicles like Steven Segal's *Maximum Conviction* (2012) and David-and-Goliath law drama *Puncture* (2011).

Regrettably, even a legitimate business such as VOLTAGE must occasionally turn to the courts for assistance against those who would disregard its rights and commercial prerogatives.  Sadly, the enforcement of legitimate rights by an apparently *bona fide* business like VOLTAGE is often confused (by an ignorant public) with superficially-similar litigation tactics adopted by so-called "copyright trolls" – "movie" companies whose bread-and-butter is in shaking down unrepresented parties for settlements of dubious or outright invalid claims.

Predictably, VOLTAGE will be called a troll for pursuing the present action, although it is perhaps distinguishable from a typical case.  However, because of the serious risk to the Court's credibility and *appearance* of fairness, it is important that the Court understand what a copyright troll action is, important that safeguards be put in place to reassure a skeptical public that the Court's authority is not being abused, and important to show that the public's trust in the Court is not misplaced.

---

[1] but **not**, critically, an ***author*** or ***copyright holder***

[2] Curiously, VOLTAGE's website reports that *Dallas Buyers Club* was released in the U.S. through Focus Features, which is apparently a Delaware limited-liability company unrelated to Plaintiff VOLTAGE PICTURES, LLC.

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com...............(503)679-1671

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com .........................(503)679-1671

**Copyright Trolling**

As an initial matter, Defendants note that "trolling" is an offensive and prejudicial term for a litigation strategy that, while questionable, is not *prima facie* vexatious nor invariably pursued in bad faith.  The practice is described and analyzed in a recent paper by Professor Matthew Sag of Loyola University Chicago School of Law and Associate Director for Intellectual Property at the Institute for Consumer Antitrust Studies (*Copyright Trolling, An Empirical Study* (March 21, 2014); Iowa Law Review, Forthcoming; available at SSRN: http://ssrn.com/abstract=2404950M; copy attached as Appendix A).  Professor Sag's label for a copyright troll, 'systematically opportunistic plaintiff,' is somewhat unwieldy, so in the following description, the simpler and neutral phrase "rightsholder action" will be adopted.  Professor Sag describes the economic motivations of a rightsholder-action plaintiff and analyzes recent data relating to numbers of cases and numbers of Doe defendants, but Defendants believe the Court's understanding may be aided by a shorter description that focuses on the 'view from the bench.'

**Rightsholder Action**

In a rightsholder action, a plaintiff files a lawsuit alleging infringement of an intellectual property right through the concerted action of a large number of defendants, whom the plaintiff can only identify by a computer address (an "IP address").  Immediately thereafter, the plaintiff files an *ex parte* motion to permit it to take early discovery, and most courts grant such motions as a matter of course.

Subpoenas are issued to the Internet Service Providers ("ISPs") associated with the IP addresses, since those companies have the information

**Mersenne Law LLP**
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97721 US
info@mersenne.com............................(503)679-1671

1    to connect an IP address with the name and address of the person who pays

2    the bill for Internet service[3].  The ISPs send letters to their customers,

3    notifying them of the lawsuit and alerting them that the ISP will disclose their

4    identifying information to the plaintiff unless the customer takes action (*e.g.*,

5    by filing a motion to quash the subpoena).

6         Sometimes motions to quash are filed, on the grounds that releasing

7    the identifying information would be a violation of the subscriber's privacy

8    interests, but these are routinely (and properly) denied, since a putative

9    privacy interest cannot properly trump a legitimate allegation of infringement.

10        When a rightsholder-action plaintiff obtains the identifying

11   information for an Internet subscriber, its counsel contacts the unrepresented

12   party, informs him that he is liable for infringement (being sure to note the

13   maximum statutory penalties for infringement[4]), and offers the target the

14   opportunity to settle the matter for a modest – but immediate – payment.

15   Individuals who protest their innocence are usually told that they must

16   cooperate in the plaintiff's investigations by allowing inspection of their

17   computers or by subjecting themselves to polygraph interrogations, and that

18   failure to cooperate will result in an adverse litigated outcome.

19        A final hallmark of a rightsholder action that ignorant laymen consider

20   a "copyright troll" suit is the lack of further proceedings before the judge who

21   granted early discovery.  Apart from occasional motions to quash or dismiss,

22

23   ---

[3] Although this point is invariably glossed over in a rightsholder complaint, the **IP address cannot identify a person**.  Thus, the early discovery sought is like trying to find the person who made a prank call, by identifying the person who pays the phone bill.

24   [4] Statutory damages for copyright infringement range from $750 to $30,000 per instance, with enhancements up to $150,000 if the copyright owner can prove willful infringement.  17 U.S.C. § 504(c).

25

the allegations of the complaint will never be proven or contested, no defenses will be presented, and no final judgment on the merits will ever be rendered.  The case will simply be dismissed without prejudice, on plaintiff's motion or by the court's own action.

It is almost as if the rightsholder plaintiff's *sole objective* is to obtain a list of names and addresses of Internet subscribers under the pretext of tracking down infringers, though it is difficult to imagine what legitimate use such a list could be, if not to name and serve defendants to the lawsuit. Rightsholder plaintiffs even present facially invalid complaints to courts whose lack of jurisdiction is not subject to *any* dispute[5], in pursuit of early discovery.  Further, even after obtaining discovery via subpoenas issued pursuant to an order of a court lacking jurisdiction, rightsholder plaintiffs do not substitute identified individuals into the pending suit, or file new separate actions against such individuals.

### VOLTAGE's Suits

Defendants' counsel recently conducted a survey of VOLTAGE's cases since 2010.  Plaintiff has filed 78 actions in district courts across the country, alleging copyright infringement by just over 30,000 Doe defendants (an average of approximately 392 Does per case).  After obtaining and reviewing the dockets in these cases, it appears that *none* of them have been litigated – not a single Doe has answered and then been found liable for the alleged infringement (or exonerated therefrom).  A small number of default judgments have been obtained, but the overwhelming majority of the cases

---

[5] For example, plaintiffs present copyright-infringement claims to state courts, despite 28 U.S.C. § 1338(a) (discussed above)

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com..................................(503)679-1671

were simply dismissed without prejudice, on VOLTAGE's motion or by the court, shortly after the grant of early discovery.

In Oregon, VOLTAGE has filed eight suits: four against multiple defendants (total 619 Does), and four individual suits after the multi-Doe suits foundered when Chief Judge Ann Aiken expressed concern that VOLTAGE was exploiting misjoinder to deprive the court of filing fees.

Judge Aiken dismissed all Does except Doe #1 from each of the multi-Doe suits, and it seems fairly clear that the Oregon federal courts will not be receptive to VOLTAGE's further attempts to avoid fees by suing many defendants in one case.

### The Present Lawsuits

Only time will tell whether VOLTAGE intends to use the information sought by the challenged subpoenas for the legitimate purpose of naming and serving the Internet subscribers to this suit.  However, in view of VOLTAGE's questionable conduct in its large number of previous actions, the possibility that it is merely seeking to obtain information on the cheap from the state court, and the burden to each of the hundred Does who *will be* inconvenienced and *may be* improperly intimidated, Defendants respectfully submit that the Court should modify the subpoenas as follows.

### The Court Should Oversee These Cases Closely

At the present stage, and until the individuals identified in response to the subpoenas are <u>named</u> and <u>served</u> in the <u>present action</u>, these cases are indistinguishable from VOLTAGE's earlier suits (which exactly fit the "systematically opportunistic plantiff" mold).  Judging by its past actions, there is a substantial probability that VOLTAGE will send false or misleading

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com.............................(503)679-1671

settlement demands, or attempt to trick unrepresented parties into executing a "free" settlement of one claim, only to have the settlement presented as conclusive evidence of a different claim, by a completely different party.

Once such demands or offers are sent, the damage cannot be undone. In fact, once the Internet subscribers are identified, if VOLTAGE is not restricted from using the information for purposes beyond those authorized by this Court, the Court's subpoena power will have been applied to support a fishing expedition by parties not before the Court – parties seeking a cheap license to take trophies neither considered nor acknowledged, let alone approved by the Court.

To maintain its integrity and – as important – the *appearance* of impartiality in this matter, the Court should modify Plaintiff's subpoenas as explained below.

### Subpoena Modifications

First, Defendants respectfully request that the Court modify its order granting early discovery to provide that any identifications obtained in response to the subpoenas shall be for the sole and exclusive use of VOLTAGE and for the sole and exclusive purpose of naming and serving those individuals as parties in the present suit. All other use of this information should be foreclosed.

Second, Defendants respectfully request that the Court review and (if necessary) amend all documents and communications Plaintiff proposes to make to unrepresented individuals identified in response to the subpoenas, to prevent VOLTAGE from disseminating false or misleading information.

Third, Defendants respectfully request that the Court require that

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com........................(503)679-1671

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com ..........................(503)679-1671

VOLTAGE file copies of *all* documents it transmits to individuals identified in response to the subpoenas, and submit records of all telephonic or in-person interactions with those individuals.

Finally, Defendants respectfully request that the Court appoint a guardian *ad litem* to represent the interests of DOEs in the present action for all purposes, until such time as the DOE is named and personally served.

### Conclusion

Federal copyright law provides remedies – and they are *substantial*, *statutory* remedies – to content owners whose rights have been infringed. But those remedies are only available to injured plaintiffs who are able to establish, to the court's or jury's satisfaction, that the defendant actually committed the acts complained of.  They are not mere threats provided for the convenience of litigants proceeding in bad faith who would coerce extrajudicial payments from Internet subscribers who may have no connection to any alleged misdeeds.

The Court should quash or modify the subpoenas as described above to avoid becoming a mere cog in a plaintiff's extortion scheme, and to avoid the *appearance* of having been duped into that role.  The requested limitations will not impair any exercise of any of Plaintiff's legitimate rights, but they will protect the Court from potential abuse of its subpoena power and any from any suggestion that it is failing to fully and fairly protect the rights of all who might come before it.  In fact, Plaintiff can obtain the injunctive relief that it claims to be seeking without *any* judicial action.  Federal law allows Plaintiff to enjoin the alleged infringement via a DMCA Notice.  (17 U.S.C. § 512(j))  By lodging such a notice with each ISP to which it has instead issued

Defendants' Motions to Dismiss and to Quash or Modify Subpoenas

1    subpoenas, VOLTAGE could have obtained the relief it seeks, without

2    consuming any judicial resources.

3

4        Sunshine is the best disinfectant, and by requiring VOLTAGE to

5    proceed in full sunlight, the Court can fulfill its obligations to *all* the citizens

6    of this State.

7

8    Respectfully submitted,

9

10

     _____        _____

11       Date                                David H. Madden, OSB #080396
                                             Attorney for Defendants A–D

12

**Mersenne Law LLP**
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com.........................(503)679-1671

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Mersenne Law LLP**
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com.........................(503)679-1671

<u>**APPENDIX A**</u>

*Copyright Trolling, An Empirical Study*

Defendants' Motions to Dismiss and to Quash or Modify Subpoenas

# Copyright Trolling, An Empirical Study

Matthew Sag[*]

### ABSTRACT

*This detailed empirical and doctrinal study of copyright trolling presents new data showing the astonishing rate of growth of multi-defendant John Doe litigation in United States district courts over the past decade. It also presents new evidence of the association between this form of litigation and allegations of infringement concerning pornographic films. Multi-defendant John Doe lawsuits have become the most common form of copyright litigation in several U.S. districts, and in districts such as the Northern District of Illinois, copyright litigation involving pornography accounts for more than half of new cases filed.*

*This Article highlights a fundamental oversight in the extant literature on copyright trolls. Paralleling discussions in patent law, scholars addressing the troll issue in copyright have applied status-based definitions to determine who is, and is not, a troll. This Article argues that the definition should be conduct-based. Multi-defendant John Doe litigation should be counted as part of copyright trolling whenever these suits are motivated by a desire to turn litigation into an independent revenue stream. Such litigation, when initiated with the aim of turning a profit in the courthouse as opposed to seeking compensation or deterring illegal activity, reflects a kind of systematic opportunism that fits squarely within the concept of litigation trolling. This Article shows that existing status-based definitions of copyright trolls are inapt because they do not account for what is now the most widely practiced from of trolling.*

*In addition to these empirical and theoretical contributions, this Article explores the features of copyright doctrine that have facilitated the recent explosion in trolling litigation in the form of litigation against John Does. In particular, it shows how statutory damages and permissive joinder make multi-defendant John Doe litigation possible and why allegations of infringement concerning pornographic films are particularly well-suited to this model.*

[*]    Professor, Loyola University Chicago School of Law and Associate Director for Intellectual Property of the Institute for Consumer Antitrust Studies. Thanks to Tonja Jacobi, Glynn Lunney, David Schwartz and Spencer Waller for their comments and suggestions. **Draft dated March 21, 2014**. Please send all comments msag@luc.edu. Accepted for publication in Volume 100 of the *Iowa Law Review*. Raw data available soon at http://matthewsag.com/publications-2/data-sets/

Electronic copy available at: http://ssrn.com/abstract=2404950

TABLE OF CONTENTS

Introduction ........................................................................................ 2

I – The Rise of the Copyright Troll ................................................... 6
   A.   Copyright Trolls and Copyright Trolling ............................... 6
   B.   MDJD Litigation and Copyright Trolling ............................... 9
   C.   The Economics of MDJD Lawsuits ...................................... 10
   D.   The Rise of MDJD Lawsuits ................................................ 11

II.   Statutory Damages, Joinder & Pornography ............................. 15
   A.   Statutory Damages .............................................................. 15
   B.   Joinder ................................................................................. 17
   C.   The Copyright Trolling-Pornography Nexus ........................ 23

III.   Reforms ..................................................................................... 30
   A.   The Normative Foundations for Reform ............................... 30
   B.   Reform Proposals ............................................................... 31

IV.   Conclusion ................................................................................ 40

INTRODUCTION

Patent trolls are in the news[1] and they have been high on the agenda of intellectual property policy makers and academics for over a decade now.[2] In 2012, those targeted by patent aggregators and patent holding companies accounted for 56% of all patent defendants;[3] depending on one's definition of a patent troll, the incidence of patent troll litigation may or may not be increasing;[4] patent trolls have been condemned by the

---

[1] See e.g., Edgar Walters, "Tech Companies Fight Back Against Patent Lawsuits" N.Y. TIMES January 24, 2014. (http://www.nytimes.com/2014/01/24/us/tech-companies-fight-back-against-patent-lawsuits.html)

[2] See e.g., FTC, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, (2003), available at http://www.ftc.gov/os/2003/10/innovationrpt.pdf; FTC, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* (2011), available at http://www.ftc.gov/os/2011/03/110307patentreport.pdf. See generally, Mark A. Lemley & A. Douglas Melamed, *Missing the Forest for the Trolls*, 113 Colum. L. Rev. 2117 (2013).

[3] Christopher A. Cotropia, Jay P. Kesan & David L. Schwartz, Unpacking Patent Assertion Entities (PAEs) (working paper), see Figure 3.

[4] Colleen Chien reports that patent trolls 29% filed in 2010 of patent lawsuits and 62% in 2012. Colleen Chien, *Patent Trolls by the Numbers* (available at http://www.patentlyo.com/patent/2013/03/chien-patent-trolls.html). However, new research using more transparent data finds that, based on the total number of patent litigants, there is almost no difference between 2010 and 2012. Christopher A. Cotropia, Jay P. Kesan & David L. Schwartz, Unpacking Patent Assertion Entities (PAEs) (working paper).

2

Electronic copy available at: http://ssrn.com/abstract=2404950

President;[5] and targeted by new legislation.[6] While patent trolls hog the limelight, a particular type of copyright troll has been taking over the dockets of several United States District Courts, and yet copyright trolls have received comparatively little attention in policy and academic circles. District court judges have certainly commented on how the nature of copyright litigation is changing,[7] but until now there has been no systematic in-depth analysis of the data.[8] This Article remedies this deficiency.

This empirical study of copyright trolling presents new data revealing the astonishing growth of a particular kind of copyright trolling — the Multi-Defendant John Doe ("MDJD") lawsuit alleging copyright violation through the file sharing software known as BitTorrent. Generally, these suits take the form of "Copyright Owner v. John Does 1 – N" where N is a large number.[9] MDJD suits are not just a form of copyright trolling; they are the dominant form. In 2013, these MDJD suits were the majority of copyright cases filed in 19 out of 92 federal districts.[10]

---

[5] President Obama recently stated "They don't actually produce anything themselves…They are essentially trying to leverage and hijack somebody else's idea and see if they can extort some money out of them."  http://www.whitehouse.gov/blog/2013/06/04/taking-patent-trolls-protect-american-innovation.  See also, Executive Office of the President, *Patent Assertion and U.S. Innovation* (June 2013).

[6] Leahy-Smith America Invents Act (AIA), Pub. L. No. 112-29, 125 Stat. 284 (2011) (codified in scattered sections of 35 U.S.C.). The AIA included a revision to the joinder rules for patent litigation, which required lawsuits filed against multiple unrelated parties to be filed separately, a provision squarely aimed at patent trolls. The Saving High-Tech Innovators from Egregious Legal Disputes Act of 2013 (SHIELD Act), H.R. 845, 113th Cong. (2013) is a sweeping bill aimed at "stopping patent troll lawsuits" likely to consider by the Senate in early 2014.

[7] See, e.g., In re BitTorrent Adult Film Copyright Infringement Cases, 2012 U.S. Dist. LEXIS 61447,1 (E.D.N.Y. May 1, 2012) ("These actions are part of a nationwide blizzard of civil actions brought by purveyors of pornographic films alleging copyright infringement by individuals utilizing a computer protocol known as BitTorrent.")

[8] The Copyright Office has never addressed the issue of copyright trolls, nor does Copyright Office's recent report on Copyright Small Claims even mention them. COPYRIGHT OFFICE, *Copyright Small Claims, A Report to the Register of Copyrights*, September 2013 (available at http://www.copyright.gov/docs/smallclaims/usco-smallcopyrightclaims.pdf.) For non-empirical discussions of the MDJD phenomenon see e.g., James DeBriyn, *Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages*, 19 UCLA ENT. L. REV. 79 (2012); Sean B. Karunaratne, *The Case Against Combating BitTorrent Piracy Through Mass John Doe Copyright Infringement Lawsuits*, 111 MICH. L. REV. 283 (2012); Patience Ren, *The Fate of BitTorrent John Does: A Civil Procedure Analysis of Copyright Litigation*, 64 HASTINGS L.J. 1343 (2013); Gregory S. Mortenson, *BitTorrent Copyright Trolling: A Pragmatic Proposal for a Systemic Problem*, 43 SETON HALL L. REV. 1105 (2013).

[9] Not all plaintiffs in such suits are trolls in the sense that this term is invoked in the patent literature – i.e., they are not all non-practicing entities – but the conclusion of this Article is that these massive multi-party john doe ("MDJD") suits are by and large instances of trolling.

[10] Alabama (SD), Colorado, Delaware, District Of Columbia, Florida (MD), Georgia (ND), Georgia (SD), Illinois (CD), Illinois (ND), Indiana (ND), Maryland, Michigan (ED), Ohio (SD), Pennsylvania (ED), Tennessee (ED), Tennessee (WD), Washington (WD), Wisconsin (ED) and Wisconsin (WD). In 2013, pornography MDJD suits accounted for over of suits filed in 11 federal districts: Alabama (SD), District Of Columbia, Illinois (CD), Illinois (ND), Indiana (ND), Maryland, Michigan (ED) Pennsylvania (ED), Tennessee (ED), Tennessee (WD) and Wisconsin (ED).

Defining exactly what makes an individual or an organization a troll is inevitably controversial.[11] The essence of trolling is that the plaintiff is more focused on the business of litigation than on selling a product or service or licensing their IP to third parties to sell a product or a service. The paradigmatic troll plays a numbers game in which it targets hundreds or thousands of defendants, seeking quick settlements priced just low enough that it is easier for the defendant to pay the troll directly rather than pay his lawyers to defend the claim. This is a familiar pattern in patent law where trolls thrive by opportunistically taking advantage of the uncertain scope of patent claims, the poor quality of patent examination, the high cost of litigation and the asymmetry of stakes faced by the patent assertion entities and the businesses they target.[12]

As this Article demonstrates, a similar numbers game is increasingly dominating copyright litigation. Copyright suits against John Does comprised over 43% copyright claims filed in 2013. The economic viability of MDJD litigation depends on suing as many defendants as possible in a single action to keep costs low and leveraging the threat of statutory damages in order to maximize the flow of settlement dollars. As discussed in more detail in Part I, it is fair to regard theses suits as a form of copyright trolling.

Copyright trolls may draw inspiration from their patent counterparts, but they are a product of two unique features of copyright law: the first is the incentives created by statutory damages; the second is the permissive approach to joinder taken by many district courts in file-sharing cases.[13] The theory behind these MDJD lawsuits is that individuals who share the same movies and other copyrighted works via BitTorrent are can be joined together in a single copyright lawsuit.[14] Litigating a case all the way to trial against thousands of individuals in the same suit would be ridiculous and unwieldy,[15] but these suits are not filed with an actual hearing in mind. MDJD lawsuits are filed to take advantage of court ordered discovery to break the veil of anonymity that separates IP addresses from the account information of actual human beings.[16] They are means to compel Internet Service Providers such as Comcast and AT&T to give plaintiff copyright owners names and addresses to match the IP addresses that they already have.

---

[11] See generally, Lemley & Melamed, *Missing The Forest For The Trolls*, 113 COLUM. L. REV. 2117 (2013).

[12] *Id.*

[13] See *infra* Part II-A on statutory damages and Part II-B on joinder.

[14] See *infra* Part II-B.

[15] Just imagine how long a scheduling conference would take.

[16] Parties generally may not initiate discovery prior to satisfying the meet and confer requirement of FED. R. CIV. P. 26(f), however this is not possible where the defendant is identified by their IP address and has not been served. Thus plaintiffs in MDJD suits must apply for earlier discovery under FED. R. CIV. P. 26(d). See, Digital Sin, Inc. v. Does 1-176, 279 F.R.D. 239, 241 (S.D.N.Y. 2012). Note also that without a Court-ordered subpoena, many of the ISPs, who qualify as "cable operators" for purposes of 47 U.S.C. § 522(5), are effectively prohibited by 47 U.S.C. § 551(c) from disclosing the identities of the putative defendants to Plaintiff. *Id.*

After obtaining the names and addresses of account holders suspected of participating in a BitTorrent swarm, the plaintiff can set to work negotiating settlements.[17] An account holder accused of infringement is almost invariably threatened with statutory damages and the prospect of paying the plaintiff's attorneys fees if he is unable to establish his innocence.[18] Reports indicate that settlements are usually in the range of $2000 to $4000 – this is a lot to pay for any movie, but a small fraction of the potential statutory damages for willful copyright infringement, which can be as high as $150,000 per work infringed.[19] The $4000 figure is also evidently "a sum calculated to be just below the cost of a bare-bones defense."[20] This does not prove that the plaintiffs are simply pursuing nuisance value settlements, but it is consistent with that theory.

In addition to relying on statutory damages and permissive joinder, Part II of this Article shows that the majority of MDJD suits also feature an additional ingredient—pornography.[21] Not all MDJD lawsuits relate to pornography, but the association with pornography is far from coincidental. The MDJD model works especially well for pornography because the potential embarrassment of being accused (accurately or not) of downloading such material is a great motivation to settle.

This Article proceeds as follows: Part I locates MDJD suits within the broader context of the IP troll debate. It explains why attempts to define copyright trolls in terms status – i.e., in terms of the plaintiff's relationship to the underlying IP – are ultimately flawed and suggests a conduct focused approach based on identifying systematic opportunism. Part I explains why MDJD lawsuits should typically be regarded as copyright trolling and it explores the basic economics of MDJD litigation. Part I then presents empirical data documenting the astonishing rise of MDJD lawsuits over the past decade. Part II explores the role of statutory damages and permissive joinder in MDJD lawsuits in terms of the economic model developed in Part I. Part II also explains why the economics of in this type of litigation is so well-suited to allegations of infringement concerning pornography and presents new data on the prevalence of pornography related MDJD lawsuits. Part III presents concrete proposals for copyright reform designed to make copyright trolling less attractive. This Part explains how, even in the absence of legislative reform, district court judges can exercise their discretion over joinder and early discovery to ensure that statutory damages are not excessive and to insist on a variety of procedural safeguards.

---

[17] Malibu Media, LLC v. Doe, 2013 U.S. Dist. LEXIS 139068, 2 (N.D. Ill. Sept. 27, 2013) ("Once the identities become known to the plaintiff, the John Does are served with process. The defendants then either settle with the plaintiffs, default, or contest the suit.")

[18] See e.g., Settlement Letter from Steele & Hansmeier, PLLC (May 16, 2011), available at http://www.scribd.com/doc/80437326/Steele-Hansmeier-Settlement-Demand-Letter-First-Time-Videos. (Explaining statutory damages and offering to settle $2,900.)

[19] 17 U.S.C. §504(c)(statutory damages).

[20] Ingenuity 13 LLC v. John Doe, 2:12-CV-8333-ODW JCX, 2013 WL 1898633 (C.D. Cal. May 6, 2013)

[21] See infra, Part II-C.

PART I        THE RISE OF THE COPYRIGHT TROLL

This Part documents the rise of the copyright troll as an empirical phenomenon. As part of the foundation for the empirical exercise, Part I-A locates MDJD litigation within the broader context of the IP troll debate. It explains why the existing focus of the literature on examples such as Righthaven overlooks the most important manifestations of trolling. Part I-B explains why MDJD lawsuits typically should be regarded as trolling. Part I-C explores the basic economics of MDJD litigation. Part I-D then presents the empirical data on the rise of MDJD lawsuits over the past decade.

## A.    Copyright Trolls and Copyright Trolling

### (1) Righthaven

From 2010 to 2011, a Nevada-based company called Righthaven LLC set about a business model that can be summarized in three simple steps: (1) recruit content owners, principally newspapers; (2) identify plausible cases of copyright infringement, such as the reposting newspaper articles on blogs; (3) acquire a partial assignment of copyright tailored precisely to the infringement identified in step two.[22] Note that steps one and two can easily be reversed. This model generated significant profits from a string of quick settlements.

The Righthaven model began to look vulnerable when a number of defendants were able to establish that their conduct fell within the scope of the fair use doctrine.[23] However, the real problem for Righthaven turned out to be that its standing to sue was built on a "nothing more than a fabrication".[24] The limited exclusive rights that Righthaven had received from the original content *appeared* to satisfy the requirement for copyright standing – only the legal or beneficial owner of an exclusive right under copyright law is entitled, or has standing, to sue for infringement.[25] However, those assignments were subject to a secret "Strategic Alliance Agreement" that meant that all Righthaven possessed was a mere right to sue.[26] An agreement transferring the right to

---

[22] Shyamkrishna Balganesh, *The Uneasy Case Against Copyright Trolls*, 86 S. CAL. L. REV. 723 (2013).

[23] E.g., Righthaven, LLC v. Hoehn, 792 F. Supp. 2d 1138, 1147-51 (D. Nev. 2011); Righthaven LLC v. Realty One Grp., Inc., No. 2:10-cv-1036-LRH-PAL, 2010 U.S. Dist. LEXIS 111576, at 4-6 (D. Nev. Oct. 18, 2010); Righthaven LLC v. Klerks, No. 2:10-cv-00741-GMN-LRL, 2010 U.S. Dist. LEXIS 105307, at 6-10 (D. Nev. Sept. 17, 2010) (finding a sufficient meritorious fair use defense to set aside a default).

[24] Righthaven LLC v. Democratic Underground, LLC, 791 F. Supp. 2d 968, 973 (D. Nev. 2011).

[25] See Silvers v. Sony Pictures Entm't Inc., 402 F.3d 881, 884 (9th Cir. 2005) (en banc).

[26] Righthaven LLC v. Democratic Underground, LLC, 791 F. Supp. 2d 968, 972 (D. Nev. 2011) (Section 7.2 of the Strategic Alliance Agreement between Righthaven and Stephens Media provided that "Despite any such Copyright Assignment, Stephens Media shall retain (and is hereby granted by Righthaven) an exclusive license to Exploit the Stephens Media Assigned Copyrights for any lawful purpose whatsoever and Righthaven shall have no right or license to Exploit or participate in the receipt of royalties from the Exploitation of the Stephens Media Assigned Copyrights other than the right to proceeds in association with a Recovery.")

sue without any of the copyright owner's exclusive rights is ineffectual. Following these revelations, Righthaven's suits were dismissed and the firm quickly succumbed to the weight of legal fees and went into insolvency.[27]

In his thought provoking article on the copyright troll phenomenon, Professor Shyamkrishna Balganesh offered the following definition: "A copyright troll refers to an entity whose business revolves around the systematic legal enforcement of copyrights in which it has acquired a limited ownership interest."[28] Balganesh argued that the real problem with copyright trolls is not this delegation of enforcement of itself, but rather the fact that such delegation disrupts the "enforcement equilibrium" that is integral to the functioning of copyright as an institution.[29]

This seems to fit the Righthaven story, but perhaps a little too well. Righthaven targeted defendants who were largely non-commercial and whose alleged infringements were usually inconsequential to the copyright owner's bottom line. Righthaven disrupted the previous enforcement equilibrium by attempting to monetize borderline cases of infringement that without its intervention would have either been ignored or tolerated. Balganesh's definition of copyright trolls, which focuses on the delegation of enforcement to a separate entity, has echoes of patent law's concerns with non-practicing entities and patent aggregators.

Righthaven is a compelling example, but it is just one example.[30] As the data in this Article shows, a status-based conception of copyright trolling does not fit particularly well with is the predominant form of copyright trolling witnessed in federal courts over the last few years. MDJD lawsuits typically do not involve any assignment of rights. By focusing on delegation through assignment, a status-based definition overlooks most of the reality of copyright trolling in practice. Arguably, there is still a form of delegation in MDJD cases in that the handling of these suits is given over to specialized law firms who in many instances recruit their clients. If these specialized law firms are working on contingency, their incentives will be virtually the same as an entity that acquired rights solely for the purpose of litigation. The willingness of entrepreneurial law firms to pursue allegations of infringement on contingency makes any status-based definition of trolls and trolling in copyright obsolete.[31] Patent litigation is driven by different economic

---

[27] Ian Polonsky, *You Can't Go Home Again: The Righthaven Cases And Copyright Trolling On The Internet*, 36 Colum. J.L. & Arts 71 (2012).

[28] Balganesh *supra* note 150 at 732.

[29] *Id.*

[30] Another example unrelated to MDJD litigation is arguably the textile printer L.A. Printex. Charles Colman, *"California federal jury finds for copyright plaintiff L.A. Printex in Aeropostale fabric pattern case: blurgh"* LAW OF FASHION February 1, 2013 ("L.A. Printex has developed something of a bad reputation in the fashion world, having brought more copyright infringement cases than one can count against a plethora of fashion designers and retailers, most of whom find it cheaper to settle than to fight the frequently questionable lawsuits.") (Available at http://lawoffashion.com/blog/story/02/01/2013/173).

[31] Statements about the relationship between the plaintiffs and their legal counsel in MDJD cases are necessarily merely generalizations.

fundamentals, but the evidence from copyright at least raises a serious question as to whether the current status-based ideas of who is and is not a patent troll are really viable.

Another potentially misleading aspect of troll discussions focusing on Righthaven is the idea that the problem with copyright trolls is that they disrupt existing conventions of tolerated use.[32] MDJD file-sharing lawsuits typically do not relate to boundary issues fair use or tolerated use—unauthorized file sharing using BitTorrent and similar software tools is not a legal gray area.[33] It is strenuously objected to by the mainstream of creative industries and is clearly not fair use or *de minimus*. We would do better to define trolling than trolls.

### (2) Beyond Righthaven

Copyright trolling cannot be defined by characteristics such as whether the plaintiff is the original owner of the copyright, or whether the plaintiff has attempted to license the work in the marketplace. Descriptively, these indicia may provide some useful shortcuts, but they would exclude the majority of troll litigation in copyright. In seeking to define what makes a litigant a troll, we would do better to focus on conduct rather than status. We should, in short, seek to identify instances of trolling rather than looking for trolls *per se*.

If anything unifies the patent law and copyright law experience of trolls, it is the sense that a troll is a systematic opportunist.[34] The reason why agreeing on an exact definition of trolls is so difficult is that there are so many different manifestations of opportunism in IP litigation. In the patent context, some plaintiffs are labeled as trolls because they exploit flaws in the administration of the patent system, such as the uncertain scope of patent claims and the poor quality of patent examination. Others are labeled as trolls because they take advantage of asymmetric stakes and the high cost of litigation to extract settlements or licensing fees based on dubious claims. The claims may be dubious in the sense that, if fully litigated, the defendant would be very likely to win. The troll's case may also be dubious in the sense that even if their patents are technically valid and infringed under our current legal standards, this simply reflects the failure of those standards to adequately promote investment in innovation and invention.

In addition to opportunism relating to litigation strategy, the decision to base a business model on litigation can be seen as a form of opportunism in itself. Patent trolls acquire and assert patents based on the their litigation potential rather than the value of the underlying technology. On this view, the essence of trolling is that the plaintiff is

---

[32] Tim Wu, *Tolerated Use*, 31 COLUM. J.L. & ARTS 617, 619 (2008)

[33] See Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005); A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir.2001); BMG Music v. Gonzalez, 430 F.3d 888, 890 (7th Cir.2005).

[34] On opportunism in general, see Kenneth Ayotte, Ezra Friedman and Henry E. Smith, *A Safety Valve Model of Equity as Anti-Opportunism* (Available at SSRN: http://ssrn.com/abstract=2245098) (explaining the development of equity as part of the law's response to the problem of opportunism).

more focused on the business of litigation than on selling a product or service or licensing their IP to third parties to sell a product or a service.

Copyright trolls are best defined in terms of a cluster of attributes rather than any single definitive feature. A troll deserving of the name either asserts rights it does not have, makes poorly substantiated claims or tenuous of infringement, or seeks disproportionate remedies. Trolls do at least one of these things on a systematic basis.[35] The opportunism of copyright trolls is primarily directed towards statutory damages. As the Righthaven example shows, statutory damages can make the pursuit of otherwise inconsequential infringements extremely profitable, more profitable than licensing those uses in advance could ever have been. As the MDJD cases show, statutory damages stack the deck in favor of the plaintiff such that the underlying liability of the defendant is effectively irrelevant to the settlement calculation.

## B.    When does Multi-Defendant John Doe Lawsuit Amount Copyright Trolling?

Not all BitTorrent lawsuits are exercises in copyright trolling. In fact the Recording Industry Association of America ("RIAA") pioneered the MDJD model as part of its broader campaign against illegal file sharing over a decade ago. Modern copyright trolling follows the RIAA's template, but with a different motivation.

In 2003 the RIAA began a widely publicized campaign of lawsuits against individual file sharers, characterized by Justice Breyer as "a teaching tool"[36] and by the RIAA itself as "the enforcement phase of its education program."[37] The RIAA wound down this program in 2008, by which time over 35,000 individuals had been targeted with letters of demand.[38] The RIAA and its members are not copyright trolls because the industry's end-user litigation strategy was aimed at sending a message not creating an independent revenue stream.

The RIAA sought to channel potential infringers back into the legitimate market: in contrast, more recent MDJD suits appear to prefer the revenues available in the courthouse to those of the market place. In 2010, a Hollywood production company, Voltage Pictures, filed a series of lawsuits against thousands of John Does for

---

[35] Of course, Rule 11 provides for sanctions against plaintiffs and attorneys who make frivolous or unsupportable claims,[35] but establishing a Rule 11 violation is notoriously difficult. See e.g., Giddings v. Vision House Production, Inc., 584 F.Supp.2d 1222 (D.Ariz 2008). (Plaintiff's legal theory ultimately proved to be incorrect but was not "so objectively baseless to qualify as completely frivolous and subject to sanctions under Rule 11"). In Raw Films, Ltd. v. Does 1–32 allegations of harassment lead to a show cause order relating to sanctions, but sanctions were not ultimately imposed. Raw Films, Ltd. v. Does 1–32, 2011 WL 6182025, at *2 (E.D.Va. Oct. 5, 2011).

[36] 545 U.S. at 963 (Breyer, J., concurring).

[37] Press Release, RIAA, *Recording Industry Begins Suing P2P File Sharers Who Illegally Offer Copyrighted Music Online* (Sept. 8, 2003), available at http://www.riaa.org/newsitem.php?id=85183A9C-28F4-19CE-BDE6-F48E206CE8A1.

[38] See, e.g., Sarah McBride & Ethan Smith, *Music Industry to Abandon Mass Suits*, WALL ST. J., Dec. 19, 2008, at B1.

downloading its film *The Hurt Locker* over BitTorrent.[39] These suits were filed as *Voltage Pictures, LLC v. Does 1 – 5000*,[40] and eventually totaled 24,500 defendants.[41] The *Voltage Pictures* cases have now been voluntarily dismissed, but only after thousands of user records were subpoenaed from ISPs and thousands of demand letters were sent to account subscribers. Statements by the plaintiff's lawyers confirm that this litigation campaign was not aimed at deterrence or compensation; their intention was to "creat[e] a revenue stream and monetize[e] the equivalent of an alternative distribution channel."[42]

## C.    The Economics of Multi-Defendant John Doe Lawsuits

To understand the copyright trolling phenomenon, it is useful to begin with its' economic fundamentals. This section explores those fundamentals by developing a simple model the costs and benefits of MDJD litigation from the point of view of the plaintiff.

The plaintiff (or realistically, the plaintiff's lawyer) in any MDJD lawsuit faces certain fixed costs ($C_f$) such as detecting potential infringement, drafting the initial complaint, drafting a motion for discovery, and appearing in court to argue in favor of discovery. Detecting potential infringement requires an investment in technology and/or technological expertise.[43] The remaining fixed costs largely consist of attorney time. These costs do not change significantly whether there is one defendant or 5000 in a single case. The plaintiff also faces variable costs ($C_v$) primarily related to the time and effort it takes to persuade Internet Service Providers to divulge subscriber information and to persuade the subscribers thus identified to settle. Where N is the number of defendants, the plaintiff's costs can be represented as follows:

*Costs = $C_f + C_v*N$*

The plaintiff's recovery depends primarily on the average settlement obtained (*P* or payoff), the percentage of defendants who can be persuaded to settle (*Y* or yield) and the number of defendants (*N*).[44] Thus,

*Recovery = $P*Y*N$*

---

[39] See e.g., Voltage Pictures, LLC v. Does, Docket No. 1:10-cv-00873 (D.D.C. May 24, 2010).

[40] *Id.*

[41] First Amended Complaint for Copyright Infringement at 1, Voltage Pictures, LLC v. Vasquez, No. 1:10-cv-00873 (D.D.C. Apr. 22, 2011), ECF No. 143-1.

[42] Eriq Gardner, *New Litigation Campaign Quietly Targets Tens of Thousands of Movie Downloaders*, HOLLYWOOD REP. (Dec. 21, 2010), http://www.hollywoodreporter.com/blogs/thresq/litigation-campaign-quietly-targets-tens-63769.

[43] It may also be the case that by contracting with outside technology firms, the cost of detecting infringement can be transformed into a variable cost.

[44] The obvious simplification here is that there is just one settlement price. In theory, a plaintiff with perfect information could extract high settlements from easy targets and low settlements from more intransigent ones.

The economic viability of copyright trolling in the form of MDJD litigation depends on suing as many defendants as possible in a single action to keep costs low and leveraging the threat of statutory damages (and sometimes other threats) in order to maximize the product of payoff and yield (*P\*Y*). Thus,

$$Profit = (P*Y*N) - (C_f + C_v*N)$$

$$= N(PY - C_v) - C_f$$

This model does not assume that all defendants are in fact liable for copyright infringement, but it does assume that the plaintiff's case is strong enough to make a certain proportion of defendants want to settle.[45] Even so, a plaintiff cannot expect to be able to locate the person responsible for every IP address named in the lawsuit, nor can it expect every accused infringer to be solvent or to settle without a costly fight. However, the plaintiff can expect that most individuals who it does locate and who do have the capacity to pay will eventually capitulate and agree to settle for a few thousand dollars.[46] Most defendants in this situation will settle because even with fee shifting, settling for a few thousand dollars will cost less on a risk-adjusted basis than establishing their innocence in court. As discussed in more detail in Part II-A, the prospect of statutory damages ensures that despite the possibility of fee shifting, a very small chance of being found liable is enough to make settlement the defendant's best option.[47] Making money from this type of litigation depends on dispersing one's fixed costs over a large group of defendants and persuading a reasonable number of defendants to settle reasonably quickly. Part II of this Article will return to this basic economic model and use it to explain the significance of joinder, statutory damages and pornography in MDJD lawsuits.

## D.    The Rise of Multi-Defendant John Doe Lawsuits

Just how widespread is the practice of generating revenue through MDJD lawsuits?[48] To answer this question, I created a database that includes all copyright cases filed in the all federal district courts circuits between January 1, 2001 and December 31, 2013.[49] "John Doe" lawsuits were identified by hand, based initially on the appearance of the words "John Doe" and "Doe" in the case title (in plural and singular form).[50] Figure 1 displays the resulting data broken down by circuit and into three-year time periods based

---

[45] Parts II-A (statutory damages) and II-C (pornography) further explain why defendants will be motivated to settle, even if the plaintiff's case is far from watertight.

[46] Ingenuity 13 LLC v. John Doe, 2:12-CV-8333-ODW JCX, 2013 WL 1898633 (C.D. Cal. May 6, 2013) (finding that settlement offers were generally about $4,000)

[47] See *infra* Part II-A

[48] Many Judges have noted the increasing prevalence of these suits. See e.g. In re BitTorrent Adult Film Copyright Infringement Cases, Nos. 11-3995(DRH)(GRB), 12-1147(JS)(GRB), 12-1150(LDW)(GRB), 12-1154(ADS)(GRB), 2012 WL 1570765, at *1 (E.D.N.Y. May 1, 2012) ("These actions are part of a nationwide blizzard of civil actions brought by purveyors of pornographic films alleging copyright infringement by individuals utilizing a computer protocol known as BitTorrent.")

[49] Note: this dataset will be expanded to all circuits in a future draft.

[50] Cases with titles such as *"___ v. Unknown Parties"* were also included.

on the year of filing, beginning with the year 2001. The figure shows the prevalence of John Doe actions as a percentage of all copyright filings in each circuit. The figure highlights the recent growth of MDJD lawsuits and their uneven geographic concentration. It is particularly noteworthy that MDJD suits made up the majority of copyright filings in Third, Fourth, Sixth, Seventh, Tenth, Eleventh and DC Circuits in 2013.

**Figure 1: Percentage of John Doe Law Suits by Circuit, 2001-03, 2004-06, 2007-09, 2010-12, 2013**



Graphs by three year groups, except 2013

MDJD suits were almost non-existent 10 years ago; as of 2013 they were the majority of filings in 19 out of 92 federal districts.[51] MDJD suits accounted for just over 16% of filings between 2001 and 2013,[52] but they account for over 42% of filings in 2013. The sudden rise of the MDJD copyright lawsuit is apparent from Figure 2, below which focuses in on the years 2010, 2011, 2012 and 2013. This Figure shows the prevalence of John Doe lawsuits as a percentage of all copyright lawsuits over the past four years, by state, excluding states with no John Doe copyright suits.

As the figure above shows, in 2010 there was substantial MDJD litigation in the District of Columbia and West Virginia and small pockets in California, Connecticut, Illinois, Oregon, Maryland, Massachusetts, New Jersey, Oregon, Texas, Utah and Virginia. By 2012, MDJD suits were the majority of all copyright cases filed in Colorado,

---

[51] See *supra* note 10.

[52] 1993 out of 19,142, to be exact.

Delaware, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, Ohio, Pennsylvania, Tennessee, Washington, Wisconsin and the District Of Columbia. Interestingly, 2013 saw a sharp decline in the proportion of these suits in California and New York.

**Figure 2: John Doe lawsuits as a percentage of all copyright lawsuits 2010–2013, by State**

* Some states with no John Doe Filings Excluded



This original data shows, for the first time, the astonishing rate of growth of this particular form of copyright trolling. MDJD lawsuits are not just the predominant form of copyright trolling; they are the dominant form of copyright litigation in several districts. It is to be hoped that now that the extent of this kind of copyright trolling is apparent has been made apparent, it will receive some attention from policy makers.[53]

## II.    STATUTORY DAMAGES, JOINDER & PORNOGRAPHY

This Part focuses on the role of statutory damages, permissive joinder and pornography in enabling MDJD litigation to thrive. Part II-A explores the role of statutory damages in MDJD lawsuits in terms of the economic model developed previously. Part II-B takes the same approach with joinder.  Part II-C explains why MDJD litigation is so well-suited to allegations of infringement concerning pornography and presents new data on the prevalence of pornography in this context. Understanding these components is vital to developing sound reform proposals, the subject of Part III.

### A.    Statutory Damages

U.S. copyright law allows the plaintiff to elect, at any time before final judgment, to receive statutory damages in lieu of actual damages or an account of the defendant's profit.[54] Statutory damages were originally designed to overcome the difficulties injured plaintiffs faced in proving the true extent of their damage or of the defendant's profits.[55] However, statutory damages now appear to be largely divorced from that original purpose. Critically, statutory damages effectively guarantee a minimum rate of recovery regardless of proof of damages or profits.[56]

Statutory damages provide compensation for real world harms that may be difficult to establish in the courtroom. The problem with statutory damages, as a matter of both design and application, is that the amounts awarded bear no relationship to the harm of infringement, the need for deterrence, or generally accepted norms of proportionality

---

[53] It is not apparent that the issues of copyright trolls or MDJD litigation are on the Copyright Office's reform agenda. See Statement of Maria A. Pallante Register of Copyrights United States Copyright Office before the Subcommittee on Courts, Intellectual Property and the Internet, Committee on the Judiciary,  "The Register's Call for Updates to U.S. Copyright Law," (March 20 2013) (available at http://www.copyright.gov/regstat/2013/regstat03202013.html) (not mentioning copyright trolls, MDJD litigation). See also Maria A. Pallante, *The Next Great Copyright Act*, COLUMBIA JOURNAL OF LAW & THE ARTS (2013) (noting in passing that "arguments abound on the subject of statutory damages, suggesting that they are either too high, too low, too easy, or too hard to pursue.")

[54] 17 U.S.C. § 504(c)

[55] See, Pamela Samuelson & Tara Wheatland, *Statutory Damages in Copyright Law: A Remedy in Need of Reform*, 51 WM. & MARY L. REV. 439 (2009) at 448 (Summarizing the legislative history of the 1909 Copyright Act.)

[56] The only prerequisite for statutory damages is copyright registration. 17 U.S.C. § 412 (requiring registration within three months of publication to qualify for awards of statutory damages and attorneys fees).

in the administration of penalties.[57] A recent review of statutory damages by Samuelson and Wheatland cites several arbitrary, inconsistent, incoherent and excessive awards of statutory damages in copyright cases.[58] In one of the most striking examples, *Capitol Records v. Thomas-Rasset*, a jury awarded statutory damages of more than $1.92 million against a defendant who had illegally downloaded about $54 worth of music on a peer-to-peer file-sharing network.[59] That is a ratio of more than 35,000 to 1.

There are many problems with the current statutory damages framework, but as they relate to the issue of copyright trolling, the basic defect of statutory damages is that the range is too broad and too high. The Copyright Act of 1976 allows for statutory damages anywhere in a range between $750 and $150,000[60] – that is the difference between an average priced 55 inch flat screen television[61] and the median sale price of a single-family home in the Mid-West of the United States.[62] Technically, the upper $30,000 to $150,000 of this range is confined to cases of "willful infringement"[63] and should be reserved for truly exceptional cases,[64] however "courts have interpreted willfulness so broadly that those who merely should have known their conduct was infringing are often treated as willful infringers."[65]

Recall the formula in Part I: *Profit = N(PY –C_v) – C_f*. Statutory damages play a significant role in the profitability of copyright trolling. Without statutory damages, defendants might cling to the idea that their infringements are so trivial that the plaintiff will not bother to pursue them. They might decide to wait it out and take the risk. An individual copyright owner who establishes a single instance of illegal downloading could hope to recover some approximation of the retail price of their product as the measure of damage they have suffered or as disgorgement of the defendant's profits from

---

[57] For a comprehensive review of the history and current application of statutory damages in copyright, see Samuelson & Wheatland, *supra* note 50.

[58] *Id.* at 442-43.

[59] Capitol Records v. Thomas-Rasset 579 F. Supp. 2d 1210, 1213, 1227 (D. Minn. 2008) ("Thomas allegedly infringed on the copyrights of 24 songs-the equivalent of approximately three CDs, costing less than $ 54.").

[60] 17 USC 504(c).

[61] E.g., at the time of writing, the LG Electronics 55LN5400 55-Inch 1080p 120Hz LED-LCD HDTV with Smart Share was available on Amazon.com for $749.

[62] National Association of Realtors, *Existing-Home Sales Data* (available at http://www.realtor.org/topics/existing-home-sales/data) (reporting the median sales price of existing single-family homes in the Mid-West of the U.S. as $143,700 in 2012, $150,800 in November 2013 and 155,700 for all of 2013).

[63] 17 USC 504(c).

[64] See S. Rep. No. 94-473, at 144-45 (1975) (enhanced damages should be available in "exceptional cases"); H.R. Rep. No. 94-1476, at 162 (1975) (same). See also Samuelson & Wheatland, *supra* note 55 (summarizing the legislative history).

[65] Samuelson & Wheatland, *supra* note 50 at 441. See also Nimmer §14.04[B][3][a] (citing cases). Note that even those defendants with plausible fair use defenses may be characterized as "egregious and willful" infringers, see e.g. Rogers v. Koons, 960 F.2d 301, 313 (2d Cir. 1992).

infringement. For the typical music single, album, television show, or movie, this would be in the range from $1 to $20.

The credible threat of damages as high as $150,000 makes any real risk of being found liable for copyright infringement intolerable for anyone who is not completely insolvent or staggeringly wealthy. Without statutory damages, the plaintiff in a typical BitTorrent suit might recover only nominal damages, thus reducing their expected settlement payoff ($P$) to almost zero. For a single infringement, statutory damages increase the potential settlement range from $0 − $20 to $0 − $150,000. But the point is not just that statutory damages increase the average payoff ($P$); the threat of statutory damages also reduces the Plaintiff's variable cost ($C_v$) by acting as a tool of persuasion that brings reluctant defendants to heel more quickly. In addition, because the possibility of a $150,000 verdict makes the plaintiff's claims that it will pursue the case to the bitter end more credible, it should substantially increase settlement yield ($Y$) compared to a world without statutory damages.[66] For the plaintiff in MDJD cases, statutory damages are the pot of gold at the end of the litigation rainbow. Statutory damages make the stakes of copyright litigation fundamentally uneven. While both plaintiff and defendant could lose and be forced to pay the other side's attorneys fees, only the plaintiff is entitled to statutory damages. The possibility of fee shifting for successful defendants should make troll-like behavior less rewarding in copyright, but the risk of statutory damages more than negates the benefits of fee shifting.

## B.    Joinder

Joinder also plays an important role in the economics of MDJD litigation. From the perspective of the plaintiff, rules relating to joinder are favorable if they permit the joining of defendants with a low level of relatedness. A low threshold of relatedness allows the plaintiff to spread its fixed costs across a large number of defendants.[67] Joinder rules are also plaintiff friendly to the extent that they allow a case to proceed to discovery in a MDJD case without a substantial investment in proving the alleged underlying infringements.[68]

The economic logic of MDJD lawsuits relies on permissive joinder of large numbers of tenuously related defendants in thinly substantiated actions that are never intended to go to trial. There is no doubt that BitTorrent is widely used for copyright infringement, nonetheless many of the MDJD cases are questionable for two reasons. First, they typically rely on a snapshot of Internet activity that does not show that a complete file was downloaded.[69] All that the snapshot shows is that a download was initiated. Second, the MDJD cases rely on the inference that the account owner behind an

---

[66] The extent to which more explicitly punitive damages could substitute for statutory damages will be discussed in Part III, infra.

[67] Thus $C_f/N$ is reduced.

[68] Thus $C_f$ itself is reduced.

[69] See e.g., Ingenuity 13 LLC v. John Doe, 2:12-CV-8333-ODW JCX, 2013 WL 1898633 (C.D. Cal. May 6, 2013).

IP address was in fact responsible for any use made of that account.[70] The possibility of hacking, open Wi-Fi networks, Internet accounts accessed by multiple users, and mistakes by ISPs open the door to numerous highly fact specific "it wasn't me" defenses.[71] These two weaknesses can be overcome, but only by investing individual time and effort into each case, something that is anathema to the copyright trolling model.

The appropriateness of joinder in MDJD litigation has divided federal district courts across the country. The Federal Rules of Civil Procedure allow defendants to be joined in a single action subject to two requirements set forth in Fed. R. Civ. P. 20(a)(2). First, the right to relief must be asserted against the defendants "jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences."[72] Second, there must be common questions of fact or law.[73] It is important to note that joinder is not merely allowed under the Federal Rules of Civil Procedure, it is strongly encouraged. The Supreme Court held in *United Mine Workers v. Gibbs* that "the impulse is toward the broadest possible scope of action consistent with fairness to the parties."[74] The current split in the district courts on whether joinder is proper in MDJD suits centers around the courts' understanding of the BitTorrent file sharing technology — specifically whether the phrase "same transaction or occurrence or series of transactions or occurrences" properly applies to the participants in a BitTorrent swarm.

BitTorrent works by segmenting a large file into thousands of smaller pieces that can be downloaded in any order and reassembled by the end user. This initial process is called "seeding". Once a file is seeded, it can be downloaded by multiple individuals simultaneously. The group of individuals downloading the seeded file is known as the 'swarm'. One advantage of BitTorrent over other file sharing programs is that there is no need to maintain a connection between the seeder and the downloader for the duration of the download. Any participant in the swarm can download any fragment from any other participant who already has it. Swarm members are typically downloading and uploading file-fragments from other computers in the swarm at the same time.[75] The probability that any two swarm members chosen at random have directly interacted is less than one, and it could be quite low in a large swarm. The basic theory in MDJD litigation is that all

---

[70] *Id.*

[71] Third Degree Films, Inc. v. Doe, 2013 U.S. Dist. LEXIS 44131, 26, n7 (E.D. Mich. Mar. 18, 2013) (noting that "plaintiff's counsel represented that approximately 95% of defendants in cases such as this raise some form of the 'it wasn't me' defense."); *In re BitTorrent Adult Film Copyright Infringement Cases,* 2012 U.S. Dist. LEXIS 61447, 2012 WL 1570765 at *12 (noting the "panoply of individual defenses including age, religious convictions, and technological savvy; misidentification of ISP accounts; the kinds of WiFi equipment and security software utilized; and the location of defendant's router.").

[72] Fed. R. Civ. P. 20(a)(2)(A).

[73] Fed. R. Civ. P. 20(a)(2)(B).

[74] United Mine Workers v. Gibbs, 383 U.S. 715, 724 (1966). (joinder of claims, parties and remedies is strongly encouraged.)

[75] Malibu Media, LLC v. Doe, 2013 U.S. Dist. LEXIS 139068, 4-5 (N.D. Ill. Sept. 27, 2013)

swarm participants are involved in a "series of transactions or occurrences" that are sufficiently related to allow joinder.[76]

Courts are divided as to whether, by itself, participation in a BitTorrent swarm meets the "same transaction or occurrence or series of transactions or occurrences" standard under Fed. R. Civ. P. 20(a)(2)(A).[77] Many courts have rejected joinder based on swarm participation alone.[78] For example, the district court in *Dragon Quest Prods., LLC v. Does*, held that "the initial seeder, other seeders, the various peers, and the Defendants may have participated in this swarm months apart from each other. While … the initial seeder, the other seeders, the peers, and the Defendants, may be connected by the same initial seed file, the Court finds that this connection alone is not sufficient to establish joinder."[79] Some plaintiffs have overcome this obstacle by pleading specifically that the Doe defendants had in fact shared the same pieces of the file with each other.[80] Others have focused on groups of John Does who acted within a short time frame.[81]

---

[76] See *infra*.

[77] See *infra* note 65 for examples of cases concluding joinder is impermissible or inappropriate. See *infra* note 69 for examples of cases allowing joinder.

[78] See e.g. SBO Pictures, Inc. v. Does 1-57, No. 12-22, 2012 U.S. Dist. LEXIS 56578, 2012 WL 1415523, *2 (D. Md. Apr. 20, 2012) (denying joinder); MCGIP, LLC v. Does 1-149, No. 11-2331, 2011 U.S. Dist. LEXIS 108109, 2011 WL 4352110, *3 (N.D. Cal. Sep. 16, 2011) (misjoinder where plaintiff "has failed to show that any of the 149 Doe defendants actually exchanged any piece of the seed file with one another"); Hard Drive Productions, Inc. v. Does 1-188, 809 F.Supp.2d 1150, 1164 (N.D. Cal. 2011) (finding no concerted action where plaintiff conceded that defendants "may not have been physically present in the swarm on the exact same day and time"); Boy Racer, Inc. v. Does 1-60, No. 11-1738, 2011 U.S. Dist. LEXIS 92994, 2011 WL 3652521, at *4 (N.D. Cal. Aug. 19, 2011) (severing defendants where plaintiff did not plead facts showing that any particular defendant illegally shared plaintiff's work with any other particular defendant); Patrick Collins, Inc. v. Does 1-23, No. 11-CV-15231, 2012 U.S. Dist. LEXIS 40536, 2012 WL 1019034, at *4 (E.D. Mich. Mar. 26, 2012) (severing the Doe defendants because the infringement of the film via BitTorrent did not constitute a "series of transactions or occurrences"); SBO Pictures, 2011 U.S. Dist. LEXIS 137361, 2011 WL 6002620, at *3 (same).

[79] Dragon Quest Prods., LLC v. Does, 2013 U.S. Dist. LEXIS 83683, 24-25 (D.N.J. June 13, 2013).

[80] See e.g., Malibu Media, LLC v. Doe, 2013 U.S. Dist. LEXIS 139068, 6 (N.D. Ill. Sept. 27, 2013) (Plaintiff alleges … John Does accessed the same piece of the copyrighted work, and each piece is identified by a unique value known as a "Hash Identifier" or "Hash Number.") Digital Sin, Inc. v. Does 1-176, 279 F.R.D. 239, 243 (S.D.N.Y. 2012) (Declining to sever where "Plaintiff claims to have carefully selected only a small group of New York-based defendants who traded the exact same file, identifiable by a hash value, as part of the same swarm within a six-week period.") Sunlust Pictures, LLC v. Does 1-75, 2012 U.S. Dist. LEXIS 121368, 2012 WL 3717768, at *3. (Noting that "Sunlust alleges in its complaint that the defendants participated in the swarm simultaneously and that it observed the defendants transferring data from the Video between themselves.")

[81] TCYK, LLC v. Does, 2013 U.S. Dist. LEXIS 177765 (finding temporal proximity of 62 doe defendants alleged to have acted within a four day period sufficient). See also, Pac. Century Int'l v. Does 1-31, No. 11 C 9064, 2012 U.S. Dist. LEXIS 82796, 2012 WL 2129003, at *2 (N.D. Ill. June 12, 2012) (allegations that the defendants participated in the same swarm at varying times spanning just over one month supported permissive joinder).

However, a number of courts have taken a broader view and held that this specific level of interaction is not necessary and that merely participating in the same swarm is sufficient for joinder under Fed. Rule 20.[82] As the district court in *Malibu Media, LLC v. John Does 1-6* explained, Rule 20 does not require that defendants acted "in concert" or with any "temporal distance or temporal overlap"; all that Rule 20 requires is "a logical relationship between the separate causes of action."[83] In *Patrick Collins, Inc. v. Does 1– 21*, the court found that logical relationship was satisfied because "each Doe Defendant downloaded the same Torrent file that was created by the same initial seeder, intending to: 1) utilize other users'' computers to download pieces of the same [Copyrighted Works], and 2) allow his . . . own computer to be used in the infringement by other peers and Defendants in the same swarm."[84]

On this view, joining the participants in a BitTorrent swarm in a single action is proper because the swarm is more than a collection of individuals acting the same way, it is in essence a cooperative endeavor, whether the participants are personally known to each other or not.[85] This interpretation is bolstered by the fact that Rule 20(a) refers to a "series of transactions or occurrences" and not just the "same transaction."[86] Astute plaintiffs have also bolstered the case for joinder by adding claims for inducement and contributory liability.[87]

Even if the individual participants in a BitTorrent swarm are sufficiently related to permit joinder under the Federal Rules, which appears likely, district courts still have the power to disallow joinder for discretionary reasons.[88] Here too, the courts are divided.[89] In

---

[82] See e.g. Pacific Century Int'l v. Does 1-31, No. 11-9064, 2012 U.S. Dist. LEXIS 82796, 2012 WL 2129003, *2 (N.D. Ill. June 12, 2012) (allowing joinder where "the anonymous defendants participated in the same 'swarm'"); Digital Sin, Inc. v. Does 1-176, 279 F.R.D. 239, 244 (S.D.N.Y. 2012); Bicycle Peddler, LLC v. Does 1-12, No. 13 C 2372, 2013 U.S. Dist. LEXIS 95184, 2013 WL 3455849, at *3-4 (N.D. Ill. July 9, 2013); Patrick Collins, Inc. v. Does 1-39, No. 12-CV-00096-AW, 2012 U.S. Dist. LEXIS 57187, 2012 WL 1432224, at *3 (D. Md. Apr. 24, 2012); First Time Videos, LLC v. Does 1-76, 276 F.R.D. 254, 257 (N.D. Ill. 2011).

[83] See e.g., Malibu Media, LLC v. John Does 1-6, 291 F.R.D. 191,204 (N.D. Ill. 2013); TCYK, LLC v. Does 1-62, 13 C 3842, 2013 WL 6671675 (N.D. Ill. Dec. 18, 2013).

[84] Patrick Collins, Inc. v. Does 1–21, 282 F.R.D. at 165 (ED Mich. 2012). See also Malibu Media, LLC v. John Does 1-6, 291 F.R.D. 191,204 (N.D. Ill. 2013)(same); TCYK, LLC v. Does 1-62, 13 C 3842, 2013 WL 6671675 (N.D. Ill. Dec. 18, 2013)(same).

[85] Id. ("Every member of a swarm joins that cooperative endeavor knowing that, in addition to downloading the file, they will also facilitate the distribution of that identical file to all other members of the swarm.") See also TCYK, LLC v. John Does 1-87, 2013 U.S. Dist. LEXIS 95817, 2013 WL 3465186, at *4 (same).

[86] Id.

[87] See e.g., Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 158 (D. Mass. 2013).

[88] Fed. R. Civ. P. 21 provides that the court may add or drop a party on motion or on its own "on just terms". The court may also sever any claim against a party. See e.g., Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 156-157 (D. Mass. 2013) (Finding that although "joinder of the defendants may be permissible under Fed. R. Civ. P. 20(a), the interests of justice and judicial economy would best be served if all of the defendants except Doe Number 1 were severed and dropped from the case pursuant to Fed. R. Civ. P. 21.")

part, the division of opinion as to whether joinder is appropriate under the Federal Rules can be seen as a conflict between *formalism* and *realism*.

For the formalist judge, the complaint is the beginning of a process that ultimately leads to a hearing. If the joinder of 5000 very loosely related individuals would make it impossible to conduct a hearing based on the merits, joinder appears to be unsound.[90] The court in *Third Degree Films, Inc. v. Does 1-131* explained at length the practical problems that make joinder in MDJD suits inappropriate: differences in factual and legal defenses would generate completely unrelated motions; scheduling and conducting hearings and discovery disputes among a large number of parties would be almost impossible; *pro se* defendants without access to the e-filing system would be forced to serve paper copies of all filings on all other parties; all defendants, including those proceeding *pro se* would have an interest in attending all other parties' depositions and may do so as a matter of right; any eventual trial would require a hundred separate mini-trials with different witnesses and evidence, "eviscerating any 'efficiency' of joinder."[91] Cumulatively, these obstacles would substantially delay the ultimate resolution of any particular defendant's case and thus from this perspective joinder appears unsound.[92]

For the realist judge, the complaint is the beginning of a process that almost inevitably leads to settlement and thus joinder is an efficient way of aggregating claims at the early stage of litigation for which there is very likely no later stage. The minority of defendants who actively contest that liability can have their cases severed at a later point in time. In the meantime, allowing MDJD suits to proceed to the discovery stage is efficient to the extent that it reduces the plaintiff's costs.

The conflict between realism and formalism is not entirely determinative of the appropriateness of joinder in MDJD cases. A number of courts have also refused to allow MDJD cases to proceed *en masse* because of their association with "potentially abusive litigation tactics."[93] These courts accept that "a valid copyright holder is entitled to seek

---

[89] See, e.g., Malibu Media 1-30, 2012 U.S. Dist. LEXIS 175919, 2012 WL 6203697 (permitting joinder); Malibu Media, LLC v. John Does 1-5, 285 F.R.D. 273 (S.D.N.Y. 2012) (permitting joinder); Malibu Media, LLC v. John Does 1-22, No. 12-5091, 2013 U.S. Dist. LEXIS 56147, 2013 WL 1704291 (D.N.J. Apr. 19, 2013)(severing and dismissing all defendants other than John Doe #1); Amselfilm Prods. GMBH & Co. KG v. Swarm 6a6dc, No. 12-3865, 2012 U.S. Dist. Lexis 186476, (D.N.J. Oct. 10, 2012)(finding joinder to be inappropriate and severing the defendants); Next Phase Distribution, Inc. v. John Does 1-27, 284 F.R.D. 165 (S.D.N.Y. 2012) (not deciding whether joinder was proper, but severing the defendants based on practical considerations).

[90] See e.g. Malibu Media, LLC v. John Does 1-39, No. 12-6945, Doc. No. 23, 2013 U.S. Dist. LEXIS 44053 (D.N.J. Mar. 28, 2013) (The court noted that its "ability to efficiently manage the pretrial phase of this action with the present number of defendants could be compromised by permitting joinder, causing a strain on judicial resources.")

[91] Third Degree Films, Inc. v. Does 1-131, 280 F.R.D. 493, 498-99 (D. Ariz. 2012) reconsideration denied, CV 12-0108-PHX-JAT, 2012 WL 2383560 (D. Ariz. June 25, 2012)

[92] *Id.*

[93] Third Degree Films v. Doe, 286 F.R.D. 188, 189 (D. Mass. 2012) ("In recent months, this Court has grown increasingly troubled by 'copyright trolling,' specifically as it has evolved in the adult film industry. … Against this backdrop of mass lawsuits and potentially abusive litigation tactics, courts

protection of its intellectual property in federal court" but they remain wary of suits filed "solely to facilitate demand letters and coerce settlement, rather than ultimately serve process and litigate the claims."[94] This doubtful impression has been reinforced by the failure of plaintiffs to actually serve the individual defendants in many cases.[95] Courts have noted that much of the coercive force of the settlement offer derives from the pornography at issue, not the alleged copyright infringement.[96] The extraordinary leverage plaintiffs obtain in John Doe pornography cases is manifest by the number of Doe defendants who rush to settle before being identified in the public record.[97]

Some courts have also taken issue with one of the main sources of efficiency in the MDJD model, the evasion of filing fees.[98] For example, the court in *In re BitTorrent Adult Film Copyright Infringement Cases* estimated that "plaintiffs have improperly avoided more than $25,000 in filing fees by employing its swarm joinder theory. . . . Nationwide, these plaintiffs have availed themselves of the resources of the court system on a scale rarely seen. It seems improper that they should profit without paying statutorily required fees."[99]

---

nationwide have become skeptical of allowing the adult film companies unfettered access to the judicial processes of subpoenas and early discovery"). See also Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 156-157 (D. Mass. 2013); Kick Ass Pictures, Inc. v. Does 1-25, C.A. No. 12-10810-MLW, 2013 U.S. Dist. LEXIS 1386, 2013 WL 80162, at *1 (D. Mass. Jan. 4, 2013). See also Pacific Century Int'l, Ltd. v. Does 1-101, 2011 U.S. Dist. LEXIS 124518, 2011 WL 5117424, at *2.

[94] Third Degree Films v. Does 1-47, 286 F.R.D. 188, 190 (D. Mass. 2012) (footnotes omitted). See also Hard Drive Prods., Inc. v. Does 1-90, No. C 11-03825 HRL, 2012 U.S. Dist. LEXIS 45509, 2012 WL 1094653, at *3 & n.4 (N.D. Cal. Mar. 30, 2012). 2012 U.S. Dist. LEXIS 45509, [WL] at *7. ("Plaintiff seeks to enlist the aid of the court to obtain information through the litigation discovery process so that it can pursue a non-judicial remedy that focuses on extracting 'settlement' payments from persons who may or may not be infringers. This court is not willing to do.")

[95] See e.g. Hard Drive Prods., Inc. v. Does 1-90, No. C 11-03825 HRL, 2012 U.S. Dist. LEXIS 45509, 2012 WL 1094653, at *3 & n.4 (N.D. Cal. Mar. 30, 2012). (magistrate judge refused to grant expedited discovery to subpoena the ISP providers for the Doe defendants' identities after noting that the adult film company plaintiff conceded that to its knowledge, neither it nor any other plaintiff had ever served a single Doe defendant after early discovery had been granted.)

[96] Third Degree Films v. Does 1-47, 286 F.R.D. at 197; Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 165-166 (D. Mass. 2013) (expressing concern that joinder is being used "to facilitate a low-cost, low-risk revenue model for the adult film companies.") Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 157 (D. Mass. 2013) ("Although the record before this court reveals no evidence of improper tactics or bad faith by Patrick Collins in this action, the fact that four settlements have occurred before any of the defendants have been identified in the public record illustrates how these types of cases create a strong tool for leveraging early settlements.")

[97] *Id.*

[98] In re BitTorrent Adult Film Copyright Infringement Cases, 2012 U.S. Dist. LEXIS 61447, 2012 WL 1570765, at *13. (estimating that "plaintiffs have improperly avoided more than $25,000 in filing fees by employing its swarm joinder theory. . . . Nationwide, these plaintiffs have availed themselves of the resources of the court system on a scale rarely seen. It seems improper that they should profit without paying statutorily required fees.")

[99] In re BitTorrent Adult Film Copyright Infringement Cases, 2012 U.S. Dist. LEXIS 61447, 2012 WL 1570765, at *13.

For a combination of all of these reasons a substantial number of courts have severed all but the first named defendant and required plaintiffs to re-file individually in a substantial number of cases.[100]

## C.    The Copyright Trolling-Pornography Nexus

Conventional wisdom asserts that 15 percent of Internet traffic is comprised of cat videos[101] and 30 percent is pornography.[102] Cat videos do not feature prominently in MDJD lawsuits; pornography is another story. To investigate the copyright trolling-pornography nexus, I individually reviewed at least one underlying complaint per John Doe plaintiff in the dataset and coded the plaintiff as either 'pornography' or 'not pornography' accordingly.[103]

**Figure 3: Percentage of John Doe Law Suits by Circuit, 2001 to 2013**



Graphs by three year groups, except 2013

---

[100] Third Degree Films v. Does 1-47, 286 F.R.D. at 198. ("Although this court emphasizes that it has observed no bad faith behavior on the part of the plaintiff thus far, "the Court takes issue with the general structure of this case and like cases, and has determined that the most appropriate method to protect against any potential coercion is to sever the Doe defendants and require them to be sued individually.") See also Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 166 (D. Mass. 2013).

[101] See e.g., http://www.cbsnews.com/videos/cat-videos-take-over-internet-marketing-world/

[102] See *"Porn Sites Get More Visitors Each Month Than Netflix, Amazon And Twitter Combined"* THE HUFFINGTON POST, May 4, 2013, available at http://www.huffingtonpost.com/2013/05/03/internet-porn-stats_n_3187682.html.

[103] I relied on descriptions of works as 'adult content', descriptions on IMDB and reasonable inferences from titles such "My Little Panties # 2". I did not watch any of the underlying titles.

Figure 3 illustrates the relative frequency of John Doe litigation as a percentage of all copyright litigation broken down by circuit and into three-year time periods based on the year of filing, beginning with the year 2001. Figure 3 differs from Figure 1[104] in that it differentiates between pornography related John Doe litigation and other John Doe litigation.

**Figure 4: Percentage of John Doe Law Suits in Selected Districts, 2010 to 2013**



Figure 4 takes a selection of the same data and shows how the relative frequency of Pornography focused John Doe litigation has changed in selected districts over the last four years. The 22 districts shown are those with had the highest ratios of pornography filings in 2013. There were almost no John Doe pornography cases until 2010, yet by 2013 these cases made more than half of all copyright filings in 19 federal districts in 2013.

Why so much pornography? The prevalence of pornography in MDJD lawsuits could be attributable to characteristics of the adult entertainment industry itself. It might be, for example, that the industry is generally more innovative and less convention bound and so is simply the first to adopt what may soon be a broader trend.[105] Indeed, anecdotal reports of the increasing appearance of low-budget and independent films in the MDJD format suggests that the appeal of MDJD litigation may be expanding. A related

---

[104] Part I, *Supra*.

[105] Peter Johnson, *Pornography Drives Technology: Why Not to Censor the Internet*, 49 Fed. Comm. L.J. 217 (1996) (discussing pornography's role at the vanguard of new technology).

explanation would be that the producers of pornography are less concerned about negative publicity than other creative industries.[106] A closer look into the mechanics of MDJD litigation suggests two additional structural explanations.

The first structural explanation is simply that the economics of copyright trolling are particularly well suited to pornography because the plaintiff can threaten accused infringers with public exposure in addition to statutory damages. This additional incentive to settle can fundamentally transform the viability of such an enterprise. As noted previously, the profitability of MDJD lawsuits depends on keeping costs low and recovery high.

Recall that $Profit = N(PY - C_v) - C_f$. Hypothetically, if the plaintiff faces fixed costs of $100,000 and an average variable cost of $1000 per defendant, MDJD litigation would be unprofitable if the plaintiff achieved an average settlement of $3000 (P=3000) and a yield of 30% (Y=0.3) in a lawsuit targeting 5000 IP addresses (N=5000). This would result in a loss of $150,000 on an investment of $5.1 million.[107] But assuming that the threat of public exposure as a consumer of pornography motivates more people to settle more quickly, the enterprise would become profitable to the tune of $3.9 million simply by increasing the yield from 30% to 60%.[108] In short, one reason that the MDJD model has been employed more in relation to pornography than an other subject matter is that the social stigma relating to pornography, or particular types of pornography, increases both yield ($Y$) and payoff ($P$) while keeping the plaintiff's variable costs ($C_v$) low.

The second structural explanation for the prevalence of pornographic subject matter in copyright trolling is that a significant amount of this litigation has been initiated by a small number of entrepreneurial lawyers and plaintiffs.[109] The most well-known of these is the Prenda Law firm.[110] A group of entities associated with Prenda Law have amassed millions of dollars in settlements in MDJD lawsuits.[111] According to media reports and court records, Prenda has leveraged this fear of social stigma associated with downloading pornography by posting the names of defendants who do not settle on its

---

[106] This seems entirely speculative.

[107] Profit = $N(PY - C_v) - C_f$ = 5000(3000*0.30 − 1000) − 100,000 = − 150,000.

[108] Profit = $N(PY - C_v) - C_f$ = 5000(3000*0.60 − 1000) − 100,000 = 3,900,000

[109] The appearance of the same counsel and making virtually identical claims and using virtually identical filings has not gone unnoticed by the courts. See e.g. Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 155 (D. Mass. 2013).

[110] Guava, LLC v. Does 1-5, 1:12-CV-8000, 2013 WL 3270663 (N.D. Ill. June 27, 2013) ("The aggressive tactics of Guava's counsel, Prenda Law, in litigating John Doe lawsuits have been widely reported and acknowledged by courts, including those in Illinois and California.") See also, Joe Mullin, *"'Porn troll' Prenda Law sanctioned in defamation lawsuit"* Ars Technica, January 23, 2014 (http://arstechnica.com/tech-policy/2014/01/porn-troll-prenda-law-sanctioned-in-defamation-lawsuit/).

[111] Kashmir Hill *"How Porn Copyright Lawyer John Steele Has Made A 'Few Million Dollars' Pursuing (Sometimes Innocent) 'Porn Pirates'"* FORBES (October 15, 2012). Note that the Prenda legal team appears to have begun under the firm title Steele Hansmeier PLLC and has now changed its name to the Anti-Piracy Law Group.

website, along with a link to the lawsuit.[112] Lawyers in an unrelated case were censured in several cases for attaching an erroneous exhibit listing several other adult films that defendants were alleged to have downloaded that were unrelated to the litigation.[113] All of these techniques are aimed at forcing settlement by leveraging the threat of exposure.

Attorneys associated with Prenda have been ruthless in their pursuit of profits and have also been sanctioned for various forms of deceit and unethical behavior.[114] Defendants in a Florida case involving Prenda have presented evidence that someone inside the firm was "seeding" its own content, i.e., making pornography available for illegal download in the first place, in an attempt to induce copyright infringement.[115] Prenda lawyers have also been accused of colluding in litigation,[116] lying to the court,[117] forging documents[118] and identity theft.[119]

The influence of Prenda and entities associated with it can be seen on the following two tables which list the top 20 plaintiffs in copyright suits against John Does. Table 1 lists the top 20 plaintiffs between 2001 and 2013 ranked according to the total number of John Doe defendants. Table 2 lists the top 20 plaintiffs between 2010 and 2013, ranked according to the number of suits filed.

---

[112] Claire Suddath, "*Prenda Law, the Porn Copyright Trolls*", BUSINESS WEEK, May 30, 2013 (available at http://www.businessweek.com/articles/2013-05-30/prenda-law-the-porn-copyright-trolls)

[113] Malibu Media, LLC, Doe, subscriber assigned IP address 184.58.186.212 and related cases (Case Nos. 13-C-536, 13-C-544, 13-C-779 (E.D. Wis. December 12, 2013); *Malibu Media, LLC v. Doe*, 2013 WL 5276081 (E.D. Wis. Sept. 17, 2013); *see also Malibu Media LLC v. Doe*, 2013 WL 4821911 (W.D. Wis. Sept. 10, 2013) (Judge Conley's Order imposing sanctions). MALIBU MEDIA, LLC v. MCSWEENEY et al, INSD (Motion for fees/costs against Malibu Media – Also 2 defaults v. 2 Does for $67.5K), 1:12-cv-00842; Malibu Media LLC v. Doe, ILND (80-Year Old Woman), 2:13-cv-00097

[114] Lightspeed Media Corp. v. Smith, CV 12-889-GPM, 2013 WL 6225093 (S.D. Ill. Nov. 27, 2013) ("the Court has no doubt that Duffy, Steele, and Hansmeier are closely associated and acted in concert to file and prosecute this frivolous lawsuit.") Ingenuity 13 LLC v. John Doe, 2:12-cv-8333-ODW JCX, 2013 WL 1898633 (C.D. Cal. May 6, 2013) (finding that "the Principals engaged in vexatious litigation designed to coerce settlement;" that the "Plaintiffs have demonstrated their willingness to deceive not just this Court, but other courts where they have appeared," and awarding sanctions against lawyers Steele, Hansmeier, Duffy and Gibbs, the Prenda Law and their clients AF Holdings and Ingenuity 13 based on the "Plaintiffs' brazen misconduct and relentless fraud.")

[115] Cyrus Farivar, *"Prenda seeded its own porn files via BitTorrent, new affidavit argues"* ARS TECHNICA (June 3, 2013).

[116] Mike Masnick, *"'Defendant' In Prenda Law Case Reveals He Agreed To Take A Dive"*, TECHDIRT. Retrieved April 11, 2013. (January 25, 2013).

[117] See Judge Wright's findings of fact in Ingenuity 13 LLC v. John Doe, 2:12-CV-8333-ODW JCX, 2013 WL 1898633 (C.D. Cal. May 6, 2013).

[118] *Id.*

[119] *Id.*

**Table 1: Top 20 Copyright John Doe Plaintiffs 2001–2013**
**By total number of defendants**

| Litigant | Cases Filed | Fewest defendants | Most defendants | Total defendants | Percentage of total |
|---|---|---|---|---|---|
| Patrick Collins, Inc | 224 | 1 | 3757 | 11460 | 12.2% |
| Third Degree Films | 56 | 1 | 3577 | 8288 | 8.8% |
| New Sensations, Inc | 17 | 1 | 1768 | 7502 | 8.0% |
| Braun | 9 | 1 | 7098 | 7106 | 7.6% |
| Digital Sin, Inc | 19 | 1 | 5698 | 6476 | 6.9% |
| Malibu Media, LLC | 1367 | 1 | 81 | 5938 | 6.3% |
| Discount Video Center, Inc | 3 | 1 | 5041 | 5071 | 5.4% |
| On The Cheap, LLC | 1 | 5011 | 5011 | 5011 | 5.3% |
| West Coast Productions | 24 | 1 | 2010 | 4761 | 5.1% |
| Diabolic Video Productions, Inc | 2 | 2099 | 2099 | 4198 | 4.5% |
| SBO Pictures | 13 | 1 | 3036 | 3637 | 3.9% |
| Zero Tolerance Entertainment | 6 | 1 | 2943 | 3128 | 3.3% |
| Openminded Solutions, Inc | 17 | 1 | 2925 | 2979 | 3.2% |
| Third World Media, LLC | 7 | 1 | 1568 | 2977 | 3.2% |
| Contra Piracy | 1 | 2919 | 2919 | 2919 | 3.1% |
| Hard Drive Productions, Inc | 57 | 1 | 1000 | 2853 | 3.0% |
| Media Products, Inc | 24 | 1 | 1257 | 2550 | 2.7% |
| Tcyk, LLC | 119 | 1 | 131 | 2528 | 2.7% |
| Combat Zone | 35 | 1 | 1037 | 2165 | 2.3% |
| Arista Records | 301 | 1 | 143 | 2123 | 2.3% |
| *Total* | *2302* | | | *93670* | *100%* |

\* Only Contra Piracy and Arista Records are not related to pornography. The 297 Arista Records suits were filed between 2004 and 2008.

The only Prenda-related entity listed on Table 1 is Hard Drive Productions, Inc.,[120] however Prenda-related entities claim 5 out of the top 20 positions on Table 2. It is important to note that the methodology of counting John Doe defendants is under-inclusive. Doe numbers were derived from the case captions them-selves—e.g. *"Digital Sin, Inc v. Does 1-208"* would be counted as 208 John Doe defendants, but *"Digital Sin, Inc v. Does"* or *"Digital Sin, Incorporated v. Unknown Parties"* would be counted as a single John Doe defendant.

---

[120] According to media reports, Hard Drive Productions stopped working with Prenda in late 2012. See, Claire Suddath, *"Prenda Law, the Porn Copyright Trolls"*, BUSINESS WEEK, May 30, 2013 (available at http://www.businessweek.com/articles/2013-05-30/prenda-law-the-porn-copyright-trolls)

**Table 2: Top 20 Copyright John Doe Plaintiffs 2010–2013**
**By number of suits filed**

| Litigant | Cases Filed |
|---|---|
| Malibu Media, LLC | 1367 |
| Patrick Collins, Inc | 224 |
| **AF Holdings, LLC*** | 138 |
| Tcyk, LLC | 119 |
| **Ingenuity 13, LLC*** | 66 |
| *Voltage Pictures*[†] | 64 |
| K-Beech, Inc | 62 |
| Quad International, Inc | 59 |
| **Hard Drive Productions, Inc*** | 57 |
| Third Degree Films | 56 |
| Killer Joe Nevada, LLC | 49 |
| *Breaking Glass Pictures*[†] | 41 |
| *John Wiley & Son*[†] | 40 |
| Combat Zone | 35 |
| *Bait Productions Pty Ltd*[†] | 34 |
| *Zambezia Film*[†] | 30 |
| **First Time Videos, LLC*** | 27 |
| West Coast Productions | 24 |
| Media Products, Inc | 24 |
| **Boy Racer, Inc*** | 21 |
| *Total* | *2537* |

*Entities associated with the Prenda Law Firm at some time.
[†] Not related to pornography

The significance of repeat players may also explain the uneven geographic distribution of MDMJ lawsuits.[121] Figure 5, below, shows the raw numbers for John Doe pornography and other John Doe copyright litigation, by district court. Measured by the number of John Doe defendants, the Northern District of Illinois is the clear leader in pornography related copyright trolling, whereas the District of Connecticut is the venue of choice for non-pornography trolling.

---

[121] The appearance of the same counsel and making virtually identical claims and using virtually identical filings has not gone unnoticed by the courts. See e.g. Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 155 (D. Mass. 2013).



Figure 5: John Doe Copyright Lawsuits 2010–2013
Selected Districts

The copyright troll-pornography nexus illustrates how a general system of incentives can lead to unintended results. Pornography may be no better and no worse than other genres, but it is uniquely well suited to exploit the litigation incentives of our current copyright system. Copyright is meant to establish market-based incentives for the production of creative works, however, for a particular breed of plaintiff, the litigation incentives established by permissive joinder and statutory damages are more attractive.

No doubt, some readers will be concerned that pornography giving copyright litigation a bad name, but the conduct of plaintiff's lawyers described in a number of copyright trolling cases might suggest the reverse: copyright litigation is sullying the reputation of pornography.

<p style="text-align:center">III.    REFORMS</p>

### A.    The Normative Foundations for Reform

Some question whether the system really works but that debate is entirely beyond the scope of this Article just as it is beyond the mandate of the judges who must apply the law.[122] For purposes of a rational discussion about copyright trolling, as opposed to a wholesale reappraisal of the copyright system, we should accept the central dogma of copyright that exclusive rights are an effective way to provide incentives for the creation and distribution of expressive works.[123] In less abstract terms this means, at the very least, accepting the premise that unauthorized file sharing is a civil wrong deserving of a remedy: there is no legal justification for someone who can pay a reasonable price for legitimate access to *Game of Thrones* to instead download it via BitTorrent.[124] In short, the problem with MDJD lawsuits is not that individual infringers face the risk of detection and sanction—an unenforceable copyright law would provide no incentives.

The primary problems with MDJD litigation relate to the fairness of the judicial process. MDJD suits allow accusations of infringement to be made based on a minimal investigation of the facts. Defendants in these cases are often subject to leverage that crosses the line into extortion, and effectively denied an opportunity to defend themselves. Once an ISP names an individual, the burden of proof is effectively reversed. This

---

[122] For a representative sample of the literature, see Shyamkrishna Balganesh, *Foreseeability and Copyright Incentives*, 122 HARV. L. REV. 1569 (2009); Lydia Pallas Loren, *The Pope's Copyright? Aligning Incentives with Reality by Using Creative Motivation to Shape Copyright Protection*, 69 LA. L. REV. 1 (2008); Diane Leenheer Zimmerman, *Copyrights as Incentives: Did We Just Imagine That?,* 12 THEORETICAL INQUIRIES L. 29 (2011).

[123] The utilitarian foundation of copyright can be traced back to its origins in England the 1710 Act "for the encouragement of learning, by vesting the copies of printed books in the authors or purchasers of such copies, during the times therein mentioned" or the Statute of Anne as it is now known. This purposive conception of Copyright is also clearly reflected in the U.S. Constitution which provides that "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., Art. I, Sect. 8, cl. 8. The Supreme Court has repeatedly observed that "the primary objective of copyright is not to reward the labor of authors, but to promote the Progress of Science and useful Arts." Feist v. Rural Telephone at 350 (quoting Art. I, § 8, cl. 8., citing *Twentieth Century Music Corp.* v. *Aiken,* 422 U. S. 151, 156 (1975)). The rights of authors are not the ends of the copyright system, but they are an important means by which those ends are achieved. As the Court observed in *Harper & Row* "By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." Harper & Row, Publishers, Inc. v. Nation Enterprises 471 U.S. 539, 558 (1985). See also Eldred v. Ashcroft, 537 US 186 (2003). See generally William M. Landes & Richard A. Posner, *An Economic Analysis of Copyright Law*, 18 J. LEGAL STUD. 325 (1989)

[124] Unauthorized file-sharing is not fair use. See Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005); A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir.2001); BMG Music v. Gonzalez, 430 F.3d 888, 890 (7th Cir.2005).

<p style="text-align:center">30</p>

reversal takes place because, unless the defendant has a lawyer willing to work on contingency, the cost of establishing his innocence vastly exceeds the settlement payoffs demanded by plaintiffs. Fee shifting is available for the successful defendant in copyright cases, but it is not guaranteed,[125] and it does not level the playing field. The innocent defendant must calculate the expected value of litigation versus settlement with reference to the small probability that the plaintiff will prevail. If the defendant prevails and is awarded attorney fees, his[126] profit is zero at best.[127] If the defendant loses, his combined liability for statutory damages and attorney fees could easily exceed $100,000. Even if the chance of this catastrophic loss is only 5%, the defendant's expected loss is $5,000. The potential for six-figure statutory damage awards compounds the problem of litigation costs by making the downside risk for a defendant who fails to establish his innocence untenable on most objective risk-reward calculations. For the innocent and guilty alike, the rational response to a letter of demand in these circumstances is to negotiate a settlement. In this context, the discovery orders that link IP addresses to personal individual information are little more than a judicially sanctioned hunting license.

Arguably, another problem with MDJD lawsuits is that they lower the cost of copyright enforcement too far. Although some enforcement is required for copyright's incentives to function, it is wrong to assume that more enforcement is always better. The idea that copyright should always be enforced equivalent to the suggestion that every trespass should lead to litigation. Like other forms of property, copyright is private right that creates the option of enforcement. We expect landholders and copyright owners alike to enforce their rights when the private benefits of doing so outweigh the private costs. Litigation invokes significant public resources and has potentially significant public costs. Attaching a positive cost to litigation through filing fees or other procedural mechanisms can act as an important screening mechanism that deters the marginal complaint and those with trivial claims. Filing fees and the like help allocate judicial resources to more valuable claims.

## B.    Reform Proposals

With these normative foundations in place, we can now consider some concrete reform proposals.

### 1. Reasonable Statutory damages

Copyright law's statutory damages framework leads to awards that are unreasonably high in contexts such as unauthorized file-sharing. In the standard

---

[125] 17 U.S.C. § 505 allows for attorney's fees to be awarded to the prevailing party at the court's discretion. The Supreme Court has held that prevailing plaintiffs and prevailing defendants must be treated alike under Section 505. Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994).

[126] Perhaps because of the close association between copyright trolling and pornography, the vast majority of defendants appear to be men.

[127] It is not truly zero, because the defendant must finance the litigation and the cost of money (whether interest or opportunity cost) is not part of the attorney fee calculation. If the defendant's lawyer works on contingency, the cost is truly zero.

BitTorrent case, statutory damages are likely to amount to tens of thousands of dollars, if not hundreds of thousands of dollars.[128] The threat of statutory damages makes resistance to even quite unreasonable plaintiff demands irrational from an economic perspective. At their current levels, statutory damages are a tool of coercion that can be wielded just as effectively against the innocent as the guilty.

Ideally, reform of statutory damages would come from Congress, but even if Congress continues to ignore the problems with statutory damages,[129] courts have a statutory and constitutional obligation to oversee them.[130] Courts should recognize that in the typical BitTorrent lawsuit, statutory damages are punitive: it is hard to see that damages which clearly exceed any plausible measure of compensation or restitution could be considered to be anything else.[131] The fact that statutory damages are punitive does not mean that there is no place for them. On the contrary, it is quite likely that punitive damages are necessary as a deterrent to illegal file-sharing. Like parking violations and cheating on taxes, the probability of an individual file-sharer being detected is low but the cumulative harm of widespread infringement may be significant.[132] Where the probability of detection is low, punitive statutory damages tilt the cost-benefit calculation of buying versus stealing back in the direction of legal acquisition. Where statutory damages exceed the amount required to compensate the plaintiff for the wrong suffered, they should be justified under some rational theory of deterrence and subject to the same constitutional constraints as other forms of punitive damages. Currently, neither is the case. For example, the district court in *UMG Recordings, Inc. v. MP3.com, Inc.* awarded $53 million in statutory damages and attorney fees against a technology startup

---

[128] Capitol Records v. Thomas-Rasset 579 F. Supp. 2d 1210, 1213, 1227 (D. Minn. 2008); Sony BMG Music Entertainment v. Tenenbaum 593 F. Supp. 2d 319 (D. Mass. 2009).

[129] Canada recently amended its copyright law to reduce the range of statutory damages to a maximum of $5000 for non-commercial infringement. Copyright Modernization Act 2012 §38.1(1)(b). The current administration is clearly in favor of statutory damages in copyright law. The United States both encourages and mandates the adoption of statutory damage rules in copyright law through bilateral and regional trade agreements and through the Special 301 review process. See, Pamela Samuelson et al, *Statutory Damages: A Rarity in Copyright Laws Internationally, But for How Long?* 60 J. COPYRIGHT SOC'Y U.S.A. (2013).

[130] Section 504 expressly states within the applicable range, the award of statutory damages should be "as the court considers just". 17 U.S.C § 504. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.")

[131] Tellingly, § 504(c) of the 1976 Act omits the part of its 1909 Act predecessor that provided that statutory damages are not intended as a penalty. Compare § 504(c) 1976 and § 101(b) 1909.

[132] There is an extensive literature that attempts to establish and quantify the effect of file sharing. Proving causality and estimating the size of any effect is extremely difficult because although music sales declined sharply after Napster emerged in 1999, this decline was at least partially attributable to the end of the CD replacement cycle, a sustained economic downturn in much of the Western world, and the increased competition for entertainment spending attributable to the Internet and the games. See generally, Stan J. Liebowitz, *File Sharing: Creative Destruction or Just Plain Destruction?*, 49 J.L. & ECON. 1, 15-16 (2006); Alejandro Zentner, *Measuring the Effect of File Sharing on Music Purchases*, 49 J.L & ECON. 63, 65-66 (2006). But see, Felix Oberholzer-Gee & Koleman Strumpf, *The Effect of File Sharing on Record Sales: An Empirical Analysis*, 115 J. POL. ECON. 1, 3 (2007) (finding no causality between declining music sales and peer-to-peer file-sharing).

that based its music streaming service on an aggressive (and ultimately flawed) reading of the fair use doctrine.[133] Rational deterrence theory suggests that where the probability of detection is low, damages must be higher in order to reduce the expected gains from law-breaking.[134] However, the probability that MP3.com would be detected was 100%, as its operation was no secret and was bound to attract the attention of the record industry. The damages/profits accrued by the time case went to trial were not substantial. Given the large number of copyrights infringed in that case, even the minimum statutory damages award plus attorney fees would have provided substantial deterrence and yet the trial judge saw fit to award damages well in excess of the statutory minimum.[135] Cases like *MP3.com* and *Capitol Records v. Thomas-Rasset* are also difficult to reconcile with the U.S. Supreme Court's guidance that "few awards [of punitive damages] exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." [136] Copyright scholars have addressed the possible unconstitutionality of statutory damages; courts have not yet seen fit to apply the constitutional standards of tort litigation to copyright law.[137]

The imposition of statutory damages should take into account the need for deterrence, but the courts must recognize that the level of damages justified by deterrence has logical and constitutional limits. The fact that statutory damages for file-sharing can exceed the financial penalty for kidnapping violates the principle of marginal deterrence as well as common decency.[138] Copyright owners should not be indifferent to public perceptions of the fairness of copyright penalties. Without completely discounting the effect of deterrence, the weight of evidence in sociology and behavioral psychology suggests that compliance with the law is much more normative than instrumental.[139] Tom

---

[133] UMG Recordings, Inc., et al v. MP3.com, Inc., Docket No. 1:00-cv-00472 (S.D.N.Y. Jan 21, 2000) Nov. 14 2000 (Final Judgment and Order Nov. 14, 2000).

[134] Gary Becker, *Crime and Punishment: An Economic Approach,* in ESSAYS IN THE ECONOMICS OF CRIME AND PUNISHMENT 1, 24–34 (Gary S. Becker & William M. Landes, eds., 1974)

[135] UMG Recordings, Inc., et al v. MP3.com, Inc., Docket No. 1:00-cv-00472 (S.D.N.Y. Jan 21, 2000) Nov. 14 2000 (Final Judgment and Order Nov. 14, 2000)

[136] State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003). The Court also noted that "four times the amount of compensatory damages might be close to the line of constitutional impropriety." Id., citing Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991), and BMW of North America, Inc. v. Gore, 517 U.S. 559, 581 (1996).

[137] See, e.g., Sony BMG Music Entertainment v. Tenenbaum, 719 F.3d 67, 70–72 (1st Cir. 2013) (an award of $675,000 for infringement of thirty songs did not offend due process); Zomba Enterprises, Inc. v. Panorama Records, Inc., 491 F.3d 574, 586–88 (6th Cir. 2007) (rejecting Due Process Clause challenges and upholding a statutory damage award of $806,000, representing a 44:1 ratio of statutory to actual damages), cert. denied, 553 U.S. 1032 (2008); Capitol Records, Inc. v. Thomas-Rasset, 692 F.3d 899, 907–10 (8th Cir. 2012) (upholding an award of $222,000 in statutory damages for infringement of twenty-four songs), cert. denied, 133 S. Ct. 1584 (2013); Lowry's Reports, Inc. v. Legg Mason, Inc., 302 F. Supp. 2d 455, 459–60 (D. Md. 2004) (rejecting a due process challenge to a $19 million jury verdict for copyright infringement where the defendant argued that actual harm was limited to $59,000).

[138] The United States Sentencing Guidelines §5E1.2 establishes a fine range of $17,000 to $175,000 for crimes at a base offense level from 23-24, such as kidnapping. See U.S.S.G. §2A4.1. and  § 5E1.2

[139] See generally TOM R. TYLER, WHY PEOPLE OBEY THE LAW (1990).

Tyler's canonical research found that obedience to the law is largely a function of the perception that the law is legitimate, and that legitimacy in turn is significantly influenced by perceptions of fairness.[140] Persuading ordinary consumers who would pay for creative content in a world without illegal file-sharing to continue to do so in spite of the existence of BitTorrent means appealing to their sense of fairness as well as their fear of sanctions. Unreasonable and arbitrary sanctions undermine the normative case for copyright compliance. Copyright owners who want to reinforce their normative appeals with deterrence would do far better to increase the perceived probability of detection than to pursue million-dollar verdicts in sporadic show trials.[141]To the extent that high levels of statutory damages are justified under a theory of rational deterrence, they must still comply with the constitutional limits of the Due Process clause. In *BMW of North America, Inc. v. Gore,* the U.S. Supreme Court indicated that punitive damages are likely to violate the constitutional guarantee of Due Process if they exceed compensatory damages by a ratio of more than 10 to 1.[142] In the subsequent case of *State Farm Mutual Automobile Ins. Co. v. Campbell,* the Court noted that "four times the amount of compensatory damages might be close to the line of constitutional impropriety."[143] It is not clear that the Court's guidance should extend to every context,[144] but it does suggest that even in the absence of legislative reform, district court judges have a duty to ensure that statutory damages do not exceed the proportionality constraints of the Due Process clause. In addition to the general duty to uphold the Constitution, the Copyright Act clearly states that any award should an amount that the court "considers just."[145]

The range of statutory damages available in ordinary file-sharing cases should be reduced by Congress or circumscribed by the courts. Obviously, selecting any particular number may appear arbitrary, but we can at least move toward a rational basis for statutory damages by comparing file sharing to other violations of the law that may easily go undetected. My specific proposal is that the constitutionally plausible range of statutory damages for a first-time defendant found liable for illegal file-sharing should be between $250 and $3000. The lower boundary is equivalent to the fine for parking in a handicapped space.[146] The upper boundary is in the ballpark of fines imposed for driving under the influence.[147] According to the Centers for Disease Control, almost 30 people in

---

[140] *Id.* at 25.

[141] Capitol Records v. Thomas-Rasset 579 F. Supp. 2d 1210, 1213, 1227 (D. Minn. 2008); Sony BMG Music Entertainment v. Tenenbaum 593 F. Supp. 2d 319 (D. Mass. 2009).

[142] State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408 (2003).

[143] *Id.* (citing Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991), and BMW of North America, Inc. v. Gore, 517 U.S. 559, 581 (1996).)

[144] Mathias v. Accor Economy Lodging, Inc., 347 F. 3d 672 (7th Cir. 2003).

[145] 17 U.S.C. § 504(c) (2006).

[146] Vehicles parked in a space reserved for persons with disabilities without properly displaying disability license plates and/or a parking placard may be fined a minimum of $250. 625 ILCS 5/11-1301.3.

[147] In lieu of more systematic data a recent example: a Chicago local television news reporter pled guilty in February 2014 to driving under the influence and was ordered to pay a $1,700 fine with one year's supervision. Prosecutors dropped other charges, including battery, leaving the scene of an accident and child endangerment. The reporter's drink-driving was detected after a minor traffic accident a Taco Bell

the United States die in motor vehicle crashes that involve an alcohol-impaired driver every day and the annual cost of alcohol-related crashes totals more than $51 billion.[148] There are no reported incidents of death by file-sharing. This range should not be exceeded even for multiple acts of infringement unless the plaintiff can establish that damages beyond the range are necessary for either compensation or deterrence.[149]

Limiting the range of statutory damages available in Internet file-sharing cases would not significantly detract from general deterrence campaigns like those of the RIAA.[150] The prospect of nontrivial sanctions combined with an award of attorney's fees should still provide a powerful incentive for accused infringers who are in fact liable to admit their wrongdoing and settle quickly. However, the amounts at stake are not so great that no reasonable person could ever be expected to defend themselves against an erroneous accusation.

Reforming statutory damages would allow copyright owners to continue to use litigation to deter infringement and to steer consumers toward the legitimate market, but it would make litigation as an independent revenue stream less attractive. This is not just an economic reform; it may also be necessary to protect the integrity of the judicial system. Currently, the prospect of high statutory damages unrelated to any assessment of harm sounds like easy money. There may be plaintiffs and lawyers pursuing in MDJD lawsuits as a revenue stream who are fine upstanding people, but there is substantial evidence that the lure of easy money in the form of statutory damages has attracted those with dubious ethics and a propensity for cutting corners.[151] In the context of MDJD suits, the threat of massive statutory damages gives plaintiffs and their attorneys enormous leverage with no accountability. By divorcing statutory damages from either compensation or deterrence, modern copyright law has extended an invitation to blackmail and abuse of process that has been eagerly accepted. That invitation should be revoked.

### 2.    Denying Joinder, Severing Cases

A second option for reform is to simply deny joinder (sever cases) as indeed many courts have done.[152] In practical terms, denying joinder increases the plaintiff's cost of

---

parking lot. Clifford Ward *"TV reporter pleads guilty in DUI case,"* CHICAGO TRIBUNE, February 5, 2014, Pg. 7

[148] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Injury Prevention & Control: Motor Vehicle Safety*, April 17, 2013 (available at http://www.cdc.gov/motorvehiclesafety/impaired_driving/impaired-drv_factsheet.html.

[149] Samuelson & Wheatland, *supra* note 40 at 509-10 (recommending that courts should also have the power to lower statutory damages when the award would be grossly disproportionate to the harm caused).

[150] See supra notes 25 to 26 and accompanying text.

[151] See *supra* note 99. See also Righthaven LLC v. Democratic Underground, LLC, 791 F. Supp. 2d 968, 979 (D. Nev. 2011) (Righthaven ordered to show cause why it should not be sanctioned for making "flagrant misrepresentation[s]" to the Court).

[152] See *supra* note 65 for examples of cases concluding joinder is impermissible or inappropriate.

enforcement: it adds a $350 filing fee to the cost of proceeding against each defendant and it demands substantially more court time from the plaintiff's lawyers. Forcing disfavored plaintiffs to endure greater expense merely because the court doubts the social value of the underlying copyrighted work would be an abuse of discretion.[153] But refusing to allow plaintiffs to circumvent filing fees is legitimate because filing fees act "as a threshold barrier, albeit a modest one, against the filing of frivolous or otherwise meritless lawsuits."[154] Requiring individual filings, and thus filing fees, in BitTorrent infringement cases would destroy the financial appeal of litigation as a revenue source, but it would still leave the courthouse door open for litigation aimed at general deterrence or example setting. If allowing joinder makes abusive litigation tactics more likely, a court should use the discretion it has been given to take steps to curb such abuse. Disallowing joinder in MDJD cases would go a long way towards ensuring that litigation is used to protect the plaintiff's copyrights and not simply to monetize infringement.[155]



Figure 6 Individual Doe Defendants in John Doe Copyright Cases 2001 – 2013

---

[153] Bleistein v. Donaldson Lithographing Company, 188 U.S. 239 (1903) (It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.)

[154] Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 166 (D. Mass. 2013) (quoting In re Diet Drugs, 325 F. Supp. 2d 540, 541 (E.D. Pa. 2004)).

[155] Patrick Collins, Inc. v. Does 1-38, 941 F. Supp. 2d 153, 166 (D. Mass. 2013) ("Furthermore, it will help to ensure that Patrick Collins is pursuing the Doe defendants for the purpose of protecting its intellectual property and not simply to coerce early settlements without any intention of litigating its claims to completion.")

Although up until now many courts have been willing to allow plaintiffs to join thousands of defendants in a single action, the data examined in this study shows signs of increasing judicial resistance. Figure 6, above, shows a conservative estimate of the number of Doe defendants in these cases.[156] As shown in Figure 6, the number of individual defendants peaked in 2010 and is been declining since. It is also apparent that although pornography related suits have accounted for an increased number of filings over the past four years, the raw numbers of John Doe defendants in pornography related suits has been declining since 2011. Although the data does not definitively establish as much, it does reinforce the observation that plaintiffs are reducing the number of defendants in each MDJD suit so as to make joinder seem more palatable and that this is in response to mounting judicial skepticism.[157]

The opportunism associated with the current wave of MDJD suits is by no means confined to this format. Lawyers working in this area have reported that some plaintiffs have now abandoned the MDJD form for BitTorrent litigation and are now suing individual IP addresses and demanding significantly higher settlement amounts. Malibu Media, for example, now appears to filing suits against single IP addresses and demanding higher settlement amounts to compensate for its increased costs. Malibu Media has filed 197 such cases, 143 in 2013 alone. Lawyers working in this area report that Malibu Media's current settlements in the range of $4000 to $8000 for cases filed against individuals.

Figure 7 illustrates the average number of John Doe defendants per the suit filed on a year-by-year basis. The individual bowls in Figure 7 are scaled to reflect the total number of John Doe defendants in a given year. As illustrated, 2010 saw an extraordinary number of defendants, 41,025 to be exact, targeted in a mere 91 suits. In the following year 43,632 defendants were targeted, but these John Does were spread out over 435 individual suits. The total number of John Doe defendants fell in 2012 and again in 2013 to 30,666 and 22,239 respectively even as the number of lawsuits filed increased from 1211 to 1640. Thus although the average number of defendants per suit has decreased precipitously since 2010 this is been somewhat offset by a steady increase in filings. We should not expect this litigation environment to remain static. The broad trends revealed in the data are consistent with anecdotal observations that the serial litigators in this area have been adapting their tactics so that they are less dependent on permissive joinder.

---

[156] As noted previously, the methodology of counting John Doe defendants relies on the case captions them-selves; it is likely to be under-inclusive. See *supra* note 120 and accompanying text.

[157] Note that the number of Doe defendants in each case is calculated based on the case title. This data will be supplemented with additional research into cases titled "Copyright Owner v. Does" in the near future. As a result the numbers reported herein will increase.



**Figure 7 Average Number of Doe Defendants per Suit 2001 – 2013**

One explanation of the decline in John Does per suit relates to personal jurisdiction. Rule 12(b)(2) permits dismissal of a claim based on lack of personal jurisdiction.[158] Personal jurisdiction can be established by either residency, minimum contacts or purposeful availment under most applicable state laws.[159] Defendants are in something of a Catch 22. They do not wish to be named individually, but until they are so named, a number of courts will not grant a motion to dismiss for lack of personal jurisdiction.[160] Nonetheless, as courts have grown more skeptical of the propriety of these

---

[158] Fed. R. Civ. P. 12(b)(2).

[159] World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (Due Process requires the plaintiff to show that the defendant has "minimum contacts" with the forum, thereby ensuring that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.")

[160] See e.g., First Time Videos, LLC v. Does 1-500, 276 F.R.D. 241, 251 (N.D. Ill. 2011) ("Defendants cannot be dismissed under Federal Rule of Civil Procedure 12(b)(2) from a lawsuit to which they are not yet parties."); see also Malibu Media, LLC v. Does 1-6, 291 F.R.D. 191, 206 (N.D. Ill. 2013); First Time Videos, LLC v. Does 1-76, 276 F.R.D. 254, 259 (N.D. Ill. 2011); MGCIP v. Does 1-316, No. 10 C 6677, 2011 WL 2292958, at *2 (N.D. Ill. June 9, 2011). See, e.g., London-Sire Records, Inc. v. Doe 1, 542 F.Supp.2d 153, 180-181 (D.Mass.2008) ("premature to adjudicate personal jurisdiction" and permitting plaintiff to engage in jurisdictional discovery); Sony Music Entm't, Inc. v. Does 1-40, 326 F.Supp.2d 556, 567 (S.D.N.Y.2004) (evaluating personal jurisdiction premature without defendants' identifying information). But see DigiProtect USA Corp. v. Does 1-240, No. 10 Civ. 8760(PAC), 2011 WL 4444666, at *3 n. 3 (S.D.N.Y. Sept. 26, 2011) (dismissing complaint because of insufficient allegations of personal jurisdiction but noting that allegations were also insufficient to satisfy joinder requirements)

MDJD suits, plaintiffs have had to work harder to establish a credible basis for pleading personal jurisdiction.

Severing cases would obviously be inefficient if it required multiple judges to adjudicate the same issues, over and over again, for the exact same plaintiffs. However, there is no reason why cases could not be severed and then consolidated. The basis of consolidation could be (i) the plaintiff, (ii) the plaintiff law firm or even (ii) the plaintiffs' technical experts who log the IP addresses to begin with. Consolidation could be for limited purposes including assessing the validity and ownership of the copyrights at issue; determining the reliability of plaintiff's proffered expert; entertaining affirmative defenses that are potentially applicable in all cases. The 'it wasn't me' defenses should then proceed on an unconsolidated basis.

### 3. Conditional Joinder and Other Safeguards

Severing John Doe defendants and forcing the plaintiff to proceed on an individual basis is not the only possible solution. District court judges have inherent power to supervise litigation and substantial discretion in matters relating to both joinder and discovery. Even in the absence of legislative reform of statutory damages, district courts could use their considerable powers to impose safeguards on the discovery process and constrain the potential for abuse. Specifically:

(i) Joinder in MDJD actions should be subject to an undertaking by the plaintiff not to seek and not to threaten to seek statutory damages above a specified amount. For the reasons stated in the previous section, that range, at least for a first-time defendant, should be between $250 and $3000.[161]

(ii) In addition, the court could appoint an independent attorney to supervise the discovery process and ensure that the names and addresses of individuals are not given over to the plaintiff until the initial round of "it wasn't me defenses" have been raised and investigated. This should bring to light any systematic errors by ISPs (or by the plaintiff) in identifying IP addresses or matching IP addresses to subscribers.

(iii) In the same vein, the court could provide defendants with the option of an express mini-trial on their "it wasn't me" defenses.

(iv) The court could grant defendants leave to proceed anonymously in order to protect their privacy, at least until liability has been definitively established.[162]

---

[161] Supra note 146 to 149 and accompanying text.

[162] TCYK, LLC v. Does, 2013 U.S. Dist. LEXIS 177765 ("Numerous courts have deemed it prudent to allow defendants to proceed by pseudonym during preliminary stages of copyright infringement proceedings, even when, as here, the material downloaded is innocuous, given the 'substantial possibility that the names turned over by ISPs will not accurately identify the individuals who actually downloaded or shared the copyrighted material.'" citing TCYK, LLC v. Does 1-87, 2013 U.S. Dist. LEXIS 95817, 2013 WL 3465186, at *4.)

These reforms and similar safeguards could reduce the threat of abusive litigation tactics while retaining the initial efficiency of the MDJD format.

## IV.    CONCLUSION

Although the problem of patent trolls has drawn more attention, we are currently witnessing an explosion of copyright trolling in U.S. federal district courts. The data in this Article shows that copyright trolling in the form of MDJD lawsuits has grown rapidly over the last decade and that much of the growth has taken place in the last four years. The data also shows that MDJD litigation is dominated by claims of infringement relating to pornographic films. As well as highlighting these particular trends and their implications, the results of this study have significant implications for the wider troll debate. What little attention has been paid to copyright trolls has largely focused on Righthaven and similar examples — this Article shows that these previous studies have missed the core of the copyright troll phenomenon.[163]

The opportunism of copyright trolls is primarily directed towards statutory damages. As the Righthaven example shows, statutory damages can make the pursuit of otherwise inconsequential infringements extremely profitable, more profitable than licensing those uses in advance could ever have been. As the MDJD cases show, statutory damages stack the deck in favor of the plaintiff such that the underlying liability of the defendant is effectively irrelevant to the settlement calculation.

---

[163] Shyamkrishna Balganesh, *The Uneasy Case Against Copyright Trolls*, 86 S. CAL. L. REV. 723 (2013). See also, Brad A. Greenberg, *Copyright Trolls And Presumptively Fair Uses*, 85 U. COLO. L. REV. 53 (2014) (focusing on the application of fair use where copyright trolls attempt to exploit previously tolerated uses); Shyamkrishna Balganesh, *Copyright Infringement Markets*, 113 COLUM. L. REV. 2277 (2013) (arguing that an independent market for copyright claims could be beneficial).

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the document entitled:

**Motion to Dismiss; Motion to Quash or Modify Subpoena**

was served upon the parties listed below on the date indicated,

☐    by handing it to the person;

☐    by leaving it at the leaving it at the person's office with a clerk or other person in charge or, if no one is in charge, in a conspicuous place in the office; or if the person has no office or the office is closed, at the person's dwelling or usual place of abode with someone of suitable age and discretion who resides there;

☒    by mailing it to the address indicated;

☐    by leaving it with the court clerk;

☐    by electronic filing notification (PACER); or

☐    other:  by electronic mail to crowell@kite.com

Carl D. Crowell, Esq.
Crowell Law
943 Liberty Street S.E.
P.O. Box 923
Salem, Oregon  97308-0923
Attorney for Plaintiff VOLTAGE PICTURES, LLC

_____        _____
        Date                              David H. Madden
                                          OSB #080396

Mersenne Law LLP
9600 S.W. Oak Street, Suite 500 / Tigard, Oregon 97221 US
info@mersenne.com.........................(503)679-1671